1  Rachel M. Baird (admitted *pro hac vice*)
2  8 Church Street, Suite 3B
   Torrington, CT 06790-5247
   Tel: (860) 626-9991
3  Fax: (860) 626-9992
   Email: rbaird@rachelbairdlaw.com
4  Attorney for Plaintiff

5  Richard A. Williams (#128832)
   402 West Broadway, Suite 800
6  San Diego, CA 92101-8506
   Tel: (619) 615-5336
7  Fax: (858) 815-6589
   Email: sdrich7777@aol.com
8  Attorney for Plaintiff

9

                    **UNITED STATES DISTRICT COURT**

10

                    **SOUTHERN DISTRICT OF CALIFORNIA**

11

12  AMERICAN NEWS AND                    CASE NO. 12-CV-2186-BEN (KSC)
    INFORMATION SERVICES, INC.[1]
13  and JAMES C. PLAYFORD,               **THIRD AMENDED**
                                         **COMPLAINT**
14                        Plaintiff,

15      vs.

16
    WILLIAM D. GORE, individually and    **DEMAND FOR TRIAL BY**
17  in his official capacity as San Diego  **JURY**
    County Sheriff, JAN CALDWELL,
18  individually and in her official capacity
    as San Diego County Sheriff's
19  Department Public Affairs Director,
    JESSE ALLENSWORTH, San Diego
20  County Sheriff's Department Deputy,
    individually, JAMES BRENEMAN, San
21  Diego County Sheriff's Department
    Deputy, individually, MICHAEL
22  PROCTOR, San Diego County Sheriff's
    Department Deputy, individually,
23

24                        Defendants.

25

26

27  ───────────────────
    [1] Claims brought by American News and Information Services, Inc., the first-named Plaintiff, were
28  dismissed by the Court in a September 18, 2014, Order. [doc. #63]

                              - 1 -

**NOW COMES** Plaintiff James C. Playford ("Playford"), by and through undersigned Counsel, and alleges against the Defendants as follows:

## NATURE OF THE CASE

1.     This is a civil rights action challenging the policies, customs, and practices of the San Diego County Sheriff's Department ("SDCSD") that obstruct rights guaranteed under the First, Fourth, and Fourteenth Amendments of the United States Constitution.

2.     Specifically, the San Diego County Sheriff's Department, San Diego County Sheriff William D. Gore, and San Diego County Sheriff's Department Public Information Officer Jan Caldwell, ("SD Defendants") have obstructed and continue to obstruct Playford from gathering, recording, and distributing information of public interest:

a.  By implementing policies, customs, and practices that resulted in the retaliatory arrests and prosecutions of Playford for obstructing a peace officer when Playford as a duly authorized representative of American News and Information Services, Inc. ("American News") lawfully engaged in the protected activity of videotaping police officers in public on or about February 28, 2010, March 9, 2010, and December 1, 2011, and attempted to access an accident scene on May 25, 2012, open to other members of the media.

b.  By implementing and condoning retaliatory policies, customs, and practices leading to the seizure of audio-visual equipment and work product properly belonging to American News from Playford on or about December 1, 2011, and May 25, 2012, while Playford as a duly authorized representative of American News lawfully engaged in the protected activity of gathering and

- 2 -

12cv2186

recording information about the San Diego County Sheriff's Department's responses to matters of public interest in San Diego County; and

        c.  By excluding Playford, a duly authorized representative of American News, from a news conference called by San Diego County District Attorney Bonnie M. Dumanis on or about January 4, 2012, and attended by media with government-issued media credentials.

        3.    The SD Defendants' animus toward Playford and the First Amendment is express and apparent in an agreement condoned by the SD County Sheriff which permits:

        a.  The San Diego Police Department (SDPD) exclusive authority in San Diego County to issue "recognized press credentials";

        b.  Law enforcement officers within the jurisdiction of San Diego County and its municipalities explicit direction and excessive discretion to prevent lawful access to and recording of public safety activities in public areas;

        c.  Law enforcement officers within the jurisdiction of San Diego County and its municipalities to engage in official duties without adequate training or direction in the First Amendment prohibition against infringement of the press;

        d.  Law enforcement officers within the jurisdiction of San Diego County and its municipalities to act under color of state law with retaliatory animus against individuals exercising rights guaranteed under the First and Fourteenth Amendments without concern for sanction from their superiors;

        e.  Law enforcement officers within the jurisdiction of San Diego County and its municipalities to target Playford for retaliatory arrest and prosecution by publishing and distributing one or more photographs and a physical description of Playford to identify him as an individual prohibited from lawful

access to and recording of public safety activity within the entirety of San Diego County as a duly authorized representative of American News; and

      f.   Law enforcement officers within the jurisdiction of San Diego County and its municipalities to censor and exert prior restraint upon Playford and other individuals from lawful access to and recording of public safety activity within the entirety of San Diego County by attaching the threat of retaliatory arrest and prosecution to such lawful activity.

      4.     Playford's refusal to allow his First Amendment activities to be chilled prior to February 23, 2010, and his refusal to chill his First Amendment activities as a duly authorized representative of American News thereafter led to four separate arrests and prosecutions; seizure of his personally-owned camera during one of the events; seizure of American News' camera from Playford in two of the events; a warrantless search and seizure of  American News' work product contained in the camera in at least one of the events; and, indicative of a government hostile to rights guaranteed under the First Amendment, exclusion from a public news conference on public property called by San Diego County District Attorney Bonnie Dumanis.

      5.     A jury of twelve, after hearing evidence on Playford's May 25, 2012, arrest and considering a copy of California Penal Code § 409.5 which was included in  the evidence and submitted to the jury at the commencement of deliberations, acquitted Playford of any criminal violation in a unanimous verdict of "not guilty" announced on September 11, 2013.

## PARTIES

      6.     Plaintiff James C. Playford ("Playford") is a resident of Ramona, California.

- 4 -

12cv2186

7.     Playford is a member of the NPPA since March 25, 2012, an agent of American News in the business of news and information gathering and recording since February 23, 2010, and a freelance photojournalist and videographer.

8.     American News is a news and information company incorporated in the State of Connecticut and owned by Edward A. Peruta that operates throughout the United States, and which gathers and provides raw, breaking news video, photographs, and news tips to various mainstream media outlets.

9.     Edward A. Peruta ("Peruta") is a resident of Rocky Hill, Connecticut and San Diego, California.

10.    Peruta is a member of the National Press Photographers Association (NPPA) since March 25, 2012, and the founder and sole stockholder of American News. NPPA is a nonprofit organization dedicated to the advancement of photojournalism in its creation, editing and distribution. Its almost 7,000 members include television and still photographers, editors, students and representatives of businesses that serve the photojournalism industry.  Since its founding in 1946, the NPPA has vigorously promoted freedom of the press in all its forms, especially as that freedom relates to photojournalism.

11.    In the February 1990 edition of the NPPA magazine, *News Photographer*, Peruta appeared on the cover with his camera, American News credentials, and media cap for the inside story, "TV Freelancer Ed Peruta fights State Cops and Wins."

12.    Defendant William Gore is the Sheriff of San Diego County.

13.    Gore, in his capacity as San Diego County Sheriff, is responsible for planning, administering, executing, and enforcing the laws, customs and practices

12cv2186

that Plaintiffs challenge and at all times relevant to the allegations in the Complaint enforced these challenged laws, customs, and practices to the Plaintiffs' detriment.

