THOMAS E. MONTGOMERY, County Counsel (State Bar No. 109654)
County of San Diego
By JAMES M. CHAPIN, Senior Deputy (State Bar No. 118530)
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 531-5244; Fax: (619) 531-6005
E-mail: james.chapin@sdcounty.ca.gov

Attorneys for Defendants County of San Diego, William D. Gore, Jan Caldwell, Thomas Seiver, Brendan Cook, Jesse Allensworth, James Breneman, Michael Proctor, San Diego County Sheriff's Department, and Bonnie Dumanis

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN NEWS AND INFORMATION SERVICES, INC., a Connecticut Corporation; EDWARD A. PERUTA; and JAMES C. PLAYFORD,<br><br>Plaintiffs,<br><br>v.<br><br>WILLIAM D. GORE, etc., et al.,<br><br>Defendants. | No. 12-cv-2186-BEN(KSC)<br><br>Date: April 22, 2016<br>Time: 10:30 a.m.<br>Dept.: 5A - Courtroom of the Honorable Roger T. Benitez<br>Trial Date: None |

_____

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT

_____

# TOPICAL INDEX

**Page**

TABLE OF AUTHORITIES ...................................................................................-ii-

I    STATEMENT OF THE CASE ................................................................2

II   STATEMENT OF FACTS ......................................................................3

       A.  February 28, 2010 ..........................................................................3

       B.  March 9, 2010 ................................................................................4

       C.  December 1, 2011 ..........................................................................5

III  THE RETALIATION CLAIM HAS NO MERIT ....................................7

IV  *HECK V. HUMPHREY* BARS THE RETALIATORY ARREST CLAIMS ...................................................................................10

V   THE FAILURE TO TRAIN CLAIM HAS NO MERIT ........................11

       A. Deliberate Indifference Cannot Be Established ...........................11

       B. Deliberate Indifference Requires That Rights Be Clearly Established ........................................................................12

VI  CONCLUSION .......................................................................................13

# TABLE OF AUTHORITIES

**Page**

Bealmear v. S. California Edison Co., 22 Cal. 2d 337 (1943) ..............................9

Briley v. City of Hermosa Beach, 2008 WL 4443854
 (C.D.Cal. Sept. 29, 2008) ...............................................................................13

City of Canton v. Harris, 489 U.S. 378 (1989)......................................................12

Connick v. Thompson, 563 U.S. 51 (2011) .....................................................11, 12

Clouthier v. County of Contra Costa, 591 F.3d 1232 (9th Cir. 2010) ....................13

Dietrich v. John Ascuaga's Nugget, 548 F.3d 892 (9th Cir. 2008) .........................9

Dougherty v. City of Covina, 654 F.3d 892 (9th Cir. 2011) ..................................11

Ford v. City of Yakima, 706 F.3d 1188 (9th Cir. 2013) ..........................................8

Heck v. Humphrey, 512 U.S. 477 (1994) ...................................................10, 11, 14

Holguin v. City of San Diego, No. 11-CV-2599-BAS WVG,
 2015 WL 5692364 (S.D. Cal. Sept. 28, 2015) .....................................................9

Houchins v. KQED, 438 U.S. 1 (1978) ...................................................................7

Huling v. City of Los Banos, 869 F.Supp.2d 1139 (E.D. Cal. 2012) .....................13

Johnson v. City of Seattle, 474 F.3d 634 (9th Cir. 2007) .......................................11

Los Angeles Free Press, Inc., v. City of Los Angeles,
 9 Cal.App.3d 448 (1970) ....................................................................................7

Monell v. Dep't of Soc. Services of City of New York, 436 U.S. 658 (1978) .......11

Skoog v. County of Clackamas, 469 F.3d 1221 (9th Cir. 2006) .............................9

Watson v. Sexton, 755 F.Supp. 583 (S.D.N.Y.1991) ............................................13

