THOMAS E. MONTGOMERY, County Counsel (State Bar No. 109654)
County of San Diego
By JAMES M. CHAPIN, Senior Deputy (State Bar No. 118530)
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 531-5244;  Fax: (619) 531-6005
E-mail: james.chapin@sdcounty.ca.gov

Attorneys for Defendants County of San Diego, William D. Gore, Jan Caldwell,
Thomas Seiver, Brendan Cook, Jesse Allensworth, James Breneman, Michael Proctor,
San Diego County Sheriff's Department, and Bonnie Dumanis

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN NEWS AND INFORMATION SERVICES, INC., a Connecticut Corporation; EDWARD A. PERUTA; and JAMES C. PLAYFORD,<br><br>Plaintiffs,<br><br>v.<br><br>WILLIAM D. GORE, individually and in his official capacity as San Diego County Sheriff; JAN CALDWELL, individually and in her official capacity as San Diego County Sheriff's Department Public Affairs Director; THOMAS SEIVER, San Diego County Sheriff's Department Deputy, individually; BRENDAN COOK, San Diego County Sheriff's Department Deputy, individually; JESSE ALLENSWORTH, San Diego County Sheriff's Department Deputy, individually; JAMES BRENEMAN, San Diego County Sheriff's Department Deputy, individually; MICHAEL PROCTOR, San Diego County Sheriff's Department Deputy, individually; JOHN DOE 1-10; San Diego County Sheriff's Department; WILLIAM LANSDOWNE, individually and in his official capacity as San Diego Police Chief; JOHN DOE 1-10; San Diego Police Department; and BONNIE DUMANIS, individually and in her official capacity as San Diego County District Attorney; JOHN DOE 1-10; San Diego County District Attorney's Office, individually,<br><br>Defendants. | No.  12-cv-2186-BEN(KSC)<br><br>NOTICE OF LODGMENT COMBINED WITH REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT<br><br>Date:  April 22, 2016<br>Time:  10:30 a.m.<br>Dept.:  5A - Courtroom of the Honorable Roger T. Benitez<br>Trial Date:  None |

12-cv-2186-BEN(KSC)

Defendants County of San Diego, William D. Gore and Jan Caldwell hereby lodge certified copies of the following exhibits, and request judicial notice thereof pursuant to Federal Rules of Evidence rule 201, in support of their motion for summary judgment, as follows:

Exhibit A:   Transcript of Trial Proceedings in Superior Court Case No. CN300278, Volumes I and II, selected pages.

Exhibit B:   Trial documents from Superior Court Case No. CN300278.

Exhibit C:   Excerpts from Superior Court Appellate Division Case No. CA241562.

Exhibit D:   Trial documents from Consolidated Superior Court Cases No. C299221 and No. C299043.

DATED:  March 24, 2016          THOMAS E. MONTGOMERY, County Counsel

By: s/ JAMES M. CHAPIN, Senior Deputy
Attorneys for Defendants County of San Diego,
William D. Gore, Jan Caldwell, Thomas Seiver,
Brendan Cook, Jesse Allensworth, James Breneman,
Michael Proctor, San Diego County Sheriff's
Department, and Bonnie Dumanis
E-mail: james.chapin@sdcounty.ca.gov

- 1 -

12-cv-2186-BEN(KSC)

# EXHIBIT "A"

ORIGINAL



**AD HOC REPORTING**

The Chamber Building
110 West C Street
Suite 807
San Diego, CA
92101

619 236-9325

IN THE SUPERIOR COURT OF CALIFORNIA

FOR THE COUNTY OF SAN DIEGO - NORTH COUNTY DIVISION

|  |  |  |
|---|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. CN300278 |
| JAMES PLAYFORD, | ) | |
| Defendant. | ) | |

VOLUME I
TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD E. MILLS
SUPERIOR COURT JUDGE, and a Jury
(Department 21)

Vista, California
Wednesday, May 16, 2012

Transcription Service:    Fransesca St. John
                          Ad Hoc Reporting
                          110 West C Street, Suite 807
                          San Diego, California 92101
                          (619) 236-9325

EXHIBIT A

1          IN THE SUPERIOR COURT OF CALIFORNIA

2      FOR THE COUNTY OF SAN DIEGO - NORTH COUNTY DIVISION

3

4    PEOPLE OF THE STATE OF        )
     CALIFORNIA,                   )
5                                  )
                    Plaintiff,     )
6                                  )
        v.                         )        Case No. CN300278
7                                  )
     JAMES PLAYFORD,               )
8                                  )
                    Defendant.     )
9    _____)

10

11                        VOLUME I
                TRANSCRIPT OF TRIAL PROCEEDINGS
12           BEFORE THE HONORABLE RICHARD E. MILLS
              SUPERIOR COURT JUDGE, and a Jury
13                    (Department 21)

14

15                    Vista, California
                Wednesday, May 16, 2012

16

17   For Plaintiff:              JACK WANG, ESQ.
                                 TED FIORITO, ESQ.
18                               Deputy District Attorneys
                                 325 S. Melrose Dr., Ste. 5000
19                               Vista, California 92081
                                 (760) 806-4004

20   For Defendant:             RICK CRAWFORD, ESQ.
                                 Deputy Public Defender
21                               400 S. Melrose Dr., Ste. 200
                                 Vista, California 92081
22                               (760) 945-4000

23   Transcription Service:     Fransesca St. John
                                 Ad Hoc Reporting
24                               110 West C Street, Suite 807
                                 San Diego, California 92101
25                               (619) 236-9325

26   **[See transcriber note on p. ii.]**

27

28   Proceedings recorded by electronic sound recording; transcript
     produced by transcription service.

EXHIBIT A

1-ii

INDEX

OPENING STATEMENTS                                          PAGE

ON BEHALF OF THE PLAINTIFF
By Mr. Wang                                                 1-15

ON BEHALF OF THE DEFENDANT
By Mr. Crawford                                             1-19

|                       | Direct | Cross | Redirect | Recross |
|-----------------------|--------|-------|----------|---------|
| WITNESSES FOR THE PLAINTIFF: |   |    |          |         |
| Ryan Dean Peters      | 1-31   | 1-37  | 1-39     | 1-39    |
| Robert Williamson     | 1-41   | 1-44  | 1-47     |         |
| Brendan Cook          | 1-49   | 1-74  |          |         |

| EXHIBITS: |   |                         | Marked | Received |
|-----------|---|-------------------------|--------|----------|
| Court's   |   |                         |        |          |
|           | 1 | Not identified          | 1-34   | ---      |
|           | 2 | Disc                    | 1-71   | ---      |
|           | 3 | Aerial photo            | 1-51   | ---      |
|           | 4 | View of west of building| 1-53   | ---      |
|           | 5 | Photo of walkway        | 1-52   | ---      |
|           | 6 | Photo of Thibodo Road   | 1-52   | ---      |
|           | 7 | Perimeter of west photo | 1-53   | ---      |
|           | 8 | East towards building   | 1-54   | ---      |

**TRANSCRIBER NOTE:  The sound system in this courtroom is either not set up correctly or not working properly.  Of the four available channels on the recording system, only one is being used.  In addition, there are several locations in the courtroom where there is no working microphone.  As a result, there are numerous "indiscernible" notations throughout this transcript, but especially during the opening statements of counsel.**

EXHIBIT A

1-1

1        VISTA, CALIFORNIA -- WEDNESDAY, MAY 16, 2012

2                           --oOo--

3       (Call to order of the Court.)

4               THE   COURT:   The   trial   case   is   CN300278,   a

5    misdemeanor, so we're not having a court reporter, we'll do a

6    recording.   And the probation revocation matter is CN250900,

7    and that is a reckless driving case.   So the only law -- the

8    only case on probation to be heard in the evidentiary hearing

9    is whether or not Defendant violated any law.   People have

10   filed some motions for this trial.   Mr. Wang and Fio Rito are

11   present for the People, Mr. Crawford for the Defendant.   And

12   I'm going to assume this is Mr. Playford.   Is that you, sir?

13              MR. PLAYFORD:  Yes, sir.

14              THE   COURT:   Okay.   We're going to do the People's

15   motion first.   And the first motion is to -- well, that's for

16   discovery, so that's granted.

17              The   second   motion   is   with   regard   to   a   911   call.

18   Normally that would be admissible.   Mr. Crawford, is there any

19   reason why that shouldn't be admissible?

20              MR. CRAWFORD:  No, Your Honor.

21              THE COURT:  All right.   911 call's admissible.

22              People's   third   motion,   Defense   should   be   precluded

23   from mentioning that the bomb threat was ultimately determined

24   to be a bottle of urine.   I'm not going to grant that motion.

25   I'm not even going to -- I'll listen to you if you want to make

26   an argument, but I can't imagine granting it.   I mean, that's

27   what happened, so I don't want to hide that from the jury.

28              MR. WANG:   Your Honor, the People's only contention

EXHIBIT A

Williamson - Direct

1          THE WITNESS:  Robert John Williamson, W-i-l-l-i-a-m-

2     s-o-n.

3          THE CLERK:  Thank you.

4                    DIRECT EXAMINATION

5     BY MR. WANG:

6     Q     Good afternoon, sir.  What do you do for a living?

7     A     I'm a deputy sheriff for the County of San Diego.

8     Q     Is  there  a  particular  assignment  that  you  are

9     (indiscernible)?

10    A     Yes.  I'm assigned to the arson and explosives unit.

11    Q     Was that your assignment on December 1st of 2011?

12    A     Yes, it was.

13    Q     Do you remember getting a call on that specific date of a

14    possible  explosive  device  that  was  located  somewhere  near

15    Congressman Issa's office?

16    A     I think it was actually for a suspicious device, but yes,

17    I do.

18    Q     When you get such a call for a suspicious device, what

19    are the -- what are the protocols that are put into place?

20    A     Initially  --  our  initial  response,  we  have  our  patrol

21    units  establish  a  300  foot  perimeter  around  the  scene.   And

22    that's,  that's  for  the  public  safety  and  for  our  safety  as

23    well.

24    Q     Do you respond to every single call that's made about

25    potential explosive devices?

26    A     Within the County of San Diego, yes, we do.

27    Q     Now, on this particular call, did you guys know at that

28    particular  time  when  you  responded  to  this  scene  what  the

EXHIBIT A

Williamson - Direct

1    nature of the explosive device was?

2    A    We did not.

3    Q    Did you know if there were any individuals still

4    inside --

5         MR. CRAWFORD:  I'm going to object to the prosecutor

6    continuing to call this device an explosive device.  The

7    officer's already corrected him once, that it was a suspicious

8    device.

9         THE COURT:  Yeah, let's work on that please.

10   BY MR. WANG:

11   Q    Sir, when you had responded to the scene about this

12   suspicious device, did you know what the nature of it was?

13   A    We did not.

14   Q    Do you treat suspicious devices differently than

15   explosive devices?

16   A    No, we treat them the same.

17   Q    When you got to the scene, did you know if there were any

18   individuals still inside of the building where Congressman

19   Issa's office is?

20   A    We had been told that the building had been evacuated.

21   Q    And so at that point -- I'm sorry -- so then evacuation

22   had happened prior to you getting there?

