Rachel M. Baird (admitted *pro hac vice*)
8 Church Street, Suite 3B
Torrington, CT 06790-5247
Tel: (860) 626-9991
Fax: (860) 626-9992
Email: rbaird@rachelbairdlaw.com
Attorney for Plaintiff

C.D. Michel, Attorney (#144257)
Michel & Associates PC
180 East Ocean Avenue, Suite 200
Long Beach, CA 90802
Email: lquesada@michellawyers.com
Attorney for Plaintiff

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AMERICAN NEWS AND INFORMATION SERVICES, INC.[1] and JAMES C. PLAYFORD,<br><br>Plaintiff,<br><br>vs.<br><br>WILLIAM D. GORE, individually and in his official capacity as San Diego County Sheriff, JAN CALDWELL, individually and in her official capacity as San Diego County Sheriff's Department Public Affairs Director, JESSE ALLENSWORTH, San Diego County Sheriff's Department Deputy, individually, JAMES BRENEMAN, San Diego County Sheriff's Department Deputy, individually, MICHAEL PROCTOR, San Diego County Sheriff's Department Deputy, individually,<br><br>Defendants. | CASE NO. 12-CV-2186-BEN (KSC)<br><br>PLAINTIFF'S ANSWERING MEMORANDUM OF POINTS AND AUTHORITIES<br><br>[Fed.R.Civ.P. 56]<br><br>Date: May 3, 2016<br>Time: 10:30 a.m.<br>Dept.: 5A – Courtroom of the Honorable Roger T. Benitez<br>Trial Date: None |

---

[1] Claims brought by American News and Information Services, Inc., the first-named Plaintiff, were dismissed by the court in a September 18, 2014, Order. [doc. #63]

- 1 -

Plaintiff James C. Playford ("Playford"), through undersigned counsel and in accordance with Local Civil Rule 7.1(f)(3), hereby files an answer to the County Defendants' memorandum of points and authorities in support of motion for summary judgment.

# I

# THE RETALIATION CLAIM HAS MERIT

A.  <u>SDCSD PIO Caldwell Distributed the Photograph of Playford in 2009-2010</u>

In a Declaration filed by San Diego County Sheriff's Department (SDCSD) Public Information Officer Jan Caldwell ("Caldwell") in support of the County's motion for summary judgment, Caldwell states that she sent a photograph of Playford to the front desk at the Sheriff's Administrative Center on May 31, 2012, for security concerns. (Caldwell Dec., ¶ 4 (doc. 95-3)) The County then argues in its memorandum that this photograph was provided to the reception desk after Playford's last arrest on May 25, 2012, "long after the actionable arrests." (County Mem. at 7 (doc. 95-1)) According to the County, "[t]he only negative comment attributed to Jan Caldwell was on March 31, 2012, long after the three actionable arrests." (County Mem. at 8 (doc. 95-1)) The County relies on Caldwell's March 18, 2016, Declaration to support its point that the retaliatory animus exhibited towards Playford in the February 28, 2010, March 9, 2010, and December 1, 2011, arrests could not have been attributable to the photograph off Playford because the arrests preceded Caldwell's delivery of the photograph.

However, on March 16, 2016, Caldwell testified in a deposition that she could not recall when she provided the photograph of Playford to the deputy in the lobby of the Sheriff's Administrative Center. (Ex. 1, Caldwell Depo., 65:9-12, 65:21-66:1) In her deposition Caldwell specifically states that she provided the photograph to a

- 2 -

12cv2186

SDCSD deputy. In her Declaration Caldwell vaguely states that she sent the photograph to the front desk of the Sheriff's Administrative Center. Based on the chronology of events related to the appearance of Playford's photograph in the lobby of the Sheriff's Administrative Center there is a reasonable inference that Caldwell's Declaration is untruthful. The chronology shows that the photograph was disseminated in 2009-2010 when Playford lost favor with the SDCSD because he videotaped an incident of excessive force in the Alan Baker case.