14.     Gore is sued in his individual capacity and in his official capacity as Sheriff.

15.     Defendant San Diego County ("SD County") is a municipal entity organized under the Constitution and laws of the State of California.

16.     Defendant Jan Caldwell ("Caldwell"), in her capacity as the San Diego County Sheriff's Department Public Affairs Director, supervises the Public Affairs/Media Relations Office for the stated purpose of interacting "daily with television, radio and print media to ensure the most up to date and reliable information is released to the public." The Public Affairs/Media Relations Office expressly grants "credentialed media" superior access to "the most up to date and reliable information." *See* http://www.sdsheriff.net/newsroom/index.html (as of June 27, 2012) and provides for "after hours" access to "credentialed media on deadline" (as of April 15, 2013).

17.     Caldwell is sued in her individual capacity and in her official capacity as the San Diego County Sheriff's Department Public Affairs Director.

18.     Defendants Jesse Allensworth, James Breneman, and Michael Proctor are sued in their individual capacities and are currently or were at the relevant times alleged in this Complaint each employed as a Deputy Sheriff by the San Diego County Sheriff's Department acting under the authority of the San Diego County Sheriff to Playford's detriment.

19.     At all times relevant to this complaint the Defendants acted under of color of state law.

**JURISDICTION  AND VENUE**

20.     This action is brought pursuant to the First, Fourth, and Fourteenth Amendments to the United States Constitution by and through 42 U.S.C. §§ 1983, 1988.

21.     This Court has subject matter jurisdiction over all federal claims by and through 28 U.S.C. §§ 1331, 1343(a)(3), and 28 U.S.C. § 2201.

**ALLEGATIONS OF FACT**

**A. James C. Playford**

22.     Playford commenced his career as a freelance photojournalist and videographer ("journalist") in 2007 recording wildfires near Ramona, California.

23.     He often is the first journalist to arrive at and record law enforcement, fire protection, and medical emergency responses to public safety incidents.

24.     Playford has provided and sold his work to CNN™, TMZ™, TruTV™, MSNBC™, and a variety of local news outlets and his work product is available on the Internet.

25.     Playford's and American News' You Tube™ Channel *NewsNowSanDiego*  has more than 5,900 subscribers and in excess of 2 million hits.

26.     Soon after he began his work as a journalist in 2007, Playford applied for and was granted SDPD press credentials.

27.     Playford enjoyed a positive rapport with law enforcement developed over a period of years:

              a.  In 2003, Len Yurkus, a twenty-two year veteran of the SD County Sheriff's Department provided a written account of his first meeting with Playford at a restaurant when Playford approached him to donate to a fund-raiser for a

- 7 -

deputy's family killed in a motor vehicle accident. Yurkus observed that Playford had a pleasant demeanor, was professional in his trade as a painter, a non-drinker, and a hard-worker.

b.  In 2003, Robert Ruiz, a thirteen-year veteran of the SD County Sheriff's Department provided a written account of his numerous contacts with Playford and his observations of Playford as honest, respectful toward Ruiz and other law enforcement personnel, reputable, and not known to cause problems or break the law.

c.  In 2003, Craig S. Thetford, a former California Highway Patrol officer, wrote that he observed Playford in the three-years Thetford had known him helping motorists and on one occasion aided Thetford in stopping a large fight. Thetford described Playford as a valuable member of the Ramona community.

d.  In 2003, Donald Fowler, a twenty-five year veteran of the SD County Sheriff's Department, wrote that in contracting Playford to paint the Encinitas Patrol Station holding cells Playford was sensitive to the security needs of the job, hard-working, ethical, and a pleasure to do business with during the job.

e.  In 2003, Sharon Leslie, a sixteen-year veteran of the SD County Sheriff's Department, wrote that Playford had been extremely helpful as a witness in a grand theft larceny investigation and respectful, helpful, and friendly during the period she had known him.

28.    On July 25, 2008, Playford captured an audio-video recording ("recording") of SDCSD deputies beating Allen Baker outside of the drinking establishment Mollie Malone's in Ramona.

- 8 -

29.     Playford posted his recording of the Mollie Malone's incident on the Internet and was called by the defense as a key witness in the criminal prosecution of Allen Baker.

30.     SDCSD deputies harassed Playford and intimidated him not to testify for the defense in the criminal prosecution of Allen Baker.

31.     Playford and Baker filed a federal court action on June 2, 2009, against San Diego County Sheriff William Kolender.  *See Baker v. County of San Diego, et al.*, Docket No. 09cv1194-BEN (S.D. Cal.).

32.     The City warned Playford on August 24, 2009, that his media credentials were in danger of being revoked as information had been received from the SDCSD that Playford had "filed complaints and court actions against deputies in which there had been apparent questionable recollections and accounting of the facts."

33.     This August 24, 2009, warning letter from the City leveraging Playford's media credentials to control the content of his news gathering commenced a pattern and practice of retaliatory measures employed by the SD Defendants to manage Playford's access to information of public interest especially pertaining to law enforcement activities.

34.     The August 24, 2009, warning letter recites SDPD policy (DP 1.31) regarding media credentials, which states: "A media identification card may be revoked if the holder refuses to obey an order given by a peace officer at an incident under control by the Police Department or Fire Department, and thereby jeopardizes public safety and order or interferes with an investigation."

35.     The letter provides no explanation of a connection between the conduct attributed to Playford that resulted in the August 24, 2009, warning,

- 9 -

12cv2186

jeopardy to public safety caused by Playford, interference with an investigation, or any indication that the conduct in question occurred at the scene of an investigation.

36.    The August 24, 2009, warning letter from the SDPD explicitly states that "possessing a media credential issued by our agency is a privilege and not a right."

37.    Where members of the general public are present and have not been excluded the right of a duly authorized representative of any news service, newspaper, or radio or television station or network to record law enforcement activity of public interest on public property is a constitutionally protected First Amendment right regardless of media status as determined by the San Diego Police Department.

38.    Where members of the media possessing government-issued media credentials are present and have not been excluded the right of a duly authorized representative of any news service, newspaper, or radio or television station or network to record law enforcement activity of public interest on public property is a constitutionally protected First Amendment right regardless of media status as determined by the San Diego Police Department.

39.    Where state law creates a property interest protected by the Due Process Clause of the Fourteenth Amendment in allowing media greater access to law enforcement activities of public interest than to members of the general public the right of a duly authorized representative of any news service, newspaper, or radio or television station or network to record law enforcement activity of public interest on public property is a constitutionally protected First Amendment right regardless of media status as determined by the San Diego Police Department.

12cv2186

40.     In October 2009 Playford recorded sordid activities at a makeshift brothel comprised of individuals illegally or unlawfully in the United States which the SDPD vehemently denied existed in the City's McGonigle Canyon.

41.      Playford posted his recording on the Internet showing evidence of the makeshift brothel in McGonigle Canyon.

42.     The City notified Playford by letter dated January 11, 2010, that his application to renew his media credentials was denied because it was clear to the SDPD that Playford's pattern of behavior had not changed.

43.     The proximity in time between the Baker v. City of San Diego filing in June 2009 and the City's warning letter to Playford in August 2009 plausibly implies a retaliatory animus on the part of the City of San Diego based upon Playford's exercise of his First Amendment right to record matters of public concern.