## TABLE OF AUTHORITIES
## (Cont'd.)

**Page**

Williamson v. City of Virginia Beach, 786 F.Supp. 1238 (E.D.Va.1992) .............13

Zwalesky v. Manistee County, 749 F.Supp. 815 (W.D.Mich.1990) ......................13

## STATUTES

Penal Code
  Section 148 .......................................................................................5, 6, 10
  Section 148(1) ................................................................................................4
  Section 415(2) ........................................................................................6, 10

Welfare and Institutions Code
  Section 5150 ....................................................................................................4

42 United States Code
  Section 1983 ..........................................................................................10, 11

THOMAS E. MONTGOMERY, County Counsel (State Bar No. 109654)
County of San Diego
By JAMES M. CHAPIN, Senior Deputy (State Bar No. 118530)
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 531-5244; Fax: (619) 531-6005
E-mail: james.chapin@sdcounty.ca.gov

Attorneys for Defendants County of San Diego, William D. Gore, Jan Caldwell, Thomas Seiver, Brendan Cook, Jesse Allensworth, James Breneman, Michael Proctor, San Diego County Sheriff's Department, and Bonnie Dumanis

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN NEWS AND INFORMATION SERVICES, INC., a Connecticut Corporation; EDWARD A. PERUTA; and JAMES C. PLAYFORD, <br><br> Plaintiffs, <br><br> v. <br><br> WILLIAM D. GORE, individually and in his official capacity as San Diego County Sheriff; JAN CALDWELL, individually and in her official capacity as San Diego County Sheriff's Department Public Affairs Director; THOMAS SEIVER, San Diego County Sheriff's Department Deputy, individually; BRENDAN COOK, San Diego County Sheriff's Department Deputy, individually; JESSE ALLENSWORTH, San Diego County Sheriff's Department Deputy, individually; JAMES BRENEMAN, San Diego County Sheriff's Department Deputy, individually; MICHAEL PROCTOR, San Diego County Sheriff's Department Deputy, individually; JOHN DOE 1-10; San Diego County Sheriff's Department; WILLIAM LANSDOWNE, individually and in his official capacity as San Diego Police Chief; JOHN DOE 1-10; San Diego Police Department; and BONNIE DUMANIS, individually and in her official capacity as San Diego County District Attorney; JOHN DOE 1-10; San Diego County District Attorney's Office, individually, <br><br> Defendants. | No. 12-cv-2186-BEN(KSC) <br><br> MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT <br><br> [Fed.R.Civ.P. 56] <br><br> Date: April 22, 2016 <br> Time: 10:30 a.m. <br> Dept.: 5A - Courtroom of the Honorable Roger T. Benitez <br> Trial Date:  None |

12-cv-2186-BEN(KSC)

# I

# STATEMENT OF THE CASE

The Second Amended Complaint alleged seven causes of action on behalf of three Plaintiffs against the San Diego County Sheriff's Department, the San Diego Police Department, Sheriff William Gore, Police Chief William Landsdowne, District Attorney Bonnie Dumanis and six individual members of the Sheriff's Department. On motions to dismiss by all Defendants, the court dismissed all claims asserted by Plaintiffs American News and Edward Peruta and all claims against the City defendants and Bonnie Dumanis without leave to amend. All claims against the County Defendants were dismissed without leave to amend, except for claims for First Amendment retaliation and failure to train and a single false arrest claim against three deputies that was dismissed with leave to amend. (Order, ECF 63.)

A Third Amended Complaint ("TAC") was filed re-alleging the undismissed claims, including the false arrest claim. On motion to dismiss, the remaining false arrest claim against the three deputies was dismissed without leave to amend. (Order, ECF 74.) After the rulings on the motions, Playford is now the only Plaintiff, and the only Defendants are Sheriff Gore, Jan Caldwell and the County. The only surviving claims are for retaliation for First Amendment activity (against Gore and Caldwell), and deliberate indifference in training (against Gore and the County).