23   A    That's correct.

24   Q    Once the arson and explosive unit get on scene, what is

25   it that you guys do?

26   A    Initially we're briefed as a unit by the on-scene

27   commander, and then we establish our response plan.

28   Q    On that specific -- I'm sorry.  Is it safe to assume that

EXHIBIT A

Williamson - Direct

1   being a part of this unit, you are familiar with explosives and

2   how they might be detonated?

3   A      Yes, I am.

4   Q      Are you familiar whether or not cell phones can be used

5   to detonate a device?

6   A      Yes.

7              MR. CRAWFORD:  Objection; relevance.

8              THE COURT:  Overruled.  Answer may stand.  Next

9   question.

10  BY MR. WANG:

11  Q      On that specific -- on that particular day, were you able

12  to identify ultimately what the suspicious object was?

13  A      Yes, we were.

14  Q      And what was it?

15  A      There were actually two.  One was a coffee cup, and the

16  second one was a plastic water bottle that contained urine.

17  Q      Prior to identifying what these suspicious objects were,

18  did you treat the situation any differently than if you had

19  known that there was an explosive on the scene?

20  A      No, we did not.

21  Q      Why is that?

22  A      By standard response, we respond to every call the same

23  as if it is an actual device.

24  Q      And why is that?

25  A      That's for our safety and for public safety.

26  Q      So just because something isn't immediately described to

27  you as a bomb or an explosive device, doesn't mean that you

28  don't take it just as serious?



1-45

Williamson - Cross

1    A      We take them all just as serious.

2              MR. WANG:  Thank you.  No further questions.

3              THE COURT:  All right.  Mr. Crawford, do you have

4    any questions at all?

5              MR. CRAWFORD:  Yes, I do.

6                        CROSS EXAMINATION

7    BY MR. CRAWFORD:

8    Q      Do you recall the time of day that you actually received

9    the call to go out to this particular location on December 1st?

10   A      No, I don't.

11   Q      Did you generate any report of any sort?

12   A      No, I did not.

13   Q      Do you know how long after you actually arrived, you and

14   perhaps your unit, that it was determined that it was a bottle

15   of urine and a coffee cup?

16   A      We were on scene for probably about an hour and a half.

17   Q      And do you recall within that hour and a half when you

18   determined that the suspicious device was a bottle of urine and

19   a coffee cup?

20   A      It would have been within the last half hour of the call.

21   Hazmat responded and determined that it was a bottle of urine.

22   Q      Do you ever recall any bottles of urine being detonated

23   by a cellular phone?

24   A      No.

25   Q      How about coffee cups?

26   A      No, I don't.

27   Q      Do you know if other officers in the area were aware of

28   what the suspicious device was?

EXHIBIT A

Williamson - Cross

1          MR. WANG:  Objection; calls for speculation.

2          THE COURT:  No.  Answer please.

3          THE WITNESS:  I don't know.

4    BY MR. CRAWFORD:

5    Q    Okay.  This 300-foot parameter, do you know how that's

6    established?

7    A    That 300-foot perimeter is -- number one, it's the

8    sheriff's department's policy, and that's a standard for bomb

9    squads throughout the country.

10   Q    Do you know how that 300-foot parameter, how that

11   interplays with the media?

12   A    I do not.

13   Q    Do you recall how many particular officers responded to

14   that particular location?

15   A    I don't know.

16   Q    Is there radio transmissions going on back and forth in

17   terms of what the suspicious device is?

18   A    Not within that 300-foot perimeter.

19   Q    Where are those transmissions being done?

20   A    It would be outside of the safety zone, which is a 300-

21   foot limit.

22   Q    So in terms of officers being outside the safety zone,

23   there's dispatch communications going on back and forth?  I'm

24   sorry, radio communications?

25   A    Could you repeat the question?

26   Q    Well, you said that there -- I believe, maybe it was a

27   bad question -- but there was no radio communications inside

28   the 300-foot perimeter.

EXHIBIT A

Williamson - Cross

1   A     There were no radio communications between my unit,

2   myself and my teammates within that 300-foot perimeter.

3   Q     How is communications then made to keep officers outside

4   the perimeter?

5   A     We do face-to-face contacts.

6   Q     Do you recall when that face-to-face contact was done, if

7   at all, in this particular case?

8   A     There were numerous face-to-face contacts throughout the

9   entire event.

10  Q     And when you arrived, the building had been evacuated,

11  correct?

12  A     It had been.

13  Q     Is it safe to say, then, that individuals were at that

14  time outside the 300-foot perimeter?

15  A     That's correct.

16  Q     As a police officer, then, you've talked about this

17  perimeter and lack of communications.  Would you stop people

18  from using communications outside that 300-foot perimeter?

19  A     I'm not sure I understand your question.

20  Q     Well, I assume that no communication is being done within

21  the 300-foot perimeter because of safety; is that correct?

22  A     That is correct.

23  Q     So as an officer, if you're outside that 300-foot

24  perimeter, would you see a reason to stop someone from using a

25  communication device?

26        MR. WANG:  Objection; relevance.

27        THE COURT:  Overruled.  Answer please.

28        THE WITNESS:  No, I do not.

EXHIBIT A

1-48

Williamson - Redirect

1        MR. CRAWFORD:  Nothing further.  Thank you.

2        THE COURT:  All right.  Any redirect.

3                  REDIRECT EXAMINATION

4   BY MR. WANG:

5   Q    When you say that there's no communications within that

6   300-feet perimeter, why is that?  What is it about the

7   communications that make it dangerous?

8   A    One of the reasons that there's a 300-foot rule is

9   because of stray radiofrequency that are put out by cell phones

10  and portable radios, including the type of radios that we carry

11  as police officers, and personal mobile radios that the public

12  often carry.

13  Q    Why are you concerned about stray radio signals?

14  A    The primary reason we're concerned about stray

15  radiofrequency is because initiators like blasting caps or

16  home-made initiators are susceptible to stray radiofrequency,

17  which could make them go off.

18  Q    If an individual, in your experience and with your

19  knowledge of explosive devices, if an individual had a trigger

20  tied to his cell phone, could he detonate that device outside

21  the 300 feet range?

22  A    Yes, he could.

23            MR. WANG:  Thank you.  I have no further questions.

24            MR. CRAWFORD:  I'm sorry, I didn't understand the

25  question.

26            THE COURT:  Well, that's not an objection.

27            MR. CRAWFORD:  All right.

28  //

EXHIBIT A

Williamson - Recross

RECROSS EXAMINATION

BY MR. CRAWFORD:

Q    How could someone detonate an explosive bottle of urine from outside of 300 feet with a cell phone?

THE COURT:    That's not a fair question, Mr. Crawford.

BY MR. CRAWFORD:

Q    Let's say we're 500 feet away, an individual's on his cellular phone, does that concern you?

A    No, it does not.

MR. CRAWFORD:  Thank you.

THE COURT:  Okay.  Deputy Williamson, thank you for your testimony.  You're excused.  Next witness.

MR. WANG:    Your Honor, the People call Detective Cook to the stand.

THE BAILIFF:  Stand up right here.  Face the clerk and raise your right hand to be sworn.

(Pause.)

BRENDAN COOK, PLAINTIFF'S WITNESS, SWORN

THE CLERK:    Have a seat in the witness stand. Please state your full name and spell your last name for the record.

THE WITNESS:  Brendan Cook.

MR. WANG:  Detective Cook, good afternoon.

THE WITNESS:  Good afternoon.

//

//

//

Cook - Direct

1              DIRECT EXAMINATION

2    BY MR. WANG:

3    Q    What do you do for a living?

4    A    I'm a sheriff's deputy employed by the County of San

5    Diego.

6    Q    And how long have you been doing that is this?

7    A    Approximately 12 years.

8    Q    Was that your occupation on November -- sorry, December

9    1st, 2011?

10   A    It was.  I was assigned to the gang enforcement team in

11   the City of Vista.

12   Q    At some point during that day, were you called to respond

13   to set up a perimeter near Congressman Issa's office?

14   A    I was.

15   Q    Can you describe to the jury what led you to that

16   particular location?

17   A    There was a call of a -- well, a bomb threat in

18   Congressman Issa's office.  There had been a protest earlier in

19   the day of some sort.  I don't really know the nature the

20   protest.  And I had just kind of driven by in the morning.  But

21   we call of a bomb threat at that point, and we were asked to

22   assist the patrol units with maintaining a perimeter and

23   evacuating people out of there because there was still a lot of

24   employees still inside the building.

25   Q    When you arrived on scene at Congressman Issa's office,

26   had individuals been evacuated yet from the building?

27   A    I'm sorry, had any individuals been evacuated?

28   Q    Yes.

*Ad Hoc Reporting*

Cook - Direct

1  A     Yeah.   There was an evacuation in process.   I had parked

2  on the east side of the perimeter, and I was assisting with

3  some evacuations from the parking lots, and we were determining

4  whether people were going to be removing vehicles or not.   We

5  were trying to get people out.   And then I noticed on the west

6  side of the perimeter there was vehicles, and the fire

7  department, but it looked like firefighters had been left to

8  watch that perimeter, so I went up there to make sure that

9  there was a law enforcement officer watching the perimeter.

10  Q    So at some point had you made it from the east perimeter

11  to the west perimeter?

12  A     Yes.

13  Q    I want to talk to you briefly about that particular day

14  and the dispatch call that led you there.   Did you know

15  anything else at the time that you arrived other than the fact

16  that there was a bomb threat located at Congressman Issa's

17  office?

18  A     From the dispatch call, no.   And I'm not sure whether it

19  was a dispatch call or someone on the ground had told me there

20  was a bomb located inside the doorway on the west entrance,

21  which is a couple of large glass doors.

22         MR. CRAWFORD:   I'm going to object as to hearsay;

23  lack of foundation.   I don't know who someone is.

24         MR. WANG:   Your Honor, it goes to his state of mind.

25         THE COURT:   Yeah, just let me rule.   You don't need

26  to argue the objections.   The objection's overruled.   It's not

27  for the truth of the matter stated.   It's only telling us --

28  the information you got is only being given to you as jurors to

EXHIBIT A

Cook - Direct

1   explain why the deputy or detective did what he did.

2   BY MR. WANG:

3   Q    On that particular day when you had moved onto the west

4   perimeter, can you describe a little bit of the layout of that

5   particular area for the jury?

6   A    Yes.  Thibodo Road is a east/west road.  It parallels the

7   78, and there's a building between the road and the 78 which

8   would be the Congressman's building.  The roadway is a standard

9   two-lane roadway divided by I think it's a double yellow.  And

10  on the western perimeter, there was a fire truck, and there

11  were two patrol cars parked, and there was some cones out

12  blocking traffic, preventing traffic from being able to drive

13  past the building in either direction.

14          MR. WANG:  Your Honor, may I approach the witness?

15          THE COURT:  Yeah.  Just go ahead anytime you need

16  to.

17  BY MR. WANG:

18  Q    Officer, I'm just going to ask you briefly to go through

19  these really quickly, and then we'll talk about them when

20  you --

21          THE COURT:  Just put them up on the screen.  That

22  saves time.