According to Caldwell in her deposition: Caldwell contacted the San Diego Police Department to obtain a photograph of Playford. (Ex. 1, Caldwell Depo., 65:13-16; 67:2-7) The photograph may have been emailed to her and it may have been in digital format. (Ex. 1, Caldwell Depo., 66:18-23) Caldwell used a computer to print out the photograph. (Ex. 1, Caldwell Depo., 69:11-13) Playford's name probably was on the photograph document and his date of birth may have been on the photograph document and there could have been other information on the photograph document that Caldwell does not recall. (Ex. 1, Caldwell Depo., 69:14-70:1) Caldwell provided the photograph to a deputy stationed in the lobby of the main office of the SDCSD located at the John F. Duffy Administrative Center, 9621 Ridgehaven Court, San Diego, CA 92123. (Ex.1, Caldwell Depo., 65:9-12) This may have occurred a few years ago or Caldwell does not recall when it occurred. (Ex. 1, Caldwell Depo., 65:9-12; 65:21-66:1) Caldwell's reason for giving the photograph to the lobby deputy was "deputy safety." (Ex. 1, Caldwell Depo., 67:8-9) The concern for deputy safety arose from Playford's "recent conduct" and behavior that was "rather aggressive, argumentative, caustic" towards Caldwell "and others, other deputies, other personnel." (Ex. 1, Caldwell Depo., 67:10-23) Caldwell as the Public Information Officer became involved in distributing Playford's photograph to the

lobby deputy because Playford was "alleging to be media and because of behaviors" she had "witnessed firsthand." (Ex. 1, Caldwell Depo., 71:1-3) In personally handing Playford's photograph to the lobby deputy, Caldwell believes she said: "This is a photograph of J.C. Playford. He is a person known to me that is antagonistic and aggressive, and I'm giving this photograph to you for deputy safety reasons." (Ex. 1, Caldwell Depo., 71:9-16) Caldwell does not know what the lobby deputy did with the photograph or whether it was posted. (Ex. 1, Caldwell Depo., 71:5-19) Caldwell does not know what happened to the photograph after she provided it to the lobby deputy. (Ex. 1, Caldwell Depo., 72:20-73:3) Caldwell does recall providing the photograph to Miramar Base (Caldwell Depo., 73:19-24) when SDCSD William Kolender passed away in October 2015. (Ex. 1, Caldwell Depo., 73:19-24; 74:7-19)

So it appears that Caldwell knew where to locate the photograph in October 2015 but does not know where it is now even though it has been the subject of a lawsuit since 2012.

Playford observed the photograph of himself in plain view in the lobby of the Sheriff's Administrative Center in 2009 or 2010 and took a picture of it. (Playford Aff., ¶ 23) An *examiner.com* article dated March 30, 2011, and written by Jeff Schwilk included a picture of a picture of a photograph of Playford with a handwritten note stating: "Per Jan Caldwell, Playford is no longer Media." (Ex. 2, examiner.com Article) The picture of a picture in the *examiner.com*'s March 30, 2011, article is a picture of the picture that Playford took of the photograph that Caldwell provided to the lobby deputy with the handwriting stating: "Per Jan Caldwell, Playford is no longer Media." (Ex. 2, examiner.com Article) Sine the picture of a picture that Playford took of the photograph that Caldwell gave to the lobby deputy in the Sheriff's Administrative Center appeared in an *examiner.com*

- 4 -

article on March 30, 2011, then Caldwell's statement that she did not provide Playford's photograph to the Administrative Center's front desk until May 31, 2012, is not true. A reasonable inference is that Caldwell has been untruthful to support the point made in the County's memorandum that her distribution of the photograph could not have resulted in retaliatory arrests of Playford because the photograph was distributed after the arrests.