44.     The proximity in time between the McGonigle Canyon controversy in October 2009 and the renewal denial of Playford's media credentials in January 2010 plausibly implies a retaliatory animus on the part of the City of San Diego based upon Playford's exercise of his First Amendment right to record matters of public concern.

45.     At an unknown date after January 1, 2009, and prior to May 25, 2012, the SDCSD disseminated a captioned photograph of Playford stating in substance: "Per Jan Caldwell J.C. Playford is not a member of the media."

46.     SDCSD Public Affairs Director Caldwell distributed or directed the distribution of a captioned photograph of Playford substantively captioned: "Per Jan Caldwell J.C. Playford is not a member of the media."

12cv2186

47. The captioned photograph of Playford distributed to SDCSD deputies and other law enforcement agencies in SD County furthered and condoned the pattern and practice of repeated confrontations, detentions, interrogations, and arrests of Playford arising from an intent to retaliate against Playford for exercising his First Amendment rights and imposed consequences for such exercise that would chill of person of ordinary firmness from future First Amendment activity.

48. At the criminal trial held in September 2013 on Playford's May 25, 2012, arrest, California Highway Patrol Officer Joseph Nielsen ("CHP Officer Nielsen") testified that SDCSD Deputy Allensworth told him prior to any contact that CHP Officer Nielsen had with Playford that Playford's credentials were not valid and that Playford was not legitimately part of the media.

49. According to CHP Officer Nielsen, these comments about Playford's media credentials caused CHP Officer Nielsen to believe that Playford's media credentials may not have been correct.

**B. American News and Playford**

50. American News is a news and information company registered with the Connecticut Secretary of the State on June 12, 1989, operating throughout the United States, which gathers and provides raw, breaking news video, photographs, and news tips to various mainstream media outlets.

51. Peruta is the sole stockholder and President of American News.

52. American News maintains business relationships with freelance videographers, photographers, and journalists throughout the United States and routinely produces, markets, and sells journalists' work product for distribution to the public through both well-recognized and less mainstream media outlets.

- 12 -

12cv2186

53. American News' business model depends upon establishing, fostering, and maintaining relationships with journalists able to consistently record video footage and images of breaking, newsworthy events.

54. On February 23, 2010, following the SDPD's January 11, 2010, renewal denial of his government-issued media credentials, Playford entered into a media gathering and distribution relationship with American News.

55. American News issued media credentials to Playford establishing Playford as a duly authorized representative of American News on February 23, 2010.

56. American News provided Playford with replacement high definition audio-video equipment to record video footage and images of newsworthy events for delivery to local, state, national media outlets.

57. Playford consistently responds to and procures news leads and provides breaking, marketable news content for San Diego County and other communities in the greater Southern California area for American News.

58. For example, on or about March 2, 2010, American News received credible and reliable information that the remains of Chelsea King, a missing San Diego County teenager, had been located on the South Shore of Lake Hodge in Rancho Bernardo Park located in the community of Rancho Bernardo.

59. The SDPD and SDCSD prohibited Peruta and Playford from entering public and private roads and property in a private subdivision south of Lake Hodge and Rancho Bernardo Community Park for the sole purpose of preventing the media from gathering information, photos, and video during the recovery of Chelsea King's remains.

12cv2186

60.     Residents of the private subdivision were not prohibited from entering or remaining in the subdivision which overlooked the recovery site and were warned by the SDPD and SDCSD not to allow the media entry to their property.

61.     The recovery scene did not present a menace to the public health or safety created by a calamity including a flood, storm, fire, earthquake, explosion, accident, or other disaster nor was there a riot or other civil disturbance, as enumerated in California Penal Code § 409.5 ("§ 409.5"), to warrant closing the area to members of the general public.

62.     The recovery scene did not include an emergency command post, as set forth in § 409.5(b), to warrant closing the area to members of the general public.

63.     But, even if the recovery area had presented a menace to the public health or safety created by a calamity including a flood, storm, fire, earthquake, explosion, accident, or other disaster or if there was a riot or other civil disturbance or an emergency command post established, none of these would have allowed the SDPD and SDCSD from "prevent[ing] a duly authorized representative of any news service, newspaper, or radio or television station or network from entering the areas closed pursuant to this section [§ 409.5]."

64.     Nor was the area cordoned-off by the SDPD and SDCSD as a crime scene.

65.     Following the recovery of Chelsea King's remains, on about March 6, 2010, American News received additional reliable and credible information supplied by Playford that the remains of Amber Dubois, a missing San Diego County teenager, had been located on a side-road approximately 2.7 miles north of State Road 76 on Pala Temecula Road.

12cv2186

66.    American News, in reliance upon the information supplied by Playford, responded to, and was the first news service to arrive at an area on Pala Temecula Road in San Diego County where two unmarked SDCSD vehicles were posted and parked to secure a gated road's entrance on the southbound side of Pala Temecula Road.

67.    American News personnel legally parked their vehicle on the southbound side of Pala Temecula Road in a spacious, cleared, gravel area well-removed from the traveled portion of the road and within the public-road right-of-way in a non-investigatory, non-crime scene area.

68.    American News personnel then approached two SDCSD deputies and identified themselves to the deputies as members of the media.

69.    The two SDCSD deputies reported by radio or cell phone to a supervisor that their location had been discovered by the media.

70.    A SDCSD supervisor ordered American News personnel to vacate the public roadside area on the southbound side of Pala Temecula Road.

71.    The two SDCSD deputies present and a SDCSD supervisor, who was summoned to the location, proceeded to create additional artificial barriers and close the public areas on both sides of Pala Temecula Road to isolate and prevent the media from viewing or recording vehicles entering and exiting the intersecting gated road leading to the remote area where the remains of Amber Dubois were located following the arrest of John Gardner.

72.    The SDCSD prohibited the media from entering the non-crime scene public and private roadside area on Pala Temecula Road for the sole purpose of establishing an artificial barrier to isolate and prevent the media from viewing and recording the activities surrounding the recovery of Amber Dubois's remains.

- 15 -

12cv2186

73.     By setting up and cordoning-off a perimeter far-removed from the recovery scene for the purpose of excluding media from access to the flow of personnel and traffic to and from the scene, the SDPD and SDCSD created a false crime-scene perimeter for the sole purpose of maintaining the secrecy which was in place by excluding Peruta, Playford, and American News from reporting details of a newsworthy event of public interest.

74.     In an April 16, 2010, news release, District Attorney Dumanis admitted to preventing news coverage and maintaining secrecy surrounding the discovery and recovery of Amber Dubois's remains "to protect the integrity of the case."

75.     The government-imposed secrecy surrounding the discovery and recovery of Amber Dubois's remains had no nexus to securing or preserving evidence or safeguarding law enforcement operations but was designed for the sole purpose of keeping information about the progress of the recovery from the media and the affected families.

**C. The Continuing Pattern of Retaliatory Seizures of Person and Property**

**1. The February 28, 2010, Ramona Incident and Subsequent Arrest**

76.     Playford, as a duly authorized representative of American News, parked his vehicle on public property approximately seventy-five yards from a public safety response scene in Ramona on February 28, 2010, approached, recorded, and documented as a newsworthy event the SDCSD response to a dispatch of an assault with a deadly weapon.