Plaintiff alleges he is a local freelance photojournalist and has been an agent of American News and Information Services, Inc. ("American News") since February 2010. The primary thrust of the original lawsuit centered around Plaintiff's claim that he had an entitlement to a media credential issued by the Chief of Police. After the rulings on the motions, there is no claim relating to media credentials remaining in the case, nor are there any claims for false arrest. The remaining claims of retaliation and deliberate indifference in training have no basis in fact and Defendants are entitled to judgment as a matter of law.

///

II

STATEMENT OF FACTS

Plaintiff was arrested on February 28, 2010, March 9, 2010, December 1, 2011, and May 25, 2012, for interfering with crime scene investigations.  He pled guilty for the first and second events, was convicted by a jury for the third, and was acquitted for the fourth prosecution.  (TAC ¶¶ 180-185.)  He now alleges these were retaliatory arrests because he was filming law enforcement.  The fourth arrest, on May 25, 2012, is no longer an issue in the case.  (Order, ECF 63, pp. 8-9.)

Plaintiff has appeared at crime scenes and obstructed officers in the midst of investigations.  Deputies did not stop Plaintiff or detain him as a reaction to him videotaping as a member of the press, but because he was interfering with an investigation at a crime scene.  Plaintiff has inserted himself into each situation and obstructed or interfered with law enforcement.

A.   February 28, 2010.

Deputy Thomas Seiver and Deputy Jason Ward were dispatched to a residence in Ramona, regarding a male brandishing a handgun.  Seiver interviewed the person who brandished the firearm at an intersection near the residence and then drove to the residence to interview the reporting party.  After interviewing the reporting party, he had more questions for the other man and returned to interview him.  As Seiver began the interview, he and Deputy Ward were standing between their patrol vehicles on the shoulder of the road when they heard Playford yelling from across the street while holding a video camera.  They tried to ignore him and continue to try to conduct the interview, but the subject became nervous and began focusing on Playford and not responding to questions.

Playford then moved across the street and was filming from the side of one of the patrol cars right near them.  Deputy Seiver asked him to move back several times, until he finally moved away, but soon he returned to the same spot.  Deputies could not continue the interview because the man was upset about Playford being there.  Deputy

1  Seiver told Playford to move back again so he could complete the interview, but Playford
2  argued with him for several minutes and refused to move.  Playford was hostile and
3  acting irrationally which caused Deputy Seiver to stop the interview again.  Seiver had to
4  move towards Playford, and continued to direct him to move back.  After some time,
5  Playford moved farther away but continued to yell at deputies during the remainder of the
6  interview.  (Declaration of Thomas Seiver, ¶¶ 1-6.)
7        Based on the intentional acts of Playford obstructing and delaying the
8  investigation, Seiver requested a notify warrant be issued for violation of Penal Code
9  section 148(1).  The arrest was not retaliatory, but occurred because of Playford's
10 conduct at the time, and deputies were not directed by anyone to make the arrest.
11 There was never an issue about the media or of filming the event and Seiver did not stop
12 Playford from filming.  (Declaration of Thomas Seiver, ¶¶ 6, 10-11.)
13       B.    March 9, 2010.
14       Deputy Thomas Seiver was at 1400 Main Street in Ramona, in the Albertson's
15 parking lot, speaking to a woman who was suicidal and also threatening to kill others.
16 The woman was mentally disturbed and Seiver was trying to determine if he could take
17 her into custody pursuant to Welfare and Institutions Code section 5150, which requires
18 reasonable cause to believe that she is experiencing a psychological breakdown and in
19 need of immediate care.  The woman was upset and scared and was not yet handcuffed.
20 Seiver was trying to talk to her to get her into his patrol car voluntarily so he would not
21 have to use force.
22       Just as Seiver had convinced the woman to walk to the patrol car, she looked away
23 and said, "Oh, I don't want my picture taken."  Seiver then saw Playford standing
24 between them and his patrol car.  At first, Seiver waved at Playford to have him move out
25 of the way.  Playford appeared to be filming with his camera and was asking the woman
26 questions.  As they approached the patrol car, Seiver asked him to stay back several
27 times.  The woman was becoming angry with Playford and was getting tense.  She told
28 Seiver she was going to grab the camera.  Playford refused to move and began arguing