23  BY MR. WANG:

24  Q    Officer, can you find the exhibit that corresponds to the

25  enlargement that we see on the projector?

26  A    Yes, I have it right here.  It's Exhibit -- Court's

27  Exhibit 3.

28  Q    Can you describe for the jury what it is that we're

EXHIBIT A

Cook - Direct

1  looking at, at the enlargement?

2  A    We're looking at an aerial view slightly to the west of

3  the building.  If you see the building that looks kind of like

4  an "L" right there, that's Congressman Issa's -- that's

5  Congressman Issa's building right there.  That would be where

6  the doorway is, the western door.  And the perimeter was set

7  approximately right here.  This is a parking lot where most of

8  the employees were parked.  There's another parking lot.  And

9  then the road was blocked in this direction.

10  Q    So when we're talking about the fact that you were at the

11  west perimeter, so in relation to this particular photograph,

12  the Court's Exhibit 3, you mean towards the top of the

13  photograph?

14  A    That would be at approximately right here (indicating).

15  Q    Now, looking at this next photo, can you identify which

16  exhibit you have in front of you that corresponds to this

17  enlargement?

18  A    That would be Court's Exhibit 6.

19  Q    Can you describe for the jury what Court's Exhibit 6 is?

20  A    Court's Exhibit 6 is a view in Thibodo Road north to the

21  building.  This would be the western entrance.  I described

22  some large glass doors earlier, and they were about right here.

23  Q    And earlier when you had testified, you said that it was

24  your understanding that what was reported to you as an

25  explosive device was located somewhere in this area?

26  A    It was supposedly just inside these doors.

27  Q    Officer, now looking at this exhibit that I put -- can

28  you find the corresponding picture from the exhibits in front

EXHIBIT A

Cook - Direct

1    of you and identify which exhibit we're looking at?

2    A    It's Court's Exhibit 4.

3    Q    Can you describe for the jury what is Court's Exhibit 4?

4    A    Court's Exhibit 4 is a view from the west back towards

5    the building.  So right here, you'd be looking at the western

6    entrance to the building right here, and the glass doors I

7    described earlier.  And this is the parking lot where the

8    employees -- most of the employees parked.  That's the largest

9    parking lot.

10   Q    Is this the entrance, then, from you had to set up --

11   where you were manning the western perimeter, is this the kind

12   of the view you had of the building?

13   A    Yes.

14   Q    Officer, can you again identify what is the exhibit in

15   front of you that corresponds with this?

16   A    This is Court's Exhibit 7.  This is the perimeter on the

17   west that day.  This is the 78 right here.  If you look right

18   over there, there's some trucks and things coming by

19   (indicating), this is fire department that starts with the

20   cones being out.  Those would be the cones right there

21   (indicating).  That is me (indicating).  This is one of the

22   sheriff's deputies' that was parked blocking traffic

23   (indicating).  And appears to be another one right there

24   (indicating).

25   Q    Okay.  So on that particular side, it looks like there

26   are individuals standing near a sidewalk area.  What would

27   those people be -- what are they doing?

28   A    Those were employees who had been evacuated, and fire

EXHIBIT A

Cook - Direct

1   department officials right there.  What I had initially seen
2   was, again, a group of people up there (indicating), the fire
3   department talking to them.  I realized those were the ones
4   that are supposed to be manning the perimeter, so I went up
5   there.  And again, there were employees who had just been
6   evacuated out of the building.  I actually had walked out there
7   with one.
8   Q     Okay.  And again, can you identify what exhibit we're
9   looking at by looking at (indiscernible)?
10  A     This is Exhibit Number 8, Court's Exhibit Number 8.  This
11  is also looking west toward -- or, I'm sorry, looking east
12  towards the building.  That would be those glass doors I
13  referenced a couple times.  And these were the marked patrol
14  cars, the fire department vehicle where the cones are blocking
15  traffic, and then there's another one there (indicating).  And
16  this is a sidewalk right -- it kind of goes down into a little
17  culvert right here (indicating).  It's a dirt kind of sidewalk
18  area.
19  Q     Now, I've noticed that well's no police tape along that
20  particular edge.  Were members of the public allowed to go past
21  those police units?
22  A     No, they weren't.
23  Q     Why not?
24  A     The bomb blast area, as told to us by the fire department
25  safety zone, the fire department had told us that their trucks
26  were going to delineate the safety zone out here.  And that's
27  why I came out.  These vehicles were supposed to delineate the
28  safety zone right there.

EXHIBIT A

Cook - Direct

1  Q    Is that why the individuals that we had seen in a
2  previous slide were parked next to the fire truck?
3  A    Right.  That's why they were -- had walked down the fire
4  truck, and they walked in right there with the fire truck
5  (indicating).
6  Q    And lastly, Officer, can you identify what corresponds to
7  this particular exhibit?
8  A    This is Court's Exhibit 5.
9  Q    Does this show that particular walkway area we were
10  talking about that was --
11  A    Yes, it's a walkway area.  And I think I described a
12  culvert.  This would be the culvert right there.
13  Q    So there's that little stretch of grass and gravel that
14  wasn't marked off yet by police tape?
15  A    Correct.
16  Q    Now, officer, when you get -- you may have a seat.  Thank
17  you so much?
18  A    In fact, and my seat kind of went down.  Okay.
19  Q    When you arrive on scene and you move from the east
20  perimeters to the west perimeter, why did you do that?
21  A    I did that -- I was initially helping to evacuate people
22  and getting some information.  I did that because I looked up
23  and I noticed that that area was not being manned by any law
24  enforcement officers, the deputies who parked there had
25  obviously come in and began evacuating people.  And we needed
26  to have somebody out there.  The fire department is busy with
27  the issues that they have to deal with, and they needed us out
28  there, so I went out there.

EXHIBIT A

Cook - Direct

1  Q    So were you the only sheriff's deputy that was on that

2  particular perimeter at that time?

3  A    Yes.

4  Q    At some point during that day, did you come in contact

5  with an individual by the name of Mr. Playford?

6  A    Yes.

7  Q    Could you please look around the courtroom and see if you

8  see Mr. Playford in court here today?

9  A    I do.

10  Q    Would you please identify where Mr. Playford is seated

11  and an article of his clothing?

12  A    Mr. Playford's seated at the Defendant's table, and he's

13  wearing a blue long-sleeve shirt with the cuffs just rolled up.

14         MR. WANG:  Your Honor, may the record reflect that

15  the witness has identified the defendant?

16         THE COURT:  Yes.

17  BY MR. WANG:

18  Q    Describe for the jury what events were occurring when you

19  first noticed the Defendant?

20  A    We were still in the process of trying to get people out

21  of the perimeter, to get out of the bomb blast area, you know,

22  in simple terms trying to get them out of there.    People

23  naturally wanted to go to their cars, they want to do things

24  like that, so it's -- it was kind of hectic.  The scene was by

25  no means static at that time.  So I had gone up there and -- I

26  don't know if I'm starting to tell a story, or I've just lost

27  focus.

28  Q    Well, let me break it up, then.   When you were attempting

EXHIBIT A

Cook - Direct

1   to escort people out of the blast area, were you having

2   conversations with them?

3   A     Yes, I was.

4   Q     At any point did any of them point out Mr. Playford to

5   you?

6   A     Yes.  Once we got back to the fire truck -- we were

7   standing there.

8           MR. CRAWFORD:  Objection; hearsay.

9           THE COURT:  No, you've answered the question.  The

10  question was did anybody point him out, and your answer was

11  yes.  So next question.

12  BY MR. WANG:

13  Q     Well, what did you do after this individual had pointed

14  Mr. Playford out to you?

15  A     I went over to contact Mr. Playford.

16  Q     What was it about what this individual had told you about

17  Mr. Playford that led you to go and contact him?

18  A     The person I contacted -- or I was with had said -- they

19  had pointed to Mr. Playford and said --

20          MR. CRAWFORD:  Objection, Your Honor; hearsay.

21          THE COURT:  No it's not offered for the truth of the

22  matter stated.  Objection's overruled.  Finish your answer

23  please.

24          THE WITNESS:  Had told me that that guy was in the

25  building -- or "that guy was with the protesters earlier and he

26  was in the building right before the bomb threat came out."

27  Words to that effect.  He was with a with the protesters and

28  was in the building right before the bomb threat came out.

EXHIBIT A

Cook - Direct

1  BY MR. WANG:

2  Q    Did you get any independent observations of the Defendant

3  prior to when you contacted him?

4  A    I did.

5  Q    And what if anything did you see?

6  A    I saw an individual who was, you know, walking with a

7  real hurried pace to get down to the area.  I noticed the

8  clothing he had on.  He had on jeans that were really dirty and

9  covered with grease, kind of greasy and oily.  I also noticed

10 he had a military-style kepi hat on, you know, kind of like --

11 well, like an army-style hat.  It was a solid olive drab.

12 Q    You mentioned the sustained pants.  But why did that

13 stand out for you?

14 A    We're talking about bomb threats, and in all your bomb

15 threat training, whether it's packaged bombs or whether it's

16 manufacturing bombs, whatever, one of the things that comes

17 with building things is getting dirty, greasy, oily.  You're

18 dealing with wires and electrical issues.

19 Q    Based on your conversation with the individual that

20 pointed out Mr. Playford, as well as your own observations,

21 what did you do next?

22 A    I went over to determine what the individual was doing,

23 who they were.

24 Q    When you first went up to make contact with Mr. Playford,

25 was he outside of that 300 -- of that perimeter of the bomb

26 blast?

27 A    No, he was walking in.

28 Q    So he had actually walked --



Cook - Direct

1   A      He was walking past the vehicles.

2   Q      Okay.  So let's back up for a second.  We're looking at

3   -- I think this is -- can you check?  Is it Court's Exhibit 8?

4   A      It's Court's Exhibit 8, yes.

5   Q      So when we're looking at Court's Exhibit 8, are you

6   saying that he had to walk past the two squad cars at this

7   point?

8   A      Yes.  He had walked past the first one.  I don't know if

9   he had cleared all the way past the second one, but he was

10  heading in.

11  Q      When you noticed that Mr. Playford was heading into the

12  blast area, what then did you do?

13  A      I engaged him in conversation and told him to stop and he

14  needed to back out of it.

15  Q      What did he do when you told him that?

16  A      He began arguing with me, but he did back out.

17  Q      So at some point he had come back on, I guess the west

18  side of the first patrol car that we see in Court's Exhibit 8?

19  A      Yes.

20  Q      At that point, once he had gotten onto the west side of

21  that first patrol car, what did you do?

22  A      I asked him his name.

23  Q      Why did you do that?

24  A      I wanted to know who he was.  We have an active

25  investigation.  There's several indicators, there's people

26  saying that he was with protesters and that he was in the

27  building right before the bomb threat.  I'm looking at the

28  pants, they're greasy, they're oily.  His demeanor was

EXHIBIT A

Cook — Direct

1  argumentative, very high strung.

2       MR. CRAWFORD:  Objection; this is not a response to

3  the question, Your Honor.  It's a narrative.