Caldwell's retaliatory animus is demonstrated by her contact with the SDPD Public Information Officer, Detective Gary Hassen, to discuss Playford's conduct. (Ex. 1, Caldwell Depo., 39:23-42:4) SDPD Hassen is the same person whom Caldwell claims provided her a photograph of Playford that she gave to the SDCSD lobby deputy and Miramar Base. (Ex. 1, Caldwell Depo., 66:24-67:1) The City warned Playford on August 24, 2009, that his media credentials were in danger of being revoked as information had been received from the SDCSD that Playford had "filed complaints and court actions against deputies in which there had been apparent questionable recollections and accounting of the facts." (Playford Aff., ¶ 13) The August 24, 2009, letter never specified the actual conduct precipitating the warning. (Playford Aff., ¶¶ 15-16)

The point made by the County in its memorandum that Caldwell did not distribute the photograph until after long after Playford's arrests is not true. In fact the opposite is true. Beneath the photograph in handwriting it states that Playford is no longer the media. (Ex. 2, *examiner.com* Article) The SDPD denied Playford's renewal of his media credentials on January 11, 2010. (Playford Aff., ¶¶ 21) The next month, on February 28, 2010, Playford experienced his first arrest. Caldwell's statement in her Declaration that she sent Playford's photograph to the front lobby on May 31, 2012, is contrary to her deposition statements that she could not recall

when she provided the photograph to the front reception desk. The handwriting on the photograph stating that Playford is no longer the media is inconsistent with the May 31, 2012, date she declared because by May 31, 2012, Playford had been without SDPD media credentials since January 11, 2010.

In 2009 and 2010 when the SDCSD was incensed that Playford was distributing a tape of the Alan Baker beating, Caldwell contacted the SDPD PIO to complain about Playford and Playford's credentials were not renewed in January 2010. Caldwell then told the lobby deputy that Playford was no longer the media. It is not credible to believe that only one deputy was told and that Caldwell did not bother to follow-up on what was done with the photograph or where it was kept if her concern was for deputy safety, especially given Caldwell lack of credibility regarding the May 31, 2012, date she declared in her Declaration contrary to the rest of the evidence that shows otherwise. The handwriting on the photograph does not mention deputy safety, no precautions were taken for deputy safety. The only concern was to convey that Playford was not the media and when Playford showed up at scenes thereafter he was arrested four times each time he attempted to gather news. Not one of Playford's arrests preceded Caldwell's distribution of the photograph to the Sheriff's Administrative Center's lobby deputy.

Playford and Baker filed a federal court action on June 2, 2009, against SDCSD sheriff. (Playford Aff., ¶ 12)) Playford received a warning letter dated August 24, 2009, from the San Diego Police Department that his media credentials were in danger of revocation. (Playford Aff., ¶ 13) The SDPD denied Playford renewal of his media credentials on January 11, 2010. (Playford Aff., ¶ 21 ) Playford had a good relationship with law enforcement prior to July 25, 2008. (Playford Aff. ¶¶ 7-9) Then he videotaped SDCSD deputies beating Alan Baker. (Playford Aff., ¶

9 ) Phone calls between Caldwell and Detective Hassen, the PIO for the SDPD which issues media credentials, occurred in this same time period when SDPD issued the August 24, 2009, letter threatening to revoke Playford's media credentials. (Caldwell Depo., 39:23-42:4) (Playford Aff., ¶ 13)

Further supporting the inference that Caldwell gave the lobby deputy Playford's photograph prior to his first arrest on February 28, 2010, is the fact that the photograph used by Caldwell is not a booking photograph. The photograph originated on a movie website for *Surf School* that includes pictures of Playford as the producer. *See* http://americanindian.net/kusi/surfschool/surfschool.html (Ex. 3, *Surf School* Photograph)

B. <u>Playford Was Not Convicted of Interfering at Trial for the February 28, 2010, or the March 9, 2010, Arrests</u>

The County relies on the case of *Holguin v. City of San Diego*, No. 11-VC-2599-BAS WVG, 2015 WL 5692364 (S.D. Cal. Sept. 28, 2015) to argue that a balancing of the strength of probable cause in Playford's arrests against the evidence of retaliatory motive supports its motion for summary judgment. In *Holguin* two police officers intercepted the inebriated plaintiff who claimed to be a police officer as he attempted to reenter a football stadium after he had been ejected by security for fighting. The plaintiff was released but arrested three months later for misdemeanor charges of resisting and providing false information to an officer under California Penal Code §§ 148(a)(1), 148.9(a), respectively. A jury convicted Holguin of providing false information and the court dismissed the two charges of resisting arrest. In his federal complaint Holguin alleged 42 U.S.C. § 1983 claims arising from violations of his First, Fourth, and Fourteenth Amendment rights under the United States Constitution related to the arrest.