77.     SDCSD Deputy Jason Ward ("Deputy Ward") knew Playford as a videographer who responded to law enforcement activities of public interest and

reported that he "immediately recognized the subject from prior law enforcement contacts as James Playford."

78.    As Playford arrived and while Playford was recording, Deputy Seiver interviewed Matthew Deskovlck and a witness to the alleged assault, Sean Maginnis, in public on or near a public roadway between the deputies' parked cruisers along the west shoulder of the 200 block of Magnolia Avenue in Ramona.

79.    Playford, while on public property, videotaped Deputy Seiver, Deskovlck, and Maginnis from across the street and from the perimeter of the parked cruisers.

80.    Deputy Ward observed the nearest Playford came to Deputy Seiver, Deskovlck, and Maginnis was ten-to-fifteen-feet.

81.    The scene was not cordoned by law enforcement and no steps were implemented to prohibit or prevent access by members of the general public or media to the scene.

82.    Deputy Seiver did not ask or demand that Deskovlck and Maginnis submit to interviews in a non-public location such as the interior of the cruisers, a police station, private residence, or otherwise and the interviews commenced and proceeded in public.

83.    Neither Deputy Ward nor Deputy Seiver arrested Playford at the scene in Ramona on February 28, 2010, despite the speedy information implicit in their direct observation of the alleged unlawful conduct.

84.    Playford filed an Internal Affairs (IA) complaint against Deputy Seiver with the SDCSD reporting Deputy Seiver's conduct at the scene including running toward Playford and pushing Playford in the street that so exceeded the

- 17 -

nature of the alleged criminal conduct as to be motivated by a retaliatory animus in its excessiveness.

85.    After Playford filed the IA complaint against Deputy Seiver, Deputy Seiver drafted a report for submission to District Attorney Dumanis that resulted in Playford's arrest.

86.    District Attorney Dumanis, contrary to § 409.5(d) and knowing that Deputy Seiver had not charged Playford but for Playford's IA complaint against Deputy Seiver, did charge Playford, a duly authorized representative of American News who recorded law enforcement activities of interest to the general public in an area where the general public was not excluded, with obstructing and delaying a police officer in Ramona on February 28, 2010, in violation of California Penal Code § 148(a)(1).

87.    Playford's case remained pending in state superior court until March 30, 2011 when, upon its resolution and in accordance with California Penal Code § 945.3, the statute of  limitations for civil rights claims related to the February 28, 2010, arrest began to run against San Diego County, Gore, Caldwell, Seiver, the City of San Diego, Lansdowne, and Dumanis.

**2.    The March 9, 2010, Arrest and Seizure of Journalist's Camera/Raw Video**

88.    Playford, as a duly authorized representative of American News, positioned himself on property open to the general public, approximately fifty-feet from a public safety response scene in Ramona on March 9, 2010, to record an incident involving a woman Deputy Seiver describes in a report as homicidal and suicidal.

89.    Although Deputy Seiver had determined that the woman's homicidal threats and mental condition warranted taking her into custody for immediate

- 18 -

hospitalization, Deputy Seiver continued to interview the woman in an Albertson's food store parking lot with members of the general public parking, walking freely, entering and exiting the store with groceries, in and around the immediate area of the woman and Deputy Seiver's interview.

90.     Deputy Seiver recorded in his report that "several months ago Playford's media credentials were not renewed by the San Diego police department, that "[o]n several incidents Playford claimed to be a member of the media, but never could produce any credentials," and that Playford, "who is no longer a member of the media, went far beyond reasonable rights of the press or public to film in public.

91.     Deputy Seiver stated in his report that Playford is "usually confrontational and argumentative with any deputy who contacts him" but Deputy Seiver failed to add that the nature of the contacts initiated by the deputies was motivated by a retaliatory animus toward Playford and intended to stop Playford from exercising his First Amendment rights to gather information of public interest even though Deputy Seiver and other deputies were aware that Playford was a duly authorized representative of American News who at one-time held SDPD media credentials.

92.     Playford recorded Deputy Seiver and the woman in an area open to the public on public property without interfering in any manner with public safety response activity except to the extent that Deputy Seiver did not want the public incident to be videotaped by Playford.

93.     While placing Playford under arrest for delaying and obstructing a police officer, Deputy Seiver reported that Playford used passive and active resistance to avoid being handcuffed.

12cv2186

94.     Deputy Seiver seized a Sony HDV Handycam HDR-FX7 camera and its stored raw video footage from Playford at the arrest scene.

95.     Playford protested the seizure of his camera and raw video footage.

96.     A consolidated jury trial on two counts of obstructing a police officer arising from the February 28, 2010, and March 9, 2010, arrests resulted in a deadlocked jury in March 29, 2011.

97.     The trial judge offered Playford a plea bargain to a charge of disturbing the peace with one-year of probation and warned Playford that if he were convicted after a retrial he would be sentenced to over two-years in jail.

98.     Playford could not ignore the judge's warning, accepted the plea bargain, and pleaded guilty to disturbing the peace.

99.     The local paper reported on April 11, 2011, that regardless of how many times the sheriffs and the district attorney come after him, Playford remained adamant: "The dirty cops and prosecutors in San Diego think they are above the law. All they are doing is exposing the deep corruption in San Diego for the whole world to see."

100.   In accordance with California Penal Code § 945.3, when the consolidated cases of February 10, 2010, and March 9, 2010, were resolved in state superior 10, 2010, and March 9, 2010, arrests began to run against San Diego County, Gore, Caldwell, Seiver, the court in March 30, 2011, the statute of limitations for civil rights claims related to the February City of San Diego, Lansdowne, and Dumanis.

1

2

**3**. **The December 1, 2011, Arrest and Seizure of Journalist's Camera/ Raw Video**

3

4       101.    Playford, as a duly authorized representative of American News,

5   responded as a member of the media to the report of a bomb threat on December 1,

6   2011, at the offices of United States Congressman Darrell Issa in Vista, California,

7   to record a news event of national interest for distribution by American News to

national media outlets.

8       102.    Playford's initial contact with law enforcement occurred at a SDCSD

9   command post north of the congressman's offices on Edna Way, a public road.

10       103.    At the request of public safety personnel, Playford left the area of the

11   command center and approached the scene from the north on Thibodo Road

12   without progressing beyond the established motor vehicle detour point or yellow

13   police-tape cordoned boundaries.

14       104.    Playford observed in his vicinity non-public safety civilians freely

15   walking and using their cell phones to make and receive phone calls.

16

17       105.    While using his cell phone to contact the news desk at San Diego

18   Channel 6 and positioning his camera to record the scene to the south of his

19   location, Playford was identified, approached, confronted, detained, questioned,

20   and prevented from gathering news by Deputy Brendan Cook.

21       106.    At all times, Playford remained north of the yellow police-tape

22   cordoned boundaries and north of all public safety vehicles and personnel engaged

23   in traffic control.

24       107.    Deputy Cook's stated cause for arrest upon suspicion that the cell

25   phone Playford used to contact San Diego Channel 6 was a bomb detonator

26

27

28

- 21 -

constituted a pretext for Deputy Cook's intent to prevent Playford from recording the public safety response to the threat at Congressman Issa's offices.