1  with Seiver and advancing towards them.  Seiver again told him several times to get
2  back.  When Playford got within 10 feet, the woman screamed and charged at Playford.
3  Seiver had to get between the woman and Playford while Deputy Stemper tried to hold
4  onto the woman.  After eventually getting the woman calmed down and into the patrol
5  car, Seiver arrested Playford for obstructing and delaying deputies in violation of Penal
6  Code section 148.  Again, there was no media issue involved or direction from Caldwell
7  or Gore, the arrest was based on specific conduct, rather than retaliation, and Seiver did
8  not prevent Playford from filming at any time.  (Declaration of Thomas Seiver, ¶¶ 7-11.)

   C. <u>December 1, 2011</u>.

   Deputy Brendan Cook was dispatched to Congressman Issa's Office to assist patrol units with maintaining a perimeter after a bomb threat had been made.  People were being evacuated from the building and Cook was told that there was a bomb located inside the doorway on the west entrance.  (Exh. A, Trial Transcript Volume I "TT," pp. 1-49 to 1-51, hereafter only two digits for Vol. I references.)  Cook was on the west side of the building where firetrucks were stationed to delineate the potential bomb blast area and the safety zone.  (TT p. 55.)  While Cook was helping get people out of the blast perimeter, someone pointed out Playford to him and told him that he had seen Playford with the protestors earlier right before the bomb threat came out.  Cook noticed that Playford was hurrying to get close to the building, and wore dirty jeans covered with grease that was consistent with bomb-making.  (TT pp. 58-59, 80.)  As Playford went past patrol cars and headed into the blast area, Cook contacted him and told him to stop and back out of the area.  Playford argued with him but backed out.  Cook was concerned that he might be involved in the bomb threat because of his attire, demeanor and because he had a hand-held camera.  (TT p. 61.)  Playford then began filming and then began dialing on a cell phone.  Cook thought Playford was going to detonate a bomb based on his training and military experience.  He knew that the most common way to detonate a bomb is with a cell phone and people who do that want to record it.  And when he told Playford to stop calling four to five times, Playford didn't comply.  (TT pp. 64-65.)  Cook

1  took the phone and camera from Playford and put them on the ground and asked Playford
2  to sit down.  Playford wouldn't sit down and kept arguing with Cook.  Cook was
3  concerned for his safety because of Playford's size, angry demeanor and body
4  movements. Playford refused to answer questions.  Playford eventually began claiming
5  that he was a member of the media but could produce no credentials and kept changing
6  his story.  Cook could not control Playford and had to call other officers to assist.  (TT
7  pp. 66-75.)  Cook did not know who Playford was at the time of this event, had never
8  seen a photograph of him and had never been briefed by anyone about him.  (TT p. 77.)
9  Cook arrested Playford for obstructing him in investigating the bomb threat and delaying
10 him and other deputies who were securing the area and trying to get people to safety.  He
11 did not arrest him because he was filming or because he was a media person.  (TT pp. 2-
12 23.)  (See generally for detail, TT Vol. I, pp. 42-84.)

13        As the testimony and declarations show, neither William Gore nor Jan Caldwell
14 directed any of the arrests or provided information about Playford to encourage arrests to
15 be made.

16        The first two arrests were consolidated for trial in Superior Court Cases Nos.
17 C299221 and C299043.  (Selected documents from that trial are lodged at Exhibit D.)
18 The jury instructions specifically deleted the word "resisting" from the Penal Code
19 section 148 instruction and related instructions.  (Exh. D, pp. 76-78.)  The only issue
20 litigated was whether Playford obstructed or delayed deputies conducting investigations.
21 And he raised the First Amendment as a defense as the jury was instructed.  (Exh. D, pp.
22 79-80.)  After trial, Playford entered a guilty plea to two counts of a lesser included
23 charge of violation of Penal Code section 415(2).  (Exh. D, pp. 80-84.)