4       THE COURT:  Objection overruled.  Please continue.

5       THE WITNESS:  The military-style cap, the way he was

6  wearing it, you know, kind of a forward angle to it.  I also

7  noticed that it was a hand-held camera.  Hand-held cameras are

8  generally not something that you're going to set up for a long

9  period of time.  Hand-held cameras are generally something that

10 you want to take something quick with.  So those things made me

11 concerned that he may have been involved with the bomb threat.

12 BY MR. WANG:

13 Q    Just a second ago you mentioned that he had a camera in

14 his hand.  So what was he doing with this camera?

15 A    Intermittently he was filming.

16 Q    Was he bringing it to his -- to his ears -- I'm sorry,

17 his eyes to do the film?

18 A    Yes.  Yeah, he had it in his left hand and he would bring

19 it up.

20 Q    Did you ever tell him to stop filming?

21 A    Not while he was just filming.

22 Q    At some point you said that had you asked him for his

23 name and he didn't give it to you.  What did you do then?

24 A    I asked him a couple more times, and then just observed

25 him.

26 Q    So at that point, did you take his camera away?

27 A    No.

28 Q    Did you place him under arrest?

EXHIBIT A

                        Cook - Direct

1   A     No.

2   Q     Did you at anytime during that initial contact where you

3   had simply asked for his name, did you ever go hands on with

4   him in any way?

5         (Audio played.)

6   BY MR. WANG:

7   Q     Officer, is that an accurate portrayal of this first

8   initial contact that we've been talking about?

9   A     Yes.

10  Q     What's going through your head when you're asking him to

11  calm down, what's your name and he keeps refusing?

12  A     It's odd.  It wasn't -- I didn't feel that I was asking

13  him in a confrontational manner or anything.  And normally

14  people will talk to you and give you your name or ask you

15  what's going on, words to those effect.

16        So, like a lot of times when you approach somebody,

17  regardless of the situation, in law enforcement you'll start

18  engaging them in conversation, and what you're doing is you're

19  gauging their demeanor, you're gauging what they're doing,

20  you're watching their face, you're watching their body, you're

21  watching all those things to determine the threat to you or

22  anyone else.

23  Q     At some point after the events had happened on this

24  video, did you ever have to get more physical with the

25  Defendant?

26  A     I did.

27  Q     Can you describe for the jury what events led you to

28  determine that you needed to get more physical with the

EXHIBIT A

Cook - Direct

1   Defendant?

2   A    Mr. Playford was filming, and that's fine, anyone can

3   film, as long as they're outside the perimeter.  But on the one

4   point -- if it's okay, can I demonstrate with a phone what I

5   observed or...

6           MR. WANG:  Your Honor, may the witness get off the

7   stand?

8           THE COURT:  Well, you can stand up to demonstrate.

9           THE WITNESS:  Mr. Playford was taking the camera

10  down, had brought it back up and was filming, and then had

11  pulled up a flip cell phone and held it while he was holding

12  the thing right to his eye and began dialing the number like

13  this.

14          MR. WANG:  Your Honor, may the record reflect that

15  the witness has indicated holding a camera in his left hand up

16  to his eye, as well as a cell phone in his right hand up to his

17  eye level as well?

18          THE COURT:  All right.

19  BY MR. WANG:

20  Q    Officer, this video camera and the cell phone, where were

21  they directed?

22  A    They were directed at the -- those glass doors on the

23  western edge where I had described early.

24          MR. CRAWFORD:  Objection; calls for speculation.

25          THE COURT:  No, he's testifying to what he observed.

26  It's all right.

27  BY MR. WANG:

28  Q    I'm sorry, were you going to answer?        EXHIBIT A

1-64

Cook - Direct

1   A    The glass doors on the western edge of the building.

2   Q    When you saw him pull out his cell phone and begin

3   dialing, what was going through your head?

4   A    I thought he was going to detonate a bomb.

5   Q    Is there anything about your training that led you to

6   believe that way?

7   A    Yes.

8   Q    Can you describe that for the jury?

9   A    Based on my training, both in college and in the military

10   as a marine corps officer in the infantry in dealing with

11   demolitions, and also in the sheriff's department both our

12   basic training, advanced training and my gang investigations,

13   as well as our -- we had some terrorism training, I know that

14   people who detonate bombs frequently like to record that bomb

15   being detonated, particularly for political issues.  They want

16   to record the event for posterity.  Same thing a lot of times

17   with people who set fires, but a little bit different.

18        The other thing is if you're going to remotely

19   detonate a device, most common way lately has been to use cell

20   phones.  And I've actually had issues where we've been called

21   out to detain people, federal agents have called us out to

22   detain people for buying multitudes of those same type of cell

23   phones because they were concerned they were being used as

24   detonating devices.

25   Q    So based on your military training, as well as your

26   training as an officer, you thought that Mr. Playford might

27   have been detonating a device?

28   A    I thought he was.

EXHIBIT A

Cook - Direct

1  Q    What did you do once you formed that belief?

2  A    I told him to hang up the phone.

3  Q    Did he comply?

4  A    No.

5  Q    How many times did you ask Mr. Playford to hang up his

6  phone?

7  A    I believe four or five times.

8  Q    When he didn't comply with those four or five requests,

9  what did you do next?

10 A    I took his phone and I closed it, and I took his camera

11 and I put it down and I detained him.

12 Q    At that point after he had refused to hang up his phone,

13 what led you to believe that at that point you needed to detain

14 him?

15 A    When he was filming, I was telling him to hang up the

16 phone, and he appeared to be continuing to dial.  If I didn't

17 stop him from doing that, there were people down in that

18 building, there were people on the other perimeter as you can

19 see in the other one, there's people nearby, I don't know the

20 strength of that bomb, I don't know who is near it, if that

21 number gets completed and the bomb gets detonated, then I've

22 just watched that happen and I've done nothing to stop it.

23 Q    Once you had taken the cell phone and placed it along

24 with the camera on the ground, did you immediately put

25 handcuffs on the Defendant?

26 A    I did not.

27 Q    What did you ask him to do instead?

28 A    I asked him to sit down.



Cook - Direct

1   Q      Before we get into that, so as of right now you've taken

2   the cell phone, you've put it on the ground, you've taken the

3   video from him and you've put it on the ground, what is the

4   Defendant doing at this point?

5   A      He's arguing with me and turning his body around.   And

6   I've gotten his hands behind his back and I'm holding him by

7   his fingers with his hands behind his back.

8   Q      And at that point when you say he's arguing with you,

9   what do you mean by that?

10  A      He's yelling and screaming at me.

11  Q      You said that you asked him to sit down.  Why did you do

12  that?

13  A      I wanted to be in a position of advantage.   Mr.

14  Playford's larger than me.   I'm restricted by gear.   I don't

15  want to end up in a fight with an individual.   I don't have

16  anyone else around there to help me at that point.   I don't

17  know where everybody else is at.   I don't know if he's armed.

18  In fact, I asked him that, and he refused to answer that.

19  Q      Well, before we get into that.   So you asked him numerous

20  times to sit down.  How many times would you say?

21  A      Three, at least.

22  Q      At that point after those three requests, did he ever sit

23  down?

24  A      He did not sit down until I had to guide him down, use

25  body weight and pushed him down onto the ground.

26  Q      Prior to him physically being -- I'm sorry -- when you

27  applied pressure to get him to sit down, you said that you

28  asked him if he had any weapons on him.  Why did you do that?

EXHIBIT A

1-67

Cook - Direct

1   A    I was detaining him to investigate whether he was

2   involved in a crime that I thought was about to take place.

3   When I detain anybody, particularly -- well, when I detain

4   anyone for a crime that involves violence, and somebody is

5   being aggressive verbally with me, verbally, facial cues,

6   physical cues, stiffening of the bad and everything like that,

7   and being non-compliant, I want to know if they have a weapon

8   because I don't want to get harmed by that weapon.

9   Q    Did you see --

10  A    And I don't want anyone else harmed by that weapon.

11  Q    I'm sorry, Officer.  You just said that you're looking

12  for facial cues.  Were there any facial cues that the Defendant

13  was exhibiting that led you to believe that he might be a

14  threat to you?

15  A    Yes.

16  Q    Can you describe those for the jury?

17  A    When I was trying to speak with him, he would be

18  interrupting me, and he had an angry -- I would describe an

19  angry look on his face with his brows down.  And his voice was

20  extremely loud, so his lips and face, as you're pushing out the

21  words, has an angry demeanor to it.

22  Q    You also mentioned that you're looking for some sort of

23  physical cue, the stiffening.  Were there any physical cues

24  that you observed that day that led you to believe that the

25  Defendant might have been hostile towards you?

26  A    Yes.

27  Q    Can you describe those for the jury?

28  A    He was moving his body back and fourth.   He wasn't

*Ad Hoc Reporting*

EXHIBIT A

Cook - Direct

1  listening to me.  He wasn't lowering his voice.  He was moving

2  his shoulders slightly.  And he would turn almost, you know,

3  like he wants to see where I'm at, things like that.  And,

4  again, he wouldn't let me get in a position of advantage.

5  Q    At some point after he had exhibited these facial queues,

6  as well as the stiffening of the body, were you able to get him

7  into handcuffs?

8  A    I was.

9  Q    Once you got him into handcuffs, did he begin to comply

10 with you then?

11 A    No.

12 Q    When you say that he didn't comply with you, what do you

13 mean by that?

14 A    He didn't comply with information identifying who he was.

15 He didn't comply in telling me whether he was armed or not, if

16 he was in possession of any weapon on his body that might harm

17 me.  He didn't comply in telling me if he was on parole or

18 probation.  He didn't comply in assisting me with investigating

19 whether he was there to detonate a bomb or whether he was there

20 for some other reason.  And he was physically, you know, non-

21 compliant when we tried to stand him up later and move him over

22 to a vehicle and put him if a police car.

23 Q    At some point after you had detained the Defendant, did

24 you explain to him why you had detained him and taken his cell

25 phone and put it on the ground?

26 A    I did.

27 Q    What did you tell him?

28 A    I told him that I detained him because I thought he was

*Ad Hoc Reporting*

EXHIBIT A

Cook - Direct

1    using his cell phone and try and detonate an explosive device.

2    Q    How did the Defendant respond to that?

3    A    He said I was crazy.

4         THE COURT:  Wait a second.  Is this what we talked

5    about in the jail?

6         MR. WANG:  No, it's not, Your Honor.  This is still

7    on the field.

8         THE COURT:  All right.  Hearing no objection, go

9    ahead.

10        THE WITNESS:  He began screaming that I was crazy or

11   -- he was just screaming, yelling, upset.

12   BY MR. WANG:

13   Q    At that point when you explained to him why you had

14   detained him, did he ever tell you, "No, Officer, that's not

15   why I'm here"?

16   A    No.

17   Q    Did he ever tell you that, "No, I was just filming and I

18   had nothing to do with this," did he ever tell you anything to

19   that effect?

20   A    No.

21   Q    At some point did you come to believe that he might be

22   involved in the media in some way?

23   A    Yes.

24   Q    Can you describe for the jury how you came to that

25   belief?

26   A    He began yelling.  And at one point he identified himself

27   as a reporter for Fox News 6.  He asked the People who were

28   watching in the crowd to call Fox News 6 and tell them that

EXHIBIT A

Cook - Direct

1   they had one of their reporters under arrest or in custody.