In examining the Fourth Amendment claim the court considered the City's three challenges to Holguin's allegation of unlawful seizure: (1) *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994); (2) issue preclusion; and (3) the undisputed evidence of lawful arrest. The doctrine of issue preclusion precludes relitigation of an issue of law or fact necessary to a prior judgment of a court in a subsequent lawsuit brought by at least one party to the previous case. "It is well established that a criminal conviction may be used to establish issue preclusion in a subsequent civil suit." *Holguin*, __F.Supp.3d at __, 2015 WL 5692364 at *5. As a matter of law the jury in his criminal trial was required to find that Holguin was lawfully retained or arrested to convict Holguin of proving false information to an officer under § 148.9(a). The court precluded Holguin from litigating his Fourth Amendment unlawful seizure claim. In examining whether the issue had been fully litigated the court found that the potential for incarceration defined the misdemeanor offenses as serious charges that Holguin "was motivated to fully litigate." *Holguin*, __F.Supp.3d at __, 2015 WL 5692364 at *7.

In examining the First Amendment retaliation claim the court identified "scant evidence supporting retaliatory animus" in "the officers' 'cocky and condescending tone' and the 30-second turnaround time between his purported protected speech and the arrest." *Holguin*, __F.Supp.3d at __, 2015 WL 5692364 at *9. The court concluded that no reasonable juror could conclude that the officers acted in retaliation for Holguin's speech. Id.

In Playford's case, the evidence of retaliation in the four arrests that followed the distribution by Caldwell of a photograph of Playford and the availability of that photograph to anyone who entered the Sheriff's Administrative Building as evidenced by its accessibility to Playford and Caldwell's misrepresentation of when

the photograph was provided to the lobby deputy far outweigh the evidence of retaliation cited in *Holguin*. In addition, Holguin sued for false arrest. The jury had to find that he was lawfully arrested to convict Holguin in the criminal trial.

A jury did not find Playford guilty of interfering with an officer in the February 28, 2010, and March 9, 2010, arrests. Playford pleaded "no contest" to two counts of section 415, subdivision (2) of the Penal Code (County Ex. D, (doc. 95-7 at 81-83)) which makes it a crime for any person to "maliciously and willfully disturb[ ] another person by loud and unreasonable noise." Section 1016 of the Penal Code allows for six kinds of pleas in criminal matters: 1. Guilty; 2. Not guilty; 3. Nolo contendere, subject to the approval of the court; 4. A former judgment of conviction or acquittal of the offense charged; 5. Once in jeopardy; and 6. Not guilty by reason of insanity. The nole contendere or no contest plea and "any admissions required by the court during any inquiry it makes as to the voluntariness of, and factual basis for, the plea may not be used against the defendant as an admission in any civil suit based upon or growing out of the act upon which the criminal prosecution is based." Playford never represented that his First Amendment rights were not violated by the February 28, 2010, and March 9, 2010, arrests. These cases differ significantly from *Holguin* in both the strength of probable cause and the retaliatory acts alleged. Playford's cases did not necessitate a finding contrary to a First Amendment defense and even if they had that fact could not be used against Playford. If, as the County argues, Playford did raise a First Amendment defense to the jury hearing the cases involving the February 28, 2010, and March 9, 2010, arrests the defense may have been the reason the jury did not convict. The County argues that Playford raised the First Amendment as his defense in both trials – in the trial concerning the February 28, 2010, and March 9, 2010, arrests, Playford did not

raise any defense. He pleaded no contest. He did not plead guilty as the County represents and attempts to use against Playford contrary to what the law states. (County Mem. at 15 (doc. 95-1)) Playford pleaded because he was told that if he did not and was convicted on retrial then he would be incarcerated. (Playford Aff., ¶¶ 41-42)