108.   Other individuals walking in the vicinity and individuals in motor vehicles operating eastbound and westbound on State Road 78 in closer proximity to 1800 Thibodo Road were captured by Playford on videotape using cell phones but those individuals were not ordered to stop using their cell phones or accused of having a bomb detonator disguised as a cell phone.

109.   Deputy Cook contacted American News President Edward A. Peruta on December 1, 2011, at 5:14 pm EST for the stated reason of verifying Playford's media status.

110.   Peruta informed Deputy Cook that American News issued Playford valid media credentials on February 23, 2010, which Playford validly held.

111.   At the scene on December 1, 2011, Playford asserted his objection to Deputy Cook's conduct citing the SDCSD ongoing pattern and practice of identifying, approaching, confronting, detaining, questioning, and preventing Playford from gathering news in public areas not closed to the public.

112.   At the scene on December 1, 2011, Playford asserted his objection to Deputy Cook's conduct citing § 409.5(d) which exempts a duly authorized representative of any news service, newspaper, or radio or television station or network from an area closure order made by law enforcement pursuant to § 409.5(a) or (b).

113.   Deputy Cook seized the Panasonic High Definition video camera ("video camera") and the raw footage in Playford's possession at the time of his arrest.

- 22 -

12cv2186

114.   The SDCSD placed the video camera and camera memory card in two separate sealed evidence bags on December 2, 2011.

115.   At all times relevant to this complaint the video camera and its contents were the property of American News.

116.   Between December 1, 2011, and December 2, 2011, when the evidence bag holding the video camera was sealed, the SDCSD conducted a warrantless search and seizure of the contents of the video camera and reproduced the contents of the camera's video card onto a separate disk.

117.   The San Diego District Attorney's office obtained the reproduced copy of the video originally contained in the video camera and SDHC video card owned by American News.

118.   California provides statutory protections for journalistic work product which prohibits even searches and seizures by warrant.

119.   California Penal Code § 1524(g) prohibits the issuance of warrants for the seizure of "unpublished information," defined under California Evidence Code § 1070 to include information not disseminated to the public by the person from whom disclosure is sought, whether or not related information has been disseminated and includes, but is not limited to, all notes, outtakes, photographs, tapes or other data of whatever sort not itself disseminated to the public through a medium of communication, whether or not published information based upon or related to such material has been disseminated.

120.   The warrantless seizure of Playford's journalistic work product from his video camera was not reasonable incident to arrest to ensure officer safety.

12cv2186

121.   The warrantless seizure of Playford's journalistic work product from his video camera was not reasonable incident to arrest to prevent the destruction of evidence.

122.   The warrantless seizure of Playford's journalistic work product from his video camera was not reasonable incident to arrest based on any exigency.

123.   At a hearing held on March 16, 2012, in the state superior court, the court ordered the video camera and memory card returned ruling that a warrant was required to access video recorded by Playford on December 1, 2011.

### 4.   The March 15, 2012, Harrah's Rincon Casino First Amendment Abridgement

124.   Peruta and Playford, as duly authorized representatives of American News, responded to the Harrah's Rincon Casino near the Valley Center gaming resort in San Diego County on March 15, 2012, to record an incident of public interest involving a SDCSD stolen motor vehicle suspect shooting.

125.   Playford exited the American News vehicle to record and document the incident area from Valley Center Road.

126.   Peruta parked the American News vehicle with other private vehicles in a casino parking lot open to the public.

127.   Peruta received a call for the stated reason of verifying Playford's media status which Peruta responded to by verifying that Playford was a duly authorized representative of American News.

128.   As Peruta then moved toward Valley Center Road where Playford was being detained and questioned, Peruta was stopped to present his media credentials and further questioned whether he has checked in with SDCSD Public Affairs Director Caldwell.

129.   Peruta was told to leave the Harrah's Rincon Casino property when he refused to recognize the authority of the SDCSD to demand that he check in with Public Affairs Director Caldwell.

130.   SDCSD deputies had informed Harrah's Rincon Casino that Peruta and Playford were not members of the media and based on this false representation Peruta and Playford were compelled to leave the property.

### 5.   The May 25, 2012, Arrest and Seizure of Journalist's Camera/Raw Video

131.   Playford responded as a duly authorized representative of American News to a motor vehicle accident with multiple fatalities on State Road 67, a public highway in San Diego County on May 25, 2012, with the intention to gather and report a major breaking news story.

132.   Playford is currently and was on May 25, 2012, a member of the National Press Photographer's Association.

133.   While walking southbound on State Road 67, Playford possessed and carried his American News issued media credentials and video camera owned by American News.

134.   The scene involved a motor vehicle accident as enumerated in § 409.5(a) which allows the SDCSD to close the area upon a determination that the accident is a calamity creating a menace to public health or safety or upon the establishment of an emergency command post pursuant to § 409.5(b).

135.   Despite closing the area however, Playford, as a duly authorized representative of American News, could not be prevented from accessing the area closed pursuant to § 409.5(d).

136.   Playford approached the scene of the accident from the north traveling southbound on State Road 67 as a passenger in a motor vehicle.

- 25 -

12cv2186

137.   Playford exited the vehicle at 10:33 am on State Road 67 in the area of Archie Moore Road approximately eight-tenths of a mile north of the accident scene and walked southbound toward the scene.

138.   Eleven minutes prior to Playford's arrival, the SDCSD permitted *Ramona Sentinel* reporter Karen Brainard to drive her vehicle southbound toward the accident scene without incident.

139.   SDCSD Deputy Proctor closed State Road 67 to non-emergency vehicle traffic southbound with the exception of *Ramona Sentinel* reporter Karen Brainard who was permitted by the SDCSD Deputy Proctor to approach the accident scene.

140.   Photos of the accident from close proximity attributed to *Ramona Sentinel* reported Karen Brainard are posted online at http://www.ramonasentinel.com/2012/05/25/4dead-in-3-vehicle-sr67-collision-reports-chp/.

141.   SDCSD Deputy Proctor was directing traffic at the intersection of State Road 67 and Archie Moore Road when he recognized Playford and saw Playford exit the vehicle and begin to walk and run toward the accident scene.

142.   SDCSD Proctor radioed notice to the SDCSD Communications Center and other law enforcement on scene that Playford had arrived.

143.   SDCSD Deputy Proctor, despite never having had any interaction with Playford, warned SDCSD deputies Breneman and Allensworth that Playford was on his way because in SDCSD Proctor's view, based upon what he had been told by others in the SDCSD, Playford was known to show up and "creates interactions with the deputies that take them away from their duties."

12cv2186

144.   Playford videotaped his approach to the scene foreseeing from experience that SDCSD deputies would identify, approach, confront, detain, question, and prevent him from gathering news at the scene in retaliation for his prior attempt to exercise the First Amendment rights afforded to members of the press.

145.   Playford observed *Ramona Sentinel* reporter Karen Brainard and her vehicle further southbound closer to the accident scene.

146.   SDCSD Deputy James Breneman approached Playford as Playford walked south toward *Ramona Sentinel* reporter Karen Brainard and then directed Playford to the northbound side of State Road 67.

147.   Playford immediately complied with SDCSD Deputy Breneman's direction and positioned himself in an area further from the accident scene than *Ramona Sentinel* reporter Karen Brainard.

148.   SDCSD Deputy Breneman then approached and informed Playford: "My sergeant advised me you do not have press credentials," and told Playford "you cannot be over here."