24        The 2011 arrest resulted in a jury verdict of guilty.  (Documents from the trial in
25 Superior Court Case No. CN300278 are lodged at Exhibit B.)  The jury instruction for
26 Penal Code section 148 specifically limits the jury's finding.  "The People allege that the
27 defendant resisted or delayed Brendan Cook by doing the following:  refusing to comply
28 with orders after being detained.  (Exh. B, pp. 6-7.)  And the jury was instructed

regarding Playford's First Amendment defense (Exh. B, p. 8) which was raised as shown by the trial exhibits listed, including his media badge and a media guide (Exh. B, pp. 2, 4). His attorney argued the First Amendment in closing argument (Exh. A, pp. 2-82 – 2-89.) and on appeal from that verdict, Playford's entire argument was directed at his First Amendment rights. (Exh. C, Appellant's Brief, pp. 037-044.) The verdict was unanimously affirmed by the Appellate Division. (Exh. C, p. 051.)

### III
### THE RETALIATION CLAIM HAS NO MERIT

Plaintiff alleges in the TAC, Count One, "retaliatory government action" against Jan Caldwell and William Gore. The only specific allegation against them is: "The positions taken by Gore and Caldwell denying persons lacking government issued media credentials the right to videotape police carrying out their duties in public would chill a person without a government-issued media credential from future First Amendment activity." (TAC ¶ 207.) Press credentials are issued by the San Diego Police Department, not the Sheriff. (TAC ¶¶ 3(a), 32-36.) And members of the media can be excluded from accident or crime scenes without violating the First Amendment. *Houchins v. KQED*, 438 U.S. 1, 10-11 (1978); Los *Angeles Free Press, Inc., v. City of Los Angeles*, 9 Cal.App.3d 448, 455 (1970); Order, ECF 63, pp. 8-9.

The three arrests that are at issue here did not involve media credentials at all, or preventing the right to videotape. (The fourth arrest is not actionable on the retaliation theory, Order, ECF 63, pp. 8-9.) Plaintiff was interfering with investigations; there was never an issue involving media access. (See Declaration of Thomas Seiver and Superior Court Case No. CN300278 transcript of testimony of Brendan Cook, as set forth above.)

The allegations in the TAC that the Court found sufficient to have alleged First Amendment retaliation are: (1) numerous deputies knew who Playford was in advance of contact with him (TAC ¶¶ 77, 90-91); (2) negative comments were made about Playford by Jan Caldwell (TAC ¶ 190); (3) Playford was targeted because a captioned

- 7 -

photo was circulated to law enforcement that singled him out for attention (TAC ¶¶ 45-47); and (4) Playford filed an Internal Affairs complaint about Deputy Seiver's conduct on February 28, 2010, that was followed by his arrest (TAC ¶ 84). (Order, ECF 63, p. 19).

The true facts are set forth in the declarations filed herein. Playford did not file an Internal Affairs complaint against Deputy Seiver. (Declarations of Jeff Duckworth and Thomas Seiver ¶ 10.) A photograph of Playford was provided to the reception desk at the Sheriff's Administrative Center on Ridgehaven Court for security concerns on May 31, 2012, *after* the fourth and final arrest, and after Playford had been convicted for the third arrest; it was not disseminated to deputies in the field. (Declaration of Jan Caldwell, ¶ 4; see TT p. 1-77.) The only negative comment attributed to Jan Caldwell was on March 31, 2012, long after the three actionable arrests, and she did not brief deputies in any regard about Playford. (TAC ¶ 190; TT p. 77; Seiver Declaration, ¶ 10.) Also, Caldwell had no contact with the deputies who made any arrests and has never given direction to a deputy regarding arrests of any kind. (Declaration of Jan Caldwell, ¶ 3.)