2   Q     Reporters, they're allowed to be around the crime scenes;

3   are they not?

4   A     Everybody's allowed to be around the crime scene.

5   Q     Are reporters -- do reporters dress in a certain way, or

6   do they have any credentials that help distinguish them as

7   press compared to regular civilians?

8   A     Yes.

9   Q     Can you describe what that is to the jury?

10  A     They have little identification cards, press credentials

11  that are usually validated by the San Diego Police Department

12  or the San Diego Sheriff's Department, at least in this area.

13  Q     When you had contact with the Defendant, at any point did

14  you see him clearly displayed media badge on him?

15  A     No.

16  Q     So when you had contacted him prior -- I'm sorry, all the

17  way leading up to him pulling his cell phone, did you have any

18  idea that he was media?

19  A     No.

20  Q     Did have any idea who he was?

21  A     No.

22  Q     Eventually when he starts yelling out that, you know,

23  someone from channel -- about a reporter from Channel 6, how

24  did you respond to that?

25  A     I asked him if he worked for Channel 6.

26  Q     Did he respond to you?

27  A     He did.

28  Q     What did he say?

EXHIBIT A

Cook - Direct

1  A     He began yelling profanities at me, and then he refused

2  to -- he said something about being a stringer for Channel 6,

3  and that he wasn't going to answer any more of my questions.

4  Q     So when you tried to identify whether or not he was

5  indeed media, he refused to answer any more of your questions?

6  A     Yes.

7  Q     At some point after you had asked him all of these

8  questions, did you attempt to move him into a police vehicle?

9  A     Yes.

10 Q     When he started to struggle, were there any attempts to

11 put him in the back of the vehicle?

12 A     Yes.

13 Q     Can you describe for the jury how he struggled with you?

14 A     When we -- I had to call additional units to assist me.

15 And as we were walking him over, he began shrugging his

16 shoulders and moving.  I know we were telling him to relax, and

17 then we had to tell him at least three times to get in the

18 vehicle.  And his body stiffened, and he wouldn't get in.

19 Eventually, he complied.

20 Q     Now, just a second ago you mentioned that you actually

21 had to call other units over.  So when you had first contacted

22 the Defendant, how many officers were on that western

23 perimeter?

24 A     One.

25 Q     Was that yourself?

26 A     Yes.

27 Q     At what point did you decide that you needed more officer

28 help?

EXHIBIT A

Cook - Direct

1   A      When I noticed -- initially, when I contacted him and he

2   was being just verbally non-compliant, from the observations

3   that I saw in his clothing and everything else, I requested at

4   least another officer.   But when he started telling me, you

5   know, to make my hands off him and shrug away from me when I

6   was trying to get him to sit down, I had to call more.   And I

7   ended up, I believe, with a total of four, and had to have a

8   supervisor monitor.

9   Q      Why were you concerned when he started struggling that

10  you would need more officers?

11  A      Again, I don't -- I want to be focusing on the

12  investigation of the bomb threat.   I don't want to be focusing

13  on this individual.   I don't want to get hurt by this

14  individual.   I don't know if he's armed.   He's considerably --

15  well, he's larger than me, considerably larger than me.   I

16  don't know any of his training.   I don't know anything about

17  him at this point.

18         (Audio played.)

19         MR. WANG:   Your Honor, I have transcripts of this.

20  Can I pass them out before we play it?

21         THE COURT:   Yeah, whatever you want.

22         THE CLERK:   (Indiscernible)?

23         THE COURT:   Yeah, what's -- is this exhibit that

24  you've been playing have a number?

25         MR. WANG:   Yes, Your Honor.   Both contained within

26  People's -- Court's Exhibit 2, I believe, is the disc.

27         THE COURT:   All right.

28         MR. WANG:   The Court has a copy?        EXHIBIT A

Cook - Direct

1      THE COURT:   No, I don't have one, but it's all

2  right.

3      (Pause.)

4      THE COURT:   You want to let the jurors know where

5  they are on their transcript or --

6      MR. WANG:   (Indiscernible.)

7      THE COURT:   Okay.

8      (Audio played.)

9  BY MR. WANG:

10  Q    Officer, does that accurately reflect the conversation

11  that you had with the Defendant that we were just talking about

12  concerning having his cell phone?

13  A    Yes.

14  Q    Officer, in that video, it appears that there were

15  numerous times where you asked him his name and to sit down.

16  Was there something about the circumstances that surrounded

17  this who incident that made you believe that you had to

18  ascertain, one, his compliance, as well as his identity?

19  A    Yes.

20  Q    Can you explain that for the jury?

21  A    There were still people in the building.   It was an

22  active investigation of a bomb.   We didn't know if there was a

23  bomb that was going to detonate, when the bomb was going to

24  detonate, who was going to detonate the bomb.   I had the only

25  person with me that appeared in any way related to it, and I

26  wanted to find out who that person was so we didn't waste time,

27  asset, manpower, investigating something that had nothing to do

28  with a bomb.

EXHIBIT A

Cook - Direct

1  Q    Now, Officer, did the Defendant's actions on that

2  particular day delay or obstruct you in the performance of your

3  duties in terms of the investigating that bomb threat?

4  A    Yes.

5  Q    Is that for all the reasons that you've articulated for

6  the jury, the fact that other resources would have to be

7  brought in?

8  A    Yes. And I wasn't able for my duties on the perimeter.

9  Q    These other deputies that you had called in, were they

10 called in from other perimeters and other duties?

11 A    Yes. They were called in from the evacuations, and I

12 think two of them I know from the other perimeter.

13 Q    So when you had called down -- other individuals that

14 were aiding in the evacuation of the building had to respond to

15 come and help you?

16 A    Yes. As well as supervisors who were trying to

17 coordinate it, had to -- one of them had to stop doing that and

18 had to monitor this incident. And investigative resources had

19 to be used to try and identify who he was, and any relation he

20 may have to a -- an explosive device.

21 Q    At any point during your contact with the Defendant out

22 in the field, did you learn that this explosive device that you

23 were potentially investigating was in fact a bottle of urine

24 and a coffee mug?

25 A    Not until I was back at the station.

26 Q    So this entire contact that had you with the Defendant,

27 what did you believe was going on inside of Congressman Issa's

28 office?

EXHIBIT A

Cook - Direct/Cross

1  A     I believed that there was an explosive device.

2  Q     Did any individual from the bomb squad ever approach you

3  and tell you like, "It's nothing, it's harmless, don't worry

4  about it"?

5  A     No.

6         MR. WANG:  Thank you, I have no further questions.

7         THE COURT:  All right.  Cross-examination, Mr.

8  Crawford.

9         MR. CRAWFORD:  Thank you.

10                    CROSS EXAMINATION

11 BY MR. CRAWFORD:

12 Q     Officer Cook, were you in contact with other officers by

13 radio or anything of that sort?

14 A     Yes.

15 Q     And is it your testimony that at no point in time when

16 you were out in the field, that you were told that the, quote,

17 suspicious device was a bottle of urine?

18 A     No.

19 Q     You've had briefings in that sort of thing as being a

20 deputy sheriff, correct?

21 A     Yes.

22 Q     And you've also mentioned that you've had training both

23 as a marine -- I think you said marine?

24 A     Yes.

25 Q     And in the academy, I assume, police force?

26 A     In the academy, yes.

27 Q     And also in dealing with -- assuming some level of

28 training in dealing with explosives?

EXHIBIT A

Cook - Cross

1  A    Yes.

2  Q    The parameter that you had you set up on that day on

3  December 1st, was that in line with what you had been trained

4  in terms of an accurate or -- I'm sorry, not an accurate -- but

5  a good parameter, so to speak, for safety purposes?

6  A    I didn't set it up.  But I'm not -- I'm not sure exactly

7  what you mean.  Depending on the size of the explosive device,

8  I don't know.

9  Q    Well, okay.  Well, apparently the two police cars were

10 parked at a particular distance away?

11 A    Correct.

12 Q    The fire trucks were parked at a particular distance

13 away?

14 A    Correct.

15 Q    Do you know how far away that was?

16 A    I think it's generally 300 meters or 300 yards.

17 Q    Could it have been more?

18 A    It could have been.

19 Q    Now you've been trained, as awe said, that people

20 sometimes use cell phones to designate (sic) these explosive

21 devices?

22 A    Yes.

23 Q    Were you not trained that if they're outside the

24 perimeter it would be okay to use a cell phone?  Was that not

25 part of your training?

26 A    No.

27 Q    As part of your training and part of your briefings, were

28 you ever briefed on who might be members of the media and who

EXHIBIT A

Cook - Cross

1  might not be members of the media?

2  A    Yes.

3  Q    Now, your sheriff substation, if you will, or perhaps

4  your main station, you're aware that they have a picture of Mr.

5  Playford as being a media member there.  Are you familiar with

6  that?

7  A    No.

8  Q    Your particular office has never been briefed on Mr.

9  Playford?

10 A    No.  I had no idea when Mr. Playford was before this day.

11

12 Q    Are you familiar with someone by the name of Jan Caldwell

13 (ph)?

14 A    Yes.

15 Q    And who is she?

16 A    Jan Caldwell is a public affairs representative at our

17 Ridgehaven (ph) Office.  I've never met her, but I've seen her

18 on TV.

19 Q    And she has never briefed your particular location or

20 your substation on who Mr. Playford was?

21 A    No.  Not to my knowledge.  I've never met her and I'm

22 never received any briefing on that whatsoever.

23 Q    How much training did you get in the academy in terms of

24 the use of cell phones for detonating explosive devices?

25 A    We had a block on domestic terrorism.  And we also had

26 our annual training on domestic terrorism.  So when they refer

27 to it, they don't get deep in the minutia of it, but they just

28 talk about that cell phones can often be used to detonate a

EXHIBIT A

Cook - Cross

1    device because there's a transfer, I guess, of static

2    electricity, and if you dial from one to another one, it can

3    detonate a device.

4    Q    So you didn't have very extensive training in that area

5    at all?

6    A    No, just basic, that cell phones can be used to detonate

7    explosive devices.

8    Q    When you arrived, was the bomb squad already there, or do

9    you know?

10   A    No.  No.

11   Q    You don't know or --

12   A    No, they were weren't.

13   Q    How long after when you arrived did they arrive?

14   A    I have no idea.

15   Q    And you said there were actually people still in the

16   building?

17   A    Yes.

18   Q    Did you go in the building and see those people?

19   A    No, I didn't.  I saw them through the window.

20   Q    Exhibit 7 --

21   A    It's the picture of me walking next to the --

22   Q    It's a picture of you walking, but it's not the same as

23   what was showed to the jury.

24            MR. WANG:  Is this it?

25            THE WITNESS:  Yes, that's it.

26        (Pause to confer.)

27   BY MR. CRAWFORD:

28   Q    You don't know how far away this truck and this car is

EXHIBIT A

Cook - Cross

1   from the building; is that correct?

2   A    I don't know the exact measurement, no.

3   Q    But you believe, based upon your training that it should

4   be at least 300?