C.   The December 1, 2011, Arrest Retaliatory Claim

A jury did find Playford guilty of interfering in violation of section 148 of the Penal Code for the December 1, 2011, arrest. The proof of retaliatory arrest is demonstrated by the fact that the individuals in the same vicinity as Playford using their cell phones were not approached by the SDCSD deputies because they were not gathering news. (Playford Aff., ¶¶ 47-48) Playford's initial contact with law enforcement occurred at a SDCSD command post north of the congressman's offices on Edna Way, a public road. (Playford Aff., ¶¶ 43-44) At the request of public safety personnel, Playford left the area of the command center and approached the scene from the north on Thibodo Road without progressing beyond the established motor vehicle detour point or yellow police-tape cordoned boundaries. (Playford Aff., ¶¶ 45-47) Playford observed in his vicinity non-public safety civilians freely walking and using their cell phones to make and receive phone calls. (Playford Aff., ¶¶ 45-47) While using his cell phone to contact the news desk at San Diego Channel 6 and positioning his camera to record the scene to the south of his location, Playford was identified, approached, confronted, detained, questioned, and prevented from gathering news by Deputy Brendan Cook. (Playford Aff., ¶¶ 45-47) At all times, Playford remained north of the yellow police-tape cordoned boundaries and north of all public safety vehicles and personnel engaged in traffic control. (Playford Aff., ¶ 48) Other individuals walking in the vicinity and individuals in motor vehicles

operating eastbound and westbound on State Road 78 in closer proximity to 1800 Thibodo Road were captured by Playford on videotape using cell phones but those individuals were not ordered to stop using their cell phones or accused of having a bomb detonator disguised as a cell phone. (Playford Aff., ¶ 48) Deputy Cook contacted American News President Edward A. Peruta on December 1, 2011, at 5:14 pm EST for the stated reason of verifying Playford's media status. (Playford Aff., ¶ 49) Peruta informed Deputy Cook that American News issued Playford valid media credentials on February 23, 2010, which Playford validly held. (Playford Aff., ¶ 50) Deputy Cook's interest in media credentials not issued by the SDPD and Playford's reliance on those credentials to record the scene was the reason for the arrest. If Playford truly appeared to be a threatening person and was acting alarming then he would have been arrested on charges of disturbing someone other than police officers and whether or not he was affiliated with American News would not have mattered.

## II.
## LEGAL ARGUMENT

In <u>Ford v. City of Yakima</u>, 706 F.3d 1188 (9th Cir. 2013), a motorist brought a civil rights action alleging First Amendment retaliation against a municipality and the police officers who arrested and held him in custody following a traffic stop. Eddie Ford ("Ford"), the motorist, was driving just after midnight and listening to music when he noticed a police cruiser approaching rapidly from the rear. Ford changed lanes twice to allow the cruiser to pass. When Ford stopped at a red light he emerged from his vehicle to ask the officer behind him why the officer was following him so closely. The officer ordered Ford to return to his vehicle and proceed but then changed his mind and, after he

and Ford went through the intersection, the officer turned on his lights and signals and stopped Ford. Ford emerged from his vehicle yelling and accused the officer of racism. The officer ordered Ford to return to his vehicle or risk arrest. Ford obeyed. The officer then commented to another officer about Ford's attitude and arrested Ford. In the course of a back-and-forth discussion in the cruiser, Ford informed the officer that he was exercising his First Amendment right to free speech and the officer responded that he was exercising his right to arrest Ford.

At trial, the officer testified that he arrested Ford for violation of a noise ordinance and for a disrespectful attitude toward the officer that endangered public safety. Ford was acquitted, then brought a civil rights action alleging that the officer retaliated against him for exercising his First Amendment right to freedom of speech. The district court granted the defendants qualified immunity finding that there was no constitutional violation as "the officers did not retaliate against Ford in violation of the First Amendment because they had probable cause to arrest Ford for violating the city noise ordinance." Id. at 1192.