149.   While SDCSD Deputy Breneman prevented Playford from proceeding further southbound, within sight of SDCSD Deputy Breneman and Playford in a southbound direction were other media representatives, including *Ramona Sentinel* reporter Karen Brainard and one local NBC media vehicle and staff.

150.   In fact, *Ramona Sentinel* reporter Karen Brainard photographed Playford from her position closer to the accident scene facing northward.

151.   The California Highway Patrol (CHP) had jurisdiction over the accident scene on State Road 67 and conducted the investigation.

12cv2186

152.   American News, Playford, Deputy Allensworth, Deputy Proctor, Deputy Breneman, and District Attorney Dumanis were aware on May 25, 2012, that the CHP does not issue media credentials.

153.   In response to the confrontation initiated by Deputy Breneman, CHP Officer Joseph Nielsen immediately approached Playford, questioned his media status, asked for and took possession of Playford's American News credentials.

154.   Officer Nielsen consulted with Deputy Breneman and Deputy Allensworth while other members of the media including *Ramona Sentinel* reporter Karen Brainard and one local NBC media vehicle and staff were nearer to the accident scene than CHP Officer Nielsen, Deputy Breneman, and Deputy Allensworth as evidenced by photographs taken by *Ramona Sentinel* reporter Karen Brainard.

155.   Deputy Allensworth and Deputy Breneman incorrectly informed and misled CHP Officer Nielsen that Playford's credentials were not valid.

156.   Playford remained in the public street which was closed to traffic but open to other members of the media and their vehicles.

157.   At no time did Playford enter any area of State Road 67 or move beyond any access point granted to other members of the media.

158.   Playford's presence at this access point location on a public street did not distract or interfere with any law enforcement officer or person directly involved with the accident.

159.   While waiting for CHP Officer Nielsen to return his press credentials, Playford was approached by Deputy Proctor who recognized Playford, despite no personal prior interaction with Playford, and addressed Playford by his last name.

- 28 -

12cv2186

160.   Both Deputy Proctor and Deputy Breneman repeatedly informed Playford that his credentials were not valid while Playford, based on his knowledge and understanding of his right to be present at this particular location as established by the California state legislature in § 409.5(d), refused to move and stated his objections to being singled-out from other members of the media at the scene.

161.   Nothing in § 409.5 "shall prevent a duly authorized representative of any news service, newspaper, or radio or television station or network from entering the areas closed pursuant to this section [§409.5]."

162.   For his refusal to move, Playford was placed under arrest and the video camera in his possession seized and shut-off by Deputy Proctor.

163.   Deputy Proctor simultaneously seized a video recording of the May 25, 2012, incident on the camera's memory card.

164.   Playford filed a formal complaint with the CHP regarding the missing/seized American News media credentials that CHP Officer Nielsen took on May 25, 2012.

165.   CHP Officer Nielsen never complained that Playford interfered with the performance of law enforcement duties or the accident scene on May 25, 2012, nor was Officer Nielsen aware that Playford's arrest was based on a representation by SDCSD deputies Proctor, Breneman, and Allensworth that Playford interfered with CHP Officer Nielsen's performance of his duties.

166.   The Panasonic camera and memory card seized on May 25, 2012, are the property of American News and were not returned until June 6, 2012, following a written June 4, 2012, demand by American News to Sheriff Gore.

12cv2186

167.   Playford's media credentials issued by American News, seized by CHP Officer Nielsen, and taken by SDCSD Deputy Allensworth on May 25, 2012, have never been returned.

**D. The Retaliatory Repression of News Gathering by Selective Media Credentialing**

168.   The SDCSD, in order to control selected members of the media who rely upon the access afforded those with government-issued media credentials, refuses to recognize media credentials that are not issued by the SDPD.

169.   American News confirmed for Deputy Cook during a phone call on December 1, 2011, that Playford held media credentials issued and recognized as valid by American News.

170.   Deputy Dennis Smith initiated further contact with American News on December 20, 2011, seeking additional information about American News which American News provided including verification of its corporate existence since 1989.

171.   American News attempted to contact Public Affairs Director Jan Caldwell and Sheriff Gore with no response to verify that Playford was a duly authorized representative of American News and provide notice that the seizure of American News' recording equipment and media raised constitutional concerns.

172.   Since March 9, 2010, the SD Defendants have continued a pattern and practice of insisting that Playford is not a member of the media and denying Playford access allowed other individuals deemed the media by the SD Defendants.

173.   On each occasion since March 9, 2010, when the SD Defendants have insisted that Playford is not a member of the media, Playford has carried valid

American News credentials and insisted on his right to record public safety responses in public and as he is statutorily entitled to under § 409.5.

174.   On each occasion, Playford has subjected himself to the likelihood of detention, search and seizure of his property, prosecution, conviction, and public ridicule due to his refusal to be chilled from his work or tolerate the unconstitutional and retaliatory practices of the SD Defendants.

175.   Playford has been presented with the decision on each occasion to (a) abandon the First Amendment guarantee which prohibits the government from abridging the freedom of the press infringing upon the press or (b) face the retaliatory animus of the SD Defendants, even arrest, for refusing to abandon the news story.

176.   In each of the three on-site March 9, 2010, December 1, 2011, and May 25, 2012, arrests alleged in section C, above, the SD Defendants prevented Playford from getting the story by seizing his recording equipment at the time of arrest.

177.   Upon demand following the March 9, 2010, arrest, Playford's recording equipment was returned to him.

178.   Upon demand following the December 1, 2011 and May 25, 2012, arrests, American News' recording equipment was returned to Playford.

179.   By the time the recording equipment and media seized on March 9, 2010, December 1, 2011, and May 25, 2012, was returned it was too late for American News to make timely distribution of the news gathered by Playford at the scenes.

180.   SD County District Attorney Dumonis joined the criminal matters arising from the February 28, 2010 and March 9, 2010, incidents into one

12cv2186

prosecution and Playford proceeded to trial in March 2011 for a violation of Penal Code § 148(a)(1) on each date.

181.   A mistrial was declared on March 29, 2011, after the jury deadlocked.

182.   Playford pleaded no contest to one count of misdemeanor disorderly conduct on March 30, 2011, and received a fine and ninety-day probation.

183.   SD County District Attorney Dumonis, knowing that the general public accessed each scene on February 28, 2010, March 9, 2010, and December 1, 2011, that even if the general public did not have access that Playford was statutorily entitled to access closed areas pursuant to § 409.5, prosecuted Playford for resisting, delaying, or obstructing a police officer arrest under California Penal Code § 148(a)(1).

184.   A jury convicted Playford of a violation of Penal Code § 148(a)(1) on May 18, 2012, for the December 1, 2011 arrest.

185.   A jury of twelve, after hearing evidence on Playford's May 25, 2012, arrest and considering a copy of California Penal Code § 409.5 which was included in the evidence and submitted to the jury at the commencement of deliberations for the first time in any of Playford's criminal proceedings, acquitted Playford of any criminal violation in a unanimous verdict of "not guilty" announced on September 11, 2013.

**E. The Modern-Day Press**

186.   The SD Defendants, despite existing state law and a revolution in access to news brought on by rapid technological advances, still seek through the use of government-issued press credentials control of the message through control of the messenger.