The only deputies who knew Playford at the time of the arrest were Ward and Seiver in 2010. Deputy Cook did not know who Playford was at the time of the arrest on December 1, 2011. (TT, p. 77.) The mere fact that patrol deputies in Ramona knew of Playford in advance cannot alone establish retaliatory intent. None of the other allegations suggesting retaliation are true, and the evidence of the events themselves establish probable cause for the offenses charged, prosecuted and resulting in convictions.

Plaintiff relies on *Ford v. City of Yakima* where the right to be free from retaliatory animus "was violated when the officers booked and jailed Ford in retaliation for his protected speech, even though probable cause existed for his initial arrest." *Ford v. City of Yakima*, 706 F.3d 1188, 1193 (9th Cir. 2013). But there, the arresting officer had the option to give a ticket or take Ford to jail. When Ford kept complaining about the arrest, the officer took him to jail. Ford was acquitted of the charge. Playford,

- 8 -

12-cv-2186-BEN(KSC)

however, was arrested, prosecuted, and convicted for interfering with crime scenes; the fact that he may have been filming the events had nothing to do with the reasons for his arrests.

In a recent case from this District, summary judgment was granted in a case that was similarly weak in its First Amendment claim. The Court in *Holguin v. City of San Diego*, No. 11-CV-2599-BAS WVG, 2015 WL 5692364, at *9 (S.D. Cal. Sept. 28, 2015) explains: "While the existence of probable cause is not dispositive of Plaintiff's retaliation claim, it is nevertheless 'highly probative' evidence of the officers' lack of retaliatory animus. *See Dietrich v. John Ascuaga's Nugget,* 548 F.3d 892, 901 (9th Cir. 2008)." The Court noted that *Skoog v. County of Clackamas*, 469 F.3d 1221, 1225 (9th Cir. 2006) held that the retaliatory First Amendment claim survived summary judgment when there was barely enough evidence to conclude that there was probable cause, while there was strong evidence of a retaliatory motive; whereas the Ninth Circuit in *Dietrich* reasoned that a case "which has very strong evidence of probable cause and very weak evidence of a retaliatory motive ... falls outside the reach of *Skoog,*" providing circumstances potentially appropriate to grant summary judgment in favor of the officer. Emphasizing the importance of "protecting government officials from the disruption caused by unfounded claims," the Court further explained that to conclude otherwise would allow nearly every retaliatory First Amendment claim to survive summary judgment because there is almost always a weak inference of retaliation whenever a plaintiff and a defendant have had previous negative interactions.

In California, a conviction is conclusive evidence of probable cause. *Bealmear v. S. California Edison Co.*, 22 Cal. 2d 337, 340 (1943). Plaintiff was convicted for all three events in 2010 and 2011. This case is precisely one of those circumstances described in *Dietrich* where there is strong evidence of probable cause, including criminal convictions, and "a weak inference of retaliation." No reasonable juror could find that Gore and Caldwell directed or caused deputies to retaliate, or that deputies acted in retaliation for Plaintiff's claimed First Amendment activities.

IV

## *HECK V. HUMPHREY* BARS THE RETALIATORY ARREST CLAIMS

The retaliatory arrest claims are not actionable under the rule of *Heck v. Humphrey*, 512 U.S. 477 (1994). In *Heck,* the Court held that §1983 actions are not "appropriate vehicles for challenging the validity of outstanding criminal judgments." *Id.* at 486. In order to protect against such collateral attack against state convictions or sentences, proof that the state conviction or sentence has been invalidated is required before a §1983 action can be pursued. Playford seeks to relitigate the criminal cases in this civil action after being convicted. This is precisely what *Heck* seeks to avoid.