5   A    About that, yes.

6   Q    Okay.  300 yards?

7   A    It's 300 yards or 300 meters.

8   Q    Now this is you right here, right (indicating)?

9   A    Yes.

10  Q    In the center of the photo?

11  A    Yes.

12  Q    Walking -- you're the only uniformed officer in this

13  particular Exhibit 7, correct?

14  A    Yes.

15  Q    And you indicated these people along here, these are --

16  who are these people?

17  A    The majority of them, I believe are people who were

18  evacuated out of the building.  Either that or people who of

19  just come down to meet them.  I don't know who each one is, but

20  most of them were people out of the building.

21  Q    Can you identify the individual who appears to be the

22  male in the far left of this particular exhibit?

23  A    No.

24  Q    But you're also in that particular exhibit a few feet

25  from him?

26  A    Yes.

27  Q    Is it fair to say that he appears to be on a cell phone?

28  A    Yes.

EXHIBIT A

Cook - Cross

1   Q     Did you know who he was?

2   A     No.

3   Q     Did you see him on the cell phone at the time?

4   A     I did not.

5   Q     Is it fair to say he's on -- that he appears to be on one

6   in that picture, though, right?

7   A     He appears to be on one in that picture.

8   Q     I'm done with that exhibit.   Now, you said that Mr.

9   Playford was -- his appearance alerted you because he was

10  greasy and dirty?

11  A     His pants were.   His shirt was not.   He had a

12  Jacksonville Jaguars shirt on that was clean, but his pants

13  were greasy.

14  Q     And you said that in your training and experience, you

15  know that in dealing with electrical issues, that you can get

16  greasy and dirty?

17  A     Yes.

18  Q     What is it about electronics that makes you greasy and

19  dirty, if you know?

20  A     The whole bomb-making process, we're taught a lot that

21  when you look for a package, a suspicious package, look for

22  wires, look for greasy smudges.   A lot of times grease will be

23  used to make the contacts apparently work better.   I'm not an

24  electrician, but I know just from my time in the military when

25  you try putting things together, whether it's with tape or

26  whether it's, you know, boxes, whether you're using bolts,

27  whatever you're using, you tend to get yourself dirty.   And

28  grease is just one of those things.

EXHIBIT A

Cook - Cross

1   Q     Okay.  You said that someone else pointed out to you that

2   Mr. Playford was with the Occupied people; is that what you

3   said?

4   A     No.

5   Q     You said --

6   A     He was with the protesters.  I had mentioned that there

7   was protesters there earlier that morning.

8   Q     And was it indicated to you that he was protesting?  Is

9   that what was indicated to you?

10  A     I think I took that from he was with the protesters.

11  Q     I see.  Do you know if any of the protesters were

12  arrested that morning?

13  A     I don't believe so.  But I don't know for sure.

14  Q     All right.  Now when you first saw Mr. Playford, you

15  indicated he was walking towards the safety zone or something

16  along those --

17  A     Yes.

18  Q     And do you believe he got past the first patrol car, but

19  never past the second?

20  A     Yeah, I don't -- I don't recall if he got past the

21  second.  I remember just knowing that he was making a beeline

22  in there, and I wanted to stop him, so I wasn't going to be

23  chasing him around inside the area.

24  Q     Did he start videotaping after you stopped him, or when

25  did he start videotaping?

26  A     He brought the camera up a couple times, so I would say

27  before I stopped him.  And then during, and then, you know,

28  after what we saw there.

EXHIBIT A

Cook - Cross

1  Q    Well, on the video that we saw, you -- is it fair to say
2  that from that video he could not have been past the cars?
3  A    Well, yeah, he was -- the last one we watched, he was
4  back.  He was back when he was filming.  He had moved back when
5  I told him to move back.
6  Q    And he never crossed the last car?
7  A    I don't recall if he did.  I don't believe he did.
8  Q    Are you familiar with the San Diego Sheriffs Department's
9  guidelines on how to deal with the media?
10  A    Yes.
11  Q    You've gone over that?
12  A    I've been briefed on it.  I don't know it verbatim,
13  but...
14  Q    Is it fair to say, then, that -- yeah, I think you said
15  earlier, "Anybody can be at a crime scene."
16  A    Anybody can be at a crime scene.  It's very common when
17  you have a crime scene for people to show up, to videotape, to
18  film, to take photos.
19  Q    And anybody can videotape or take photos, whether they be
20  media or not; is that correct?
21  A    Yes.
22  Q    As long as they don't interfere with police activity in
23  doing so?
24  A    Right.
25  Q    Now when you got a hazardous area, or in this case, an
26  alleged bomb threat, isn't the policy of the San Diego Sheriff
27  to warn the media there may be some danger there?
28  A    I think you might be mixing up what's called a disaster

EXHIBIT A

Cook - Cross

1    area or avalanche zone and a crime scene.  It's 409.5 PC, the

2    Penal Code says that, "After being warned, the media is allowed

3    to enter into a disaster area."  So, for instance, the fires

4    that we've had in San Diego, the media's allowed to go in those

5    zones and report, as long as their presence isn't going to

6    interrupt the emergency, the firefighting, they're not going to

7    drive over the hoses or anything like that.  So the media is

8    warned, but they're allowed to go into those type things.

9          A plane crash, I think the case was a plane crash in

10   San Diego. The media is allowed to go into that site.  But if

11   it's an active crime scene, that doesn't apply.

12   Q    And an active crime scene is designated how?

13   A    An active crime scene is designated as an unnatural event

14   that's taking place.  I mean, we're trying to determine if a

15   crime is occurring at that moment, is about to occur or has

16   just occurred.

17   Q    And how is it that a person of the media is told that

18   they're crossing an active crime scene?

19   A    I would tell the person, "I'm sorry, you can't go past

20   this crime scene."  There's generally not a problem.  They'll

21   tell them where they can go and they'll set up wherever they

22   need to go.  That's how I tell them.

23   Q    Did you have a command center set up at this particular

24   location?

25   A    There was a command center, I believe, just west of there

26   on the side --

27   Q    Just west of?

28   A    I'm sorry, just west of our location down a side street.

EXHIBIT A

1  There was commands -- a command post set up with the capitals

2  and lieutenants and everybody coordinating the efforts.

3          THE COURT:  All right.  It's 4:30 or a little past.

4  I assume you have quite a bit more.

5          MR. CRAWFORD:  I do.

6          THE COURT:  All right.  Well, let's take our break,

7  then.  Deputy Cook, we need you back tomorrow at 9:00, okay.

8          THE WITNESS:  No problem, Your Honor.

9          THE COURT:  Okay.  You may be excused for now.  And

10  per the jurors, it's important that I remind you of the

11  admonition.  You don't need to talk to the lawyers or Mr.

12  Playford.  Don't do any research on the case.  Don't look up

13  anything on the internet.  Don't go by the scene.  Don't

14  consult with anybody else or any other reference works.  And if

15  you have a problem, make sure you call us.

16          And we'll be ready to go at 9:00.  And we're moving

17  right along, so I would anticipate that you'll get this case

18  tomorrow.  I think that would be a good bet.  And if you need

19  to deliberate on Friday, you can do that.  So, any questions

20  about the schedule?  Okay, then leave your notebooks and we'll

21  see you tomorrow.

22      (Jury exits courtroom.)

23          THE COURT:  All right, the jurors have left.  I've

24  gone over -- I want to talk about instructions for a minute.  I

25  looked at the instructions that Mr. Wong provided.  I took out

26  -- I don't know where I put it, so I don't know what the number

27  is -- the one that says Defendant testifying, but not

28  explaining anything, I never read that one.  Defendant

EXHIBIT A

1  testifying and not explaining everything, that one I don't

2  read.

3          I believe that we're going to need instruction 3500,

4  the unanimity instruction.  I know that you put it in here,

5  kind of, but there's been -- let me find that, because this

6  could be important later on.  Yeah, this is the end of

7  instruction 2656, resisting arrest, and you have a paragraph

8  you put in here of your theory.  The People allege that the

9  Defendant resisted or delayed Brendan Cook by doing the

10  following:  Refusing to comply with orders after being

11  detained.  You may not find the Defendant guilty unless you all

12  agree that the People have proved that the Defendant committed

13  at least one of the alleged acts of resisting or delaying a

14  peace officer who was lawfully performing his duties.

15          I suggest that paragraph is inconsistent, internally

16  inconsistent, because you've presented all kinds of theories

17  under which he could be guilty.  If you want to select only one

18  of those theories, that is, that he didn't comply with orders

19  after being detained, if that's your only theory that you're

20  going to argue, then this still isn't a good paragraph, because

21  you're including other conduct in the last sentence.

22  So, what I think we ought to do --

23          MR. WANG:  Your Honor, just to let Your Honor know,

24  that is directly pulled from the CALCRIMs.  The reason why the

25  People filled in that blank is that we did allege with

26  specificity where the conduct is, so that we would not need a

27  unanimity instruction.  If Your Honor feels that way, I'll

28  certainly prepare one, but I'm just letting you know that that

EXHIBIT A

1   was not a paragraph put in by me as a special instruction,

2   that's directly from the CALCRIMs.

3         THE COURT:  Well if you're going to only argue --

4   what are you going to argue that he did then?

5         MR. WANG:  I'm going to argue that after --

6         THE COURT:  What's the plan?

7         MR. WANG:  I'm going to argue that after the cell

8   phone was placed on the ground where the video camera by the

9   officer, his refusal to sit down and comply with orders by the

10  officer is what the 148 is.

11        THE COURT:  You're not going to argue that it's

12  delaying the other officers who had to come to the scene, or

13  the supervisor, or --

14        MR. WANG:  It certainly delayed Officer Cook's

15  investigation that he had to call other officers over.

16        THE COURT:  Well, but what I'm saying, you're not

17  going to argue that it's a 148 for all that other stuff?

18        MR. WANG:  I am not going to allege multiple victims

19  of the 148.  The fact that other individuals came and responded

20  is simply to reflect the amount of delay that Officer Cook had

21  to do, because he actually had to call a cover officer before

22  he could engage the upon defendant, due to his non-compliance.

23        THE COURT:  All right.  You're going to have to be

24  really careful in your argument.

25        MR. WANG:  I will not allege that other officers

26  were delayed.

27        THE COURT:  All right.  Now when you say he refused

28  to comply with orders after being detained, and then you say

EXHIBIT A

1  with you, but I understand that concept.

2          MR. CRAWFORD:  No, I understand.

3          THE COURT:  Pardon?

4          MR. CRAWFORD:  I understand you don't agree with me.

5          THE COURT:  All right.  I just -- I'd do it a

6  different way, but it's not my job to decide how to do it.  My

7  job is only to decide if instructions match what the arguments

8  are going to be.

9          MR. CRAWFORD:  I am going to oppose that instruction

10  the way it's been particularly generated.  I think that that's

11  a due process argument.  I think what he's saying to this jury,

12  if you find that he did those specific acts, then you find that

13  that's an obstruction.  I think that's a due process issue.

14          THE COURT:  Okay.

15          MR. CRAWFORD:  They're asking the jury to come to a

16  specific conclusion based upon certain acts.  And I think

17  that's unlawful.

18          THE COURT:  Okay.  That instruction's fine.  I mean,

19  it's part of an entire instruction.  It's really limiting.