The Ninth Circuit performed a two-prong analysis: First, whether the facts supported a violation of Ford's First Amendment rights and, second, whether such violation, if demonstrated, had been clearly established at the time Ford was arrested and held by the defendants.

First Prong: To determine whether the facts could support a First Amendment violation the court first asked if the defendants' "'acts would chill or silence a person of ordinary firmness from future First Amendment activities.'" Id. at 1192 (quoting Mendocino Envtl. Ctr. v. Mendocino Cnty., 192 F.3d 1283, 1300 (9th Cir.1999)). A rational jury could find that the officers' arrest and

- 12 -

12cv2186

detention "deterred or chilled the future exercise of Ford's First Amendment rights." Id. at 1194.  The court next determined whether the "speech was a but-for cause" of the defendants' conduct. As the court stated: "In other words, would Ford have been booked and jailed, rather than cited and arrested, but for the officers' desire to punish Ford for his speech?" Id. The "issue of causation ultimately should be determined by a trier of fact … ." Id.

Second prong: "Police officers have been on notice at least since 1990 that it is unlawful to use their authority to retaliate against individuals for their protected speech." Id. at 1195 (citing Duran v. City of Douglas, 904 F.2d 1372, 1375-78 (9th Cir.1990)). Skoog v. Cnty. of Clackamas, 469 F.3d 1221, 1232 (9th Cir.2006) established that "an individual has a right to be free from retaliatory police action, even if probable cause existed for that action." Ford, 706 F3d at 1195-96.

Playford, like Ford, has "put forth facts sufficient to allege a violation of his clearly established First Amendment right to be free from police action motivated by retaliatory animus, even if probable cause existed for that action." Id. at 1196.

> 5. "'But For' And Causation In Mam and Ford As Applied to Playford

Question #1:   Would a person of ordinary firmness be chilled from future First Amendment activity based on the facts in Mam and Ford and the allegations regarding Playford's arrests?

In Mam the answer is "Yes" because Mam was arrested, searched, and his cell phone seized. In Ford the answer is "Yes" because Ford was arrested and detained. Playford was arrested and detained four times and his property seized on March 9, 2010, December 1, 2011, and May 25, 2012. A person of ordinary

firmness would be chilled from future First Amendment activities when subject to the conduct attributed to the arresting SDCSD deputies.

Question # 2:   Was Mam's, Ford's, and Playford's First Amendment activity a "but for" cause of their arrests?

In <u>Mam</u> the answer is "Yes" because "the only difference between Mam and those near him was the cell phone being used to record." <u>Mam</u>, 2013 WL 951401 at 6. In <u>Ford</u> the answer is "Yes" because Ford was outspoken in exercising his First Amendment rights. Playford recorded police activity in public locations on February 28, 2010, March 9, 2010, and December 1, 2011. Although other individuals in the vicinity had cell phones on December 1, 2011, in the public location where Playford was recording, the SDCSD deputies seized Playford's cell phone on suspicion of an explosive device.  Moreover, the history between Playford and the SD County Defendants as alleged in the Amended Complaint from the July 2008 recording of the Alan Baker beating, the August 2009 SDPD warning letter, Playford's participation as a witness in the Alan Baker criminal and civil proceedings, the McGonigle Canyon controversy which pitted Playford's video recordings against the official SDCSD PIO version of events, the January 2010 renewal denial of Playford's SDPD government-issued media credentials, to the SD County Defendants' refusal to recognize American News' media credentials sufficiently allege a retaliatory animus absent which, in combination with his First Amendment activities, Playford would not have been arrested.

| | | |
|---|---|---|
| 1 | Dated: April 15, 2016 | PLAINTIFF |
| 2 | | JAMES C. PLAYFORD |

BY:  /s/ Rachel M. Baird
Rachel M. Baird
*Pro Hac Vice* Attorney for Plaintiff