12cv2186

187.   The modern-day press is not defined by who captures the footage but by what footage is caught. This is particularly evidenced by the 1963 filming of President Kennedy's assassination by a private citizen named Abraham Zapruder, the 1991 video recorded by a private citizen of Rodney King's beating by Los Angeles Police Department officers, and the visual images and privately captured cell phone video of the Arab Spring uprisings and the raid that led to Osama Bin Laden's death on May 2, 2011.

188.   The modern means of capturing news has blurred and increasingly diminished the distinction between individuals identified as media and individuals performing the function of the media.

189.   The United States Court of Appeals for the First Circuit explored this issue in *Glik v. Cunniffe*, 655 F.3d 78, 83 (1st Cir. 2011) (recognizing that the First Amendment protects the filming of government officials in public spaces, in accordance with the decisions of numerous other circuit and district courts), expressively stating:

> The First Amendment right to gather news is, as the Court has often noted, not one that inures solely to the benefit of the news media; rather, the public's right of access to information is coextensive with that of the press… Moreover, changes in technology and society have made the lines between private citizen and journalist exceedingly difficult to draw.  The proliferation of electronic devices with video-recording capability means that many of our images of current events come from bystanders with a ready cell phone or digital camera rather than a traditional film crew, and news stories are now just as likely to be broken by a blogger at her computer as a reporter at a major newspaper.  Such developments make clear why the news-gathering protections of the First Amendment cannot turn on professional credentials or status.

*Id.,* 83-84.

- 33 -

190.   A quote attributed to SDCSD Public Affairs Director Jan Caldwell in a March 31, 2012, article by *North County Times* reporter Brandon Lowrey states: "Well, Playford is known amongst the deputies, especially in North County, because he's an issue.  If I'm on scene, there's an excellent chance that Playford will be there.  Every contact I've had with him has been negative."

191.   On February 19, 2013, at a San Diego Society of Professional Journalists' Annual Report Card on the Media Panel Discussion, SDCSD Public Affairs Director Caldwell  was recorded stating the position of the SDCSD on media credentials, including:

a.  "Um first of all and my first point I want to make is be nice to me, I mean seriously be nice to me because I'm a mirror and I will reflect how you treat me.  If you are rude, if you are obnoxious, if you are demanding, if you call me a liar, I will probably not talk to you anymore."

b.  "And there's only one Sheriff's Department in town and you can go talk to all the deputies all you want, but there's one Public Affairs Director, just be nice to me. If you're nice to me and when I say I'm sorry I don't know the answer to that but I'm sorry I can't talk about that, I'm not lying, I'm not lying to you.  Thirty Two years with the FBI, six years with the Sheriff's Department I believe I have Integrity, because if you don't have integrity you don't have a good soul, then you have nothing. That's my soapbox on that."

c.  "Now we're getting into a whole nother area with regard to the, and this may be a panel for next year, journalism credentials and who should have them and should we have them and I would al… I'm gonna throw that back on you all in a minute to find out what you think."

- 34 -

12cv2186

d.  "[B]ecause you can sit with your Apple laptop in your fuzzy slippers, you can be eight hundred pounds, a disabled man who can't get out of bed and be a journalist, because you can blog something."

e.  "Does that give you the right because you blog in your fuzzy slippers out of your bedroom, and you don't go out, and you haven't gotten that degree? Should you be called a journalist or should you be like Pauline ??? who graduated from Journalism school and has been doing a long time or J.W or Dennis I mean are you on the same par?"

f.  "In my estimation, and I'd like to hear from Darren and Michael on that no, because Pauline and J.W. and Matt and the others that have been doing this a long time know the questions to ask, as will you. But if you're sitting at home on your laptop and you're blogging and you just want to get under my skin for your city beat, I love that then yea, so I drop that out on you all what do you think about that?"

192.   The presence of Playford, American News, or any news service that refuses to compromise their First Amendment freedoms and rights disrupts the efforts of government officials like SDCSD Public Affairs Director Caldwell, who direct, control, and in some cases, prevent the dissemination of information to the public based on personal, discriminatory, and retaliatory animus in an attempt to protect the inaccurate image of government agencies.

- 35 -

12cv2186

## VIOLATIONS AND CLAIMS

### Count One
### First and Fourteenth Amendments of the United States Constitution
### (Retaliatory Government Actions)
### 42 U.S.C. § 1983
### Against Gore (I/O) and Caldwell (I/O)
### By Playford

193.   The foregoing paragraphs 1-192, inclusive, are incorporated by reference as pleaded to under this Count One.

194.   The First Amendment protects the right of people to videotape police carrying out their duties in public.

195.   Police officers have been on notice at least since 1990 in this Circuit that it is unlawful to use their authority to retaliate against individuals for their protected speech.

196.   The law is clearly established that an individual has a right to be free from police action motivated by retaliatory animus even if probable cause exists for an arrest.

197.   A citizen's right to film government officials, including law enforcement officers, in the discharge of their duties in a public space is a basic, vital, and well-established liberty safeguarded by the First Amendment.

198.   The freedom of individuals to verbally oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state.

199.   Retaliatory arrests even when supported by probable cause are actionable under 42 U.S.C. § 1983.

200.   California Penal Code § 409.5(d) establishes a state-defined protected property interest in the media's access to areas, including accident scenes, closed to the general public.

- 36 -

201.   Subsequent to Playford's videotaping two SD County deputies beating a man outside a bar and the criminal prosecution and civil rights action that followed and subsequent to the McGonigle Canyon controversy, a pattern of retaliatory conduct demonstrating animus against Playford's First Amendment activity commenced as described in section A and persisted as described in sections B and C of this Amended Complaint.

202.   A retaliatory police action such as an arrest or search and seizure would chill a person of ordinary firmness from engaging in future First Amendment activity.

203.   Deputy Seiver's conduct on February 10, 2010, in arresting Playford for videotaping police carrying out their duties in public would chill a person of ordinary firmness from future First Amendment activity.

204.   Deputy Seiver's conduct on March 9, 2010, in arresting Playford for videotaping police carrying out their duties in public would chill a person of ordinary firmness from future First Amendment activity.

205.   Deputy Cook's conduct on December 1, 2011, in arresting Playford and seizing his video camera for videotaping police carrying out their duties in public would chill a person of ordinary firmness from future First Amendment activity.

206.   The conduct of deputies Proctor, Allensworth, and Breneman on May 25, 2012, in arresting Playford and seizing his video camera for exercising his right to be present where other media were allowed to be present and exercising his right under § 409.5(d) to enter the accident scene would chill a person of ordinary firmness from future First Amendment activity.

12cv2186

207.   The positions taken by Gore and Caldwell denying persons lacking government-issued media credentials the right to videotape police carrying out their duties in public would chill a person of ordinary firmness without a government-issued media credential from future First Amendment activity.

208.   SD County District Attorney Dumanis' prosecution of Playford for arrests motivated by retaliatory animus - arrests that would not have occurred on February 10, 2010, March 9, 2010, December 1, 2011, and May 25, 2012, but for a desire by Gore, Caldwell, Seiver, Cook, Allensworth, Breneman, and Proctor to chill Playford's freedom as a member of the press to report newsworthy and public law enforcement activities - would chill a person of ordinary firmness from future First Amendment activity.

209.   As a direct and proximate consequence of Gore's and Caldwell's actions, Plaintiff suffered damages, including but not limited to retaliatory arrests, searches, and seizures and the loss of access to recording equipment and media used to gather and distribute news to the public, invasion of privacy, and the loss of opportunity to record news.