Playford specifically made his First Amendment right a defense in both criminal cases. In his first trial, which consolidated the cases from both 2010 arrests, he raised the First Amendment as a defense as the jury was instructed. (Exh. D, pp. 79-80.) The jury instructions specifically deleted the word "resisting" from the Penal Code section 148 instruction and related instructions. (Exh. D, pp. 76-78.) The only issue litigated was whether Playford obstructed or delayed deputies conducting investigations. The jury inquired about whether resisting was included (Ex. D, p. 75) and the Court responded that Playford was only being charged with "delaying and/or obstructing the officer" (Exh. D p. 73). After trial, Playford entered a guilty plea to two counts of lesser included charges of violation of Penal Code section 415(2). (Exh. D, pp. 80-84.)

The 2011 arrest resulted in a jury verdict of guilty and the jury instruction for Penal Code section 148 specifically limited the jury's finding to whether Playford refused to comply with orders after being detained. (Exh. B, pp. 6-7.) Playford raised his First Amendment defense in trial (Exh. B, pp. 2, 4) and the jury was instructed regarding the First Amendment defense (Exh. B, p. 8). His attorney argued the First Amendment in closing argument (Exh. A, pp. 2-82 – 2-89.), and on his appeal from that verdict, his entire argument was directed at his First Amendment rights. (Exh. C, pp. 037-044.) The verdict was unanimously affirmed by the Appellate Division. (Exh. C, p. 051.)

///

1 Plainly, Playford's defense in his criminal trials has been that he was exercising his
2 First Amendment rights. Yet, he has both pled guilty and has been convicted of
3 interfering with law enforcement, despite assertion of that defense. Now he seeks to
4 relitigate those criminal cases in this civil action without having successfully invalidated
5 the criminal judgments. *Heck* forbids and bars this claim.

## V
## THE FAILURE TO TRAIN CLAIM HAS NO MERIT

### A. Deliberate Indifference Cannot Be Established.

The TAC alleges in Count Two that Sheriff Gore "failed to train his deputies that retaliatory arrests based on deputies' dislike for Playford's First Amendment activities violate the law." (TAC ¶ 216.) It also alleges that somehow he is liable for entering into an agreement with the City regarding issuance of press credentials. (TAC ¶¶ 219-220). As set forth above, there was no media credential issue involved in any of the three arrests; and the Department conducts in-service training in addition to the training deputies receive in the Regional Academy. (Declaration of Jan Caldwell, ¶ 5.)

"Like individual state officials, municipalities are only liable under Section 1983 if there is, at minimum, an underlying constitutional tort." *Johnson v. City of Seattle,* 474 F.3d 634, 638–39 (9th Cir. 2007). Since there is no underlying constitutional violation by deputies here, there can be no public entity liability. *Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658 (1978).

In any event, a government entity may not be held liable under 42 U.S.C. §1983, unless a policy, practice, or custom of the entity can be shown to be a moving force behind a violation of constitutional rights. *Dougherty v. City of Covina,* 654 F.3d 892, 900 (9th Cir. 2011)(citing *Monell,* 436 U.S. at 694). However, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson,* 563 U.S. 51, 61 (2011). "[A] municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of the persons with whom the untrained

1  employees come into contact." *Id.* Anything less "would result in *de facto*
2  *respondeat superior* liability on municipalities." *Id.* at 62. Deliberate indifference is a
3  stringent standard of fault, requiring proof that a municipal actor disregarded a known
4  or obvious consequence of his action. *Id.* at 61.

5      A pattern of similar constitutional violations by untrained employees is ordinarily
6  necessary to demonstrate deliberate indifference for purposes of failure to train.
7  Policymakers' continued adherence to an approach that they know or should know has
8  failed to prevent tortious conduct by employees may establish the conscious disregard for
9  the consequences of their action—the deliberate indifference—necessary to trigger
10 municipal liability. "Without notice that a course of training is deficient in a particular
11 respect, decisionmakers can hardly be said to have deliberately chosen a training program
12 that will cause violations of constitutional rights." *Connick*, 563 U.S. at 62.