20  It's limiting the rest of the instruction.

21          MR. CRAWFORD:  What I have found, Your Honor, in

22  this kind of case, is what a jury does is they take that very

23  instruction and they -- they vote, if you will, for lack of a

24  better term, on do you find this particular act occurred, yes

25  or no.

26          THE COURT:  Well, then that's your job to convince

27  them not to do that.

28          MR. CRAWFORD:  But I think it's the Court's job not

*Ad Hoc Reporting*

EXHIBIT A

1   to issue an instruction that is in violation of due process of

2   the law.

3          THE COURT:   Well, I agree with that part.   All

4   right.   If you have any other instructions, bring them in the

5   morning, because I anticipate we'll be reading instructions

6   pretty early in the day tomorrow.

7          Have you -- you don't need to tell me right now, Mr.

8   Crawford, what the answer is, but have you made a decision

9   about whether or not Mr. Playford's going to testify, just in

10  terms of --

11         MR. CRAWFORD:   Right now I would say yes, but --

12         THE COURT:   All right.   So I'm just thinking in

13  terms of scheduling.   So I should plan on some extra time?

14         MR. CRAWFORD:   Well, I don't know.   I don't know how

15  many more witnesses he's planning on calling, but I think he's

16  got through the crux of his case already.

17         THE COURT:   Yeah.   Well, let me do this.   How much

18  more cross do you want to -- just guess for me.

19         MR. CRAWFORD:   Half hour max.

20         THE COURT:   All right, 9:30.   Then what are you

21  going to do?

22         MR. WANG:   Your Honor, have I four civilian

23  witnesses that are the same length, approximately, of Deputy

24  Williamson, the individual that testified right before Deputy

25  Cook, so about 10, 15 minutes each.

26         THE COURT:   Okay.   I may not have let Williamson

27  testify if I'd known what he was going to say and there was an

28  objection.   I don't think he's testified to anything relevant.

EXHIBIT A

1    What are the other people going to say?

2              MR. WANG:   Your Honor, there were individuals that

3    were actually part -- as the Court can see from the fire

4    station, they observed the incident as it occurred.

5              THE COURT:   So they're percipient witnesses to

6    alleged 148?

7              MR. WANG:   Right.

8              THE COURT:   All right.

9              MR. WANG:   As far as the individual that directed

10   the deputy's attention to Mr. Playford, that he testified

11   about.

12             THE COURT:   All right.   So they're all percipient

13   witnesses, that's fine.   So, so you have roughly 9:30, if you

14   don't get involved in some lengthy redirect, these other

15   witness, 10:30, 11:00 maybe?

16             MR. CRAWFORD:   They should have the -- they should

17   have it by early afternoon.

18             THE COURT:   Yeah, I was going to say, we won't

19   finish in the morning if we have defense evidence, but that's

20   fine.   All right.   Then see everybody in the morning.

21             MR. WANG:   Thank you, Your Honor.

22             THE COURT:   I do have -- I don't think these -- I

23   don't think you marked these transcripts.

24             MR. WANG:   I need to mark the transcripts.

25             THE COURT:   All right.   Well, let's do that tomorrow

26   morning before we start.   Do you have another transcript, or do

27   we have all of them?

28             MR. WANG:   Yes, I have one more.   I forgot to give

EXHIBIT A

1   that one to (indiscernible).

2            THE COURT:  But we already played it?

3            MR. WANG:  We did play it.

4            THE COURT:  All right.

5            MR. WANG:  It was the first one and it was very

6    short.

7            THE COURT:  All right.  Let's forget about it, then.

8     That's all right.  Just mark the other ones either tonight or

9    tomorrow.

10        (Proceedings recessed.)

11

12                      CERTIFICATE

13        I  certify,  under  penalty  of  perjury,  that  the

14   foregoing  is  a  verbatim  transcription  prepared  from  the

15   electronic  sound  recording  provided  to  me  from  the  proceedings

16   in  the  above-entitled  matter,  and  is  a  true  and  accurate

17   transcript  of  said  proceedings  to  the  best  of  my  ability  and

18   belief.

19

20   _Fransesca St. John_____        JUL 3 1 2012
                                         _____
21   Fransesca St. John, Transcriber      Date

22

23

24

25

26

27

28

EXHIBIT A

1     IN THE SUPERIOR COURT OF CALIFORNIA

2   FOR THE COUNTY OF SAN DIEGO - NORTH COUNTY DIVISION

3

4  THE PEOPLE OF THE STATE OF   )
  CALIFORNIA,          )

5               )

6     Plaintiff,     )

               )  Case No. CN300278

7   v.           )

               )

8  JAMES PLAYFORD,      )

               )

9     Defendant.     )
   _____)

10

11           VOLUME II
        TRANSCRIPT OF TRIAL PROCEEDINGS

12     BEFORE THE HONORABLE RICHARD E. MILLS
         SUPERIOR COURT JUDGE

13         (Department 21)

14

         Vista, California

15      Thursday, May 17, 2012

16

17  For Plaintiff:     JACK WANG, ESQ.
             TED FIORITO, ESQ.

18            Deputy District Attorneys
             325 S. Melrose Dr., Ste. 5000

19            Vista, California 92081
             (760) 806-4004

20  For Defendant:     RICK CRAWFORD, ESQ.
             Deputy Public Defender

21            400 S. Melrose Dr., Ste. 200
             Vista, California 92081

22            (760) 945-4000

23  Transcription Service:   Fransesca St. John
             Ad Hoc Reporting

24            110 West C Street, Suite 807
             San Diego, California 92101

25            (619) 236-9325

26  **[See transcriber note on p. iii.]**

27

28  Proceedings recorded by electronic sound recording; transcript
  produced by transcription service.

EXHIBIT A

2-ii

1                               INDEX

2

3                          Direct    Cross    Redirect    Recross

WITNESSES FOR THE
4  PLAINTIFF:

5  Brendan Cook           ----      2- 1     2-17        2-24

6  Debra Sue Bonomo       2-29      2-31     ----        ----

7  Katie Boettcher        2-33      ----     ----        ----

8  Donald Eppich          2-36      ----     ----        ----

9  WITNESSES FOR THE
   DEFENSE:
10
   James C. Playford, Jr.  2-41     2-47     2-60        ----
11

12  EXHIBITS:                                Marked      Received

13    Court's

14      1    (Not identified)               1-34        2-40

15      2    Disc                           1-71        2-40

16      3    Aerial photo                   1-51        2-40

17      4    View of west of building       1-53        2-40

18      5    Photo of walkway               1-52        2-40

19      6    Photo of Thibodo Road          1-52        2-40

20      7    Perimeter of west photo        1-53        2-40

21      8    East towards building          1-54        2-40

22    Defendant's

23      A    Portion of media guide         2-95        2-95

24      B    Portion of media guide         2- 2        2-40

25      C    Portion of media guide         2-94        2-94

26      D    Photo ID                       2-14        2-40

27      E    "Stringer" ID                  2-14        2-40

28  (Note:  Defense Exhs A, B and C excluded from jury at p. 96.)

*Ad Hoc Reporting*

EXHIBIT A

Cook - Redirect

1  Q    On that particular date, December 1st, 2011, did you

2  arrest the defendant because he was trying to film?

3  A    No.

4  Q    Did you arrest the Defendant because he wouldn't tell you

5  his name?

6  A    No.

7  Q    Did you arrest the Defendant because he potentially was a

8  media person that had tried to cross that line?

9  A    No.

10 Q    Why did you arrest him?

11 A    I arrested him because after I detained him and was

12 trying to conduct a preliminary investigation to find out if he

13 was in fact involved with this bomb, his behavior, his

14 mannerisms, his evasiveness, his physical refusal to comply

15 with my commands to the point where I actually had to put my

16 hands on him and force him to sit down required me to call four

17 other deputies who were on perimeters who were trying to

18 evacuate people, who were trying to make sure no innocent

19 people drove their car in, or, you know, someone on their

20 bicycle doesn't go around the perimeter, caused me to have to

21 call and have detectives try and identify who this person was.

22        And caused us to focus a descent amount -- I mean,

23 we really only had like six or seven people there, and we were

24 all focused on him for, you know, a good 20, 30 minutes at that

25 time before I could leave.  The video is only the beginning

26 part of it.  That's why I arrested him, because I couldn't

27 complete my preliminary investigation.

28        MR. WANG:  Thank you.  I have nothing further.

*Ad Hoc Reporting*                    EXHIBIT A

1         THE COURT:   However, I have one more thing to do.

2  And that is, he's going to have to pay some attorney's fees.  I

3  read his financial declaration.  I'm going to give him a break

4  on it, but I'm going to set the attorney's fees for the trial

5  at a reduced rate of $300.  And you can get your -- you can

6  wait outside.  We'll give you the paperwork.  You can take it

7  down to Collections and set up an account to make payments.

8        MR. PLAYFORD:   Thank you very much.

9        MR. CRAWFORD:   Thank you.

10    (Proceedings adjourned.)

11

12                 CERTIFICATE

13     I   certify,   under   penalty   of   perjury,   that   the

14  foregoing   is   a   verbatim   transcription   prepared   from   the

15  electronic sound recording provided to me from the proceedings

16  in   the   above-entitled   matter,   and   is   a   true   and   accurate

17  transcript   of   said   proceedings   to   the   best   of   my   ability   and

18  belief.

19

20  *Fransesca St. John*                   7-31-12

21  Fransesca St. John, Transcriber            Date

22

23

24

25

26

27

28

EXHIBIT A

1  that could have had drastically different outcomes than it

2  did.  And we expect members of our community that we entrust

3  with a badge and uniform that they don't sit idly by and watch

4  someone potentially commit a crime.  They're not

5  (indiscernible), they're just as much (indiscernible).

6          And members of the jury, we might be sitting here

7  scrutinizing a different person if Deputy Cook had not done

8  (indiscernible), because he was doing his job.  He was

9  protecting those individuals in Congressman Issa's office.  He

10  was making sure that today, as we stand here today, that

11  December 1st of 2011 didn't have any significance.

12          THE COURT:  All right.  Thank you, Mr. Wang.  Mr.

13  Crawford, go ahead.

14          MR. CRAWFORD:  I'm going to need a minute to set up,

15  just to swap the table out.

16          THE COURT:  All right.

17          MR. CRAWFORD:  I hope it works.

18      (Pause.)

19          CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

20          MR. CRAWFORD:  Thank you.  Ladies and gentlemen of

21  the jury, we all respect police officers.  That's not what this

22  is about.  Mr. Playford also had a job to do.  And butt for the

23  interference, and unlawful interference and unlawful detention

24  of a police officer, Mr. Playford would have been allowed to do

25  that job.

26          First Amendment guarantees freedom of the press.

27  That's what we talked about way yesterday morning, a long time

28  ago it seems like now.  That's what the First Amendment

EXHIBIT A

1   guaranties.    Mr.   Playford   has   a   right   to   dispute   his

2   infringement  upon  his  First  Amendment  right.    First  Amendment

3   guarantees   freedom   of   speech.    Certainly,   I   don't   hear   the

4   prosecution  saying  that  the  things  that  Mr.  Playford  was  saying

5   were  unlawful.    So  that's  not  an  issue  for  us,  whether  or  not

6   his  speech  was  unlawful.