**Count Two**
**First and Fourteenth Amendments of the United States Constitution**
**(Failure to Train)**
**42 U.S.C. § 1983**
**Against the County of San Diego and Gore (I/O)**
**By Playford**

210.   The foregoing paragraphs 1-192, inclusive, are incorporated by reference as pleaded to under this Count Two.

211.   Sheriff Gore is responsible for the operations, practices, and customs of the San Diego Sheriff's Department.

- 38 -

212.   Sheriff Gore is responsible also for the hiring, screening, training, retention, supervision, discipline, counseling and control of the personnel and deputies under his supervision and command.

213.   Sheriff Gore failed to properly screen, train and/or supervise his deputies and Public Affairs Director Caldwell

214.   Notably, Sheriff Gore had actual notice of statutory protections for journalistic work product and unpublished documentary materials prior to Playford's March 9, 2010, December 1, 2011, and May 25, 2012, arrests.

215.   Notably, Sheriff Gore had actual notice of statutory protections for duly authorized representatives of news organizations prior to Playford's March 9, 2010, December 1, 2011, and May 25, 2012, arrests.

216.   Notably, Sheriff Gore had actual notice of constitutional protections for Playford's First Amendment activities in the events leading to the criminal prosecution and civil rights actions related to Alan Baker, Playford's coverage of the McGonigle Canyon controversy, and Playford's videotaping of police carrying out their duties in public, but failed to train his deputies that retaliatory arrests based on his deputies dislike for Playford's First Amendment activities violate the law.

217.   Public Affairs Director Caldwell is responsible for the operations, practices, and customs of the San Diego Sheriff's Department.

218.   Public Affairs Director Caldwell is responsible also for establishing media guidelines for the department and its deputies to follow.

219.   By entering into a county-wide agreement assigning the San Diego Police Department exclusive authority to issue valid press credentials and then training SD County deputies to limit Playford's and American News' First

12cv2186

Amendment rights and deny them access afforded to those holding government-issued media credentials, Sheriff Gore and Public Affairs Director Caldwell infringed upon the First Amendment activities of American News, a news organization, and Playford, its duly authorized representative.

220.   By condoning a county-wide agreement assigning the San Diego Police Department exclusive authority to issue valid press credentials and then prosecuting Playford for arrests arising from a retaliatory animus against Playford for engaging in First Amendment activities without government-issued media credentials, District Attorney Dumanis infringed upon the First Amendment activities of American News, a news organization, and Playford, its duly authorized representative, by allowing her assistants to engage in prosecutions of Playford that would chill a person of ordinary firmness from future First Amendment activity.

221.   As a direct and proximate consequence of the herein named Defendants' actions, Plaintiff suffered damages, including but not limited to retaliatory arrests, searches, and seizures and the loss of access to recording equipment and media used to gather and distribute news to the public, invasion of privacy, and the loss of opportunity to record news.

- 40 -

12cv2186

**Count Three**
**Fourth and Fourteenth Amendments of the United States Constitution**
**(False Arrest)**
**42 U.S.C. § 1983**
**Against Allensworth (I), Breneman (I), Proctor (I)**
**By Playford**

222.   The foregoing paragraphs 1-192, inclusive, and more specifically paragraphs 131-167, are incorporated by reference as pleaded to under this Count Three.

223.   SDCSD deputies Allensworth, Breneman, and Proctor arrested Playford on May 25, 2012, for the criminal misdemeanor violation of California Penal Code § 148(a)(1).

224.   A jury returned a verdict of "not guilty" on September 11, 2013.

225.   California Penal Code § 148(a)(1) has three necessary elements: (1) The defendant willfully resisted, delayed, or obstructed a police officer, (2) when the officer was engaged in the performance of his or her duties, and (3) the defendant knew or reasonably should have known that the other person was a peace officer engaged in the performance of his or her duties.

226.   It was clearly established on May 25, 2012, by the United States Court of Appeals for the Ninth Circuit in *Smith v. City of Hemet*, 394 F.3d 689, 695 (9th Cir. 2005), that the lawfulness of an officer's order is an essential element of the offense of resisting, delaying, or obstructing a peace officer.

227.   Both Deputy Proctor and Deputy Breneman repeatedly informed Playford that his credentials were not valid while Playford, based on his knowledge and understanding of his right to be present at this particular location as established by the California state legislature in § 409.5(d), refused to move and stated his objections to being singled-out from other members of the media at the scene.

- 41 -

12cv2186

228.   Nothing in § 409.5 "shall prevent a duly authorized representative of any news service, newspaper, or radio or television station or network from entering the areas closed pursuant to this section [§409.5]."

229.   The County of San Diego and Gore failed to train SDCSD deputies Allensworth, Breneman, and Proctor in statutory law clearly establishing Playford's right as a member of the media to remain in the area of State Road 67 that SDCSD deputies Allensworth, Breneman, and Proctor ordered him to leave.

230.   As a result SDCSD deputies Allensworth, Breneman, and Proctor engaged in unlawful conduct when they arrested Playford on May 25, 2012, for refusing to obey an unlawful order that he leave an area where he had the statutory right to remain to the same extent as *Ramona Sentinel* reporter Karen Brainard.

231.   Playford, despite the SDCSD's prior conduct, refused to be chilled in the exercise of his clearly established statutory right to remain in an area gathering news where *Ramona Sentinel* reporter Karen Brainard was allowed by SDCSD deputies Allensworth, Breneman, and Proctor.

232.   Playford's arrest, based upon an unlawful order to leave an area where he had a clearly established statutory right to remain was an illegal detention of his person under the Fourth and Fourteenth Amendments of the United States Constitution.

233.   As a direct and proximate consequence of the Defendants' actions, Playford suffered damages, including the loss of his ability to work in gathering and distributing news to the public.

12cv2186

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff has suffered damages and seeks:

**I.     DECLARATORY JUDGMENT**

**(1)** To establish that Media/Press Credentials issued by non-governmental agencies shall be equally recognized in all respects to Media/Press Credentials issued by the San Diego Police Department or any other governmental agency, and that holders of those Media/Press Credentials enjoy unfettered access to all non-crime scene public safety response events; and **(2)** To provide that a person or entity engaged in recording of news, by whatever means, shall not be informed or instructed by the government that public recording of public safety activity is not allowed; requires a permit; or is conditioned upon law enforcement consent.  Specifically, the government shall not: a) Demand that person or entity cease such activity; b) Demand that person or entity's identification; c) Demand that person or entity to state a reason for recording; d) Detain that person or entity; e) Intentionally block or obstruct cameras or recording devices; or f) Threaten, intimidate, or otherwise discourage a person or entity from recording public safety response activity.

**II.     COMPENSATORY AND PUNITIVE DAMAGES**

**III.     REASONABLE ATTORNEY'S FEES AND COSTS**

**IV.     SUCH OTHER RELIEF AS DEEMED APPROPRIATE**

12cv2186

Dated: October 6, 2014                    PLAINTIFF
                                          JAMES C. PLAYFORD


                                   BY:    /s/ Richard A. Williams
                                          Richard A. Williams (#128832)
                                          Rachel M. Baird (admitted *pro hac vice*)

                                          Attorneys for Plaintiff

12cv2186