13     Playford was arrested and successfully prosecuted for every event except the last
14 one. He was convicted because of his actual interference with crime scenes. There
15 could be no notice to the Sheriff of violations of constitutional rights where Playford is
16 convicted for interfering with deputies at crime scenes. The first time the issue of First
17 Amendment retaliation ever came up was when this lawsuit made the allegation. There
18 is no relevant training issue here and media training is provided by the department.
19 (Declaration of Jan Caldwell, ¶ 5.) Plaintiff has to show that "it was *so* predictable that
20 failing to train . . . amounted to *conscious disregard*" for constitutional rights.  See
21 *Connick*, 563 U.S. at 71.

22     B.    <u>Deliberate Indifference Requires That Rights Be Clearly Established</u>.

23     The deputies here have been granted qualified immunity because there is not a
24 clearly established First Amendment right to be free from retaliatory arrest that is
25 otherwise supported by probable cause. (Order, ECF 63, pp. 13-16.) Significantly, the
26 identified deficiency in a training program must be closely related to the ultimate injury.
27 *City of Canton v. Harris,* 489 U.S. 378, 391 (1989). Critically, the required "deliberate
28 indifference" is established where " 'the need for more or different training is so obvious,

and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.' " *Clouthier v. County of Contra Costa,* 591 F.3d 1232, 1249 (9th Cir. 2010) (quoting *City of Canton,* 489 U.S. at 390).

Several district courts have held, that "to be 'deliberately indifferent' to rights requires that those rights be clearly established." *Watson v. Sexton,* 755 F.Supp. 583, 588 (S.D.N.Y.1991) (dismissing failure to train claim based upon employer's collection of urine specimens as part of a physical examination to determine fitness for employment because it was not yet clearly established that the collection was a fourth amendment search); *Williamson v. City of Virginia Beach,* 786 F.Supp. 1238, 1264-65 (E.D.Va.1992) ("[Even if] the constitutional rights alleged by plaintiff did exist, the conclusion that they were not clearly established negates the proposition that the city acted with deliberate indifference"), aff'd, 991 F.2d 793 (4th Cir. 1993); *Zwalesky v. Manistee County,* 749 F.Supp. 815, 820 (W.D.Mich.1990) ("[I]t would be irrational to hold that a municipality has shown a deliberate indifference to the rights of its citizens by failing to train its personnel when its officers have violated no clearly established right."); *see also* \*1158 *Briley v. City of Hermosa Beach,* 2008 WL 4443854, \*7 (C.D.Cal. Sept. 29, 2008) (granting summary judgment on failure to train claim based upon act that did not violate a clearly established right because such an act "does not constitute deliberate indifference"); *Huling v. City of Los Banos*, 869 F.Supp.2d 1139, 1157-58 (E.D. Cal. 2012) ("This is the only logical conclusion in a failure to train case. How can a municipality be expected to train officers to avoid violating a right the outlines of which cannot be reasonably be discerned from existing precedent?").

## VI

## CONCLUSION

There is no basis for the allegations of retaliation governmental action. Defendants Gore and Caldwell did not direct or in any way cause deputies to arrest Playford. The allegations of dissemination of a photograph and an internal affairs complaint are not

true. Deputy Cook had never heard of Playford before the arrest in 2011, and Deputy Seiver made the 2010 arrests on his own without any direction from anyone. The arrests were based on Playford's conduct of intentional interference with investigations -- conduct for which he was convicted of the charges. The action is further barred by *Heck v. Humphrey*, since in the criminal cases Playford specifically litigated the First Amendment issue as a defense and they resulted in convictions. The failure to train cause of action has no merit because deputies receive media training, and because the law is not clearly established so that appropriate training could be conducted. Defendants are entitled to summary judgment.

DATED: March 24, 2016       THOMAS E. MONTGOMERY, County Counsel

By: s/ JAMES M. CHAPIN, Senior Deputy
Attorneys for Defendants County of San Diego, William D. Gore, Jan Caldwell, Thomas Seiver, Brendan Cook, Jesse Allensworth, James Breneman, Michael Proctor, San Diego County Sheriff's Department, and Bonnie Dumanis
E-mail: james.chapin@sdcounty.ca.gov