7            I  think  what  you've  heard  is  a  significant  amount  of

8   verbal   criticism,   particularly   after   Mr.   Playford   was

9   approached  unlawfully,  and  detained  unlawfully.    We  talked

10  about  him  being  immediately  abusive  and  aggressive.    That's  not

11  what   you   heard   on   the   videotape.    When   he's   initially

12  approached  he's  saying,  sir,  yes,  can  I  help  you,  have  I  done

13  anything  wrong,  have  I  broken  any  laws.    He  has  a  right  to

14  inquire.    He's  being  detained.    He's  being  stopped  from  doing

15  what  he  has  a  lawful  right  to  do.    It's  not  until  the  officer

16  becomes  more  aggressive  that  the  officer  starts  using  force,

17  that  Mr.  Playford  then  becomes  agitated  and  uses  some  language

18  that  none  of  us  appreciate.

19           Had  that  officer  not  stopped  Mr.  Playford  from  doing

20  what  he's  legally  entitled  to  do,  none  of  us  would  be  here

21  today  determining  the  outcome  of  this  particular  case.    While

22  that  police  officer  may  resent  having  abusive  language  directed

23  at  him  --  and  the  judge  read  you  that,  as  part  of  the

24  instruction  you  have  --  think  may  not  exercise  that  power  at

25  their  disposal  to  punish  individuals  for  conduct  that  is  not

26  merely  lawful.    Lawful,  it  is  lawful  for  him  to  videotape.    It

27  is  lawful  for  him  to  be  on  his  cellular  phone.    It  is  lawful

28  for  him  to  question  why  are  you  talking  to  me  at  all,  why  are

EXHIBIT A

1  you bothering me.  I'm not in a safety zone, I'm outside the

2  safety zone.  I'm not even near the yellow tape.  You have no

3  reason, Officer, to talk to me at all.

4           Was Mr. Playford being a nice guy?  No.  He doesn't

5  have to be.  He's (indiscernible).  Is he saying things that

6  you probably -- you're probably saying oh, man, I don't like

7  that language, but it's not against the law.  You can't be

8  arrested for that.  It's not a jailable offense to use swear

9  words.  It's not a jailable offense to swear at an officer.

10          Not only is it lawful, but it is protected by the

11  First Amendment.  That's what we talked about early yesterday.

12  Everybody heard of the First Amendment; does anybody have a

13  problem with it?  I don't believe anyone indicated that have a

14  problem with the First Amendment.

15          A peace officer is not lawfully performing his or

16  her duties if he or she is unlawfully arresting or detaining

17  someone.  The police officer may believe that he has a lawful

18  detention, but that doesn't make it so.  The peace officer may

19  believe he has a reasonable detention, but that doesn't make it

20  so.  That's determined by statutes and codes.

21          Therefore, if he's incorrect in arresting or

22  detaining someone who's doing something perfectly lawful, and

23  we've talked about what's perfectly lawful, I even asked the

24  officer what's lawful, what was unlawful about what Mr.

25  Playford was doing.  Folks, it's lawful to videotape; and it's

26  not unlawful.  If it's lawful to be on your cellular, then it's

27  not unlawful.  If it's lawful to say get away from me, then

28  it's not unlawful.  Therefore, if you're detaining someone for

EXHIBIT A

1    any of those reasons, it's an unlawful detention.

2            We heard from a bomb expert, a real expert

3    apparently, he said that he was, he qualified himself as one,

4    one with more knowledge about the use of cellular phone in the

5    field, and what did he tell you?  Not concerned with someone

6    using a cellular phone outside the safety zone, wouldn't

7    concern him at all.  So a reasonable officer who knows what

8    he's doing, wouldn't be concerned about that at all.  So if a

9    reasonable officer is not concerned about a person using a

10   cellular phone outside the safety zone, it is unreasonable for

11   another officer to say it's not something you should be doing.

12           People make mistakes.  Officers make mistakes.  Mr.

13   Playford makes mistakes.  We all make mistakes.  Thus, if this

14   officer is making a mistake in detaining Mr. Playford, it's a

15   mistake.  But that doesn't mean that Mr. Playford has done

16   anything wrong.  It doesn't mean that Mr. Playford was

17   willfully violating the law.  Mr. Playford was willfully doing

18   what he had been trained to do.  Stay outside the safety zone,

19   videotape, get that message to their agency as soon as you can,

20   and update your agency as soon as you can.  That's what he was

21   doing.  So he had a job he was performing as well.

22           If the officer made a mistake in believing that Mr.

23   Playford was trying to detonate a bomb, so be it, he made a

24   mistake.  Does that make it a lawful arrest?  Does that make

25   Mr. Playford an illegal person?  I submit to you it doesn't.

26   No more than it would have made that other person standing over

27   there using his cell phone an illegal person.  That other

28   person could have been questioned as well if he had been

EXHIBIT A

1  questioned.   Why didn't you ask me to get off my cellular
2  phone?  I have a right to use my cellular phone.  Everyone else
3  here was using their cellular phone, why are you -- why are you
4  messing with me?  As a citizen you have a right to do that, to
5  question what you believe is unlawful.   Illegal, violation of
6  your constitutional rights, activity by peace officers.

7          You can also use reasonable force when you believe
8  unreasonable force has been used against you.  What kind of
9  force have we heard that Mr. Playford used at any point in
10  time?  Oh, get away from me, what are you doing, he's running
11  away from him.  Well, that's the first thing we've heard.  Is
12  that unreasonable when you believe someone's taking away your
13  ability to make a living?  Was that unreasonable for you to
14  question what he's doing and to try to -- he didn't take off
15  running, he said what are you doing?  At least by the
16  description.  Why are you trying to grab my cellular phone.
17  Why are you trying to grab my camera.  I'm with the news.  What
18  else did he want to say?  What else did that officer need to
19  hear at that point?

20          He doesn't have to provide identification.  He's not
21  required to.  He doesn't have to say his name.  He's not
22  required to.  None of that is unlawful.

23          Officer Cook said at no time did he see a press
24  credential.  That's what he said initially.  At no time had he
25  ever seen one.  Wasn't aware of one to this day.  Then when I
26  cross-examined him on that, he changed it.  Have you a jury
27  instruction about the believability of the witness.  And you
28  have to ability to judge the believability of a witness, .

1    whether he be a police officer or whether he be anyone else.
2    And you can question the believability of that testimony.

3          Initial indication was never -- at no point in time
4    was he able to verify that he was a number.  Changed that to
5    saying that well at some point in time we did find something
6    around his neck.  How does that comport with the statement
7    that, No, I never was able to verify he was a member of the
8    media?  That's part of the exhibit.

9          As for a San Diego sheriff's officer press
10   credential, that doesn't even ask.  Why is he asking Mr.
11   Playford for something that doesn't exist?  The officer said
12   well I thought it did, it used to be.  Did he say when it used
13   to be?  It was last year or the year before, 10 years ago?

14         Never saw Mr. Playford enter the safety zone.  To me
15   that's huge.  Tremendous.  If he never saw him enter the safety
16   zone, why is he approaching him in the first place?  If you
17   never see a person committing a crime, why did you take them in
18   the first place?  You may want to investigate, but he doesn't
19   have to cooperate.

20         Admitted that it's not against the law to video, he
21   admitted that.  So what you saw Mr. Playford doing outside the
22   safety zone was videotaping.  Is that against the law, sir?
23   No, it isn't.  Can you detain someone for doing something that
24   is lawful?  Is that unlawful detention?

25         And it's not against the law to be on his cellular
26   phone.  Particularly, where that's a particular concern is that
27   he's outside the safety zone on his cellular phone.  If it's
28   not against the law to be on his cellular phone, he wasn't in

EXHIBIT A

1  the safety zone, it's not against the law to video, why is he
2  being detained?  Is that unlawful detention?  If he has a right
3  to question why he's being detained, is that unlawful?  That's
4  his First Amendment right.

5          Officer didn't notice another person on the phone
6  right in front of him.  What were his observations?  He said he
7  was there to observe the perimeter.  To make sure no one went
8  beyond the perimeter.  That's what he said that his duty was at
9  that particular point.  Well, no one did go beyond the
10 perimeter.  That his observations are so keen that he didn't
11 see another guy on his cellular phone directly in front of him,
12 but you saw the picture.  If he did see him, why didn't he
13 detain him?

14          He did not know the device was urine in a bottle,
15 yet Mr. Playford did.  Mr. Playford's got more knowledge than
16 the police at that point?  You can disbelieve what Mr. Playford
17 said or you can disbelieve what the officer said, or you can
18 have some other reasonable explanation for that.  But if you
19 believe what Mr. Playford said, apparently he's got more access
20 to what's going on at that crime scene than the police do.  I
21 asked the police officer, aren't there communications going on
22 outside the perimeter.  Aren't there radio transmissions that
23 you're listening to?  He said yes, but he was not informed as
24 to what the device was.  Mr. Playford knew what the device was.
25 He said he got that information from Channel 6.  Channel 6 had
26 more information than the police?

27          You can question that for yourselves.  The Defendant
28 is not guilty, plain and simple.  We have an unlawful detention

EXHIBIT A

1   and  an  unlawful  arrest.   You  can  use  reasonable  force  in

2   resisting  either.   You  can  use  reasonable  statements  in

3   questioning  either.   Therefore,  he  cannot  be  convicted  of  the

4   charge.   I'm  going  to  ask  you  to  find  that  he  is  not  guilty.

5   Thank  you.

6            THE  COURT:   All  right.   Thank  you,  Mr.  Crawford.

7   Mr.  Wang,  why  don't  you  go  ahead.

8            MR.  WANG:   Yes,  sir.

9            THE  COURT:   This  will  probably  go  a  little  bit  past

10  noon,  but  I'll  stop  if  somebody  wants  me  to  stop  right  now,  but

11  I  rather  finish.   So  is  everybody  okay  for  maybe  another  10

12  minutes,  15,  something  like  that?

13            REBUTTAL  ARGUMENT  ON  BEHALF  OF  THE  PLAINTIFF

14            MR.  WANG:   You  may  notice  a  funny  thing  when  you  go

15  back  in  the  jury  room.   Read  through  that  instruction  that  asks

16  you  about  what  constitutes  unlawful  detention,  you're  not  going

17  to   hear   the   word   lawful   or   illegal   anywhere   in   that

18  description.   What  it  asks  is  whether  or  not  the  officer

19  (indiscernible)  to  believe  that  someone  might  commit  a  crime.

20  That's   (indiscernible).    Why   did   he   that   particular

21  individual?   Well,  because  somebody  told  him  that  that  guy  was

22  part  of  the  demonstrate.   He  was  inside  the  building  right

23  before  the  bomb  scare.   Why  did  he  come  and  take  the

24  Defendant's  cell  phone  away?   Because  he  raised  it  in  front  --

25  pointed  it  at  the  building  where  he  thought  the  bomb  was  and

26  started  punching  in  numbers.

27            Members  of  the  jury,  when  you  go  back  there,  I  want

28  to  you  ask  yourself  a  question  because  Mr.  Crawford  seems  to

EXHIBIT A