Rachel M. Baird (admitted *pro hac vice*)
8 Church Street, Suite 3B
Torrington, CT 06790-5247
Tel: (860) 626-9991
Fax: (860) 626-9992
Email: rbaird@rachelbairdlaw.com
Attorney for Plaintiff

C.D. Michel, Attorney (#144257)
Michel & Associates PC
180 East Ocean Avenue, Suite 200
Long Beach, CA 90802
Email: lquesada@michellawyers.com
Attorney for Plaintiff

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN NEWS AND INFORMATION SERVICES, INC.[1] and JAMES C. PLAYFORD,<br><br>Plaintiff,<br><br>vs.<br><br>WILLIAM D. GORE, individually and in his official capacity as San Diego County Sheriff, JAN CALDWELL, individually and in her official capacity as San Diego County Sheriff's Department Public Affairs Director, JESSE ALLENSWORTH, San Diego County Sheriff's Department Deputy, individually, JAMES BRENEMAN, San Diego County Sheriff's Department Deputy, individually, MICHAEL PROCTOR, San Diego County Sheriff's Department Deputy, individually,<br><br>Defendants. | CASE NO. 12-CV-2186-BEN (KSC)<br><br>DECLARATION OF JAMES C. PLAYFORD and EDWARD A. PERUTA<br><br>[Fed.R.Civ.P. 56]<br><br>Date: May 3, 2016<br>Time: 10:30 a.m.<br>Dept.: 5A – Courtroom of the Honorable Roger T. Benitez<br>Trial Date: None |

---

[1] Claims brought by American News and Information Services, Inc., the first-named Plaintiff, were dismissed by the court in a September 18, 2014, Order. [doc. #63]

- 1 -

I, JAMES C. PLAYFORD, as to paragraphs 1-2 and 6-48, and I, Edward A. Peruta, as to paragraphs 3-5 and 49-50, declare as follows:

1. I am is a resident of Ramona, California.

2. I have been a member of the NPPA since March 25, 2012, an agent of American News and Information Services, Inc. in the business of news and information gathering and recording since February 23, 2010, and a freelance photojournalist and videographer.

3. American News is a news and information company incorporated in the State of Connecticut and owned by Edward A. Peruta that operates throughout the United States, and which gathers and provides raw, breaking news video, photographs, and news tips to various mainstream media outlets.

4. The State of Connecticut Judicial Branch recognizes American News as a media TV Station. (Ex. ?, List of Approved Media Organizations Pursuant to Practice Book Section 1-10A)

5. The United States Secret Service recognized American News as the media for entry to the media section of April 15, 2016, Donald Trump rally in Hartford. (Ex. , )

6. I commenced my career as a freelance photojournalist and videographer ("journalist") in 2007 recording wildfires near Ramona, California.

7. I am often is the first journalist to arrive at and record law enforcement, fire protection, and medical emergency responses to public safety incidents.

8. I have provided and sold my work to CNN™, TMZ™, TruTV™, MSNBC™, and a variety of local news outlets and my work product is available on the Internet.

6. My You Tube™ Channel *NewsNowSanDiego* has more than 12,000 subscribers and in excess of 7 million hits.

7. Soon after I began my work as a journalist in 2007, I applied for and was granted SDPD press credentials.

8. I enjoyed a positive rapport with law enforcement developed over a period of years.

9. On July 25, 2008, I captured an audio-video recording ("recording") of SDCSD deputies beating Allen Baker outside of the drinking establishment Mollie Malone's in Ramona.

10. I posted my recording of the Mollie Malone's incident on the Internet and was called by the defense as a key witness in the criminal prosecution of Allen Baker.

11. SDCSD deputies harassed me and intimidated me not to testify for the defense in the criminal prosecution of Allen Baker.

12. Baker and I filed a federal court action on June 2, 2009, against San Diego County Sheriff William Kolender. *See Baker v. County of San Diego, et al.*, Docket No. 09cv1194-BEN (S.D. Cal.).

13. The City warned me on August 24, 2009, that my media credentials were in danger of being revoked as information had been received from the SDCSD that I had "filed complaints and court actions against deputies in which there had been apparent questionable recollections and accounting of the facts."

14. This August 24, 2009, warning letter from the City leveraging my media credentials to control the content of his news gathering commenced a pattern and practice of retaliatory measures employed by the SD Defendants to manage my access to information of public interest especially pertaining to law enforcement activities.

15. The August 24, 2009, warning letter recites SDPD policy (DP 1.31) regarding media credentials, which states: "A media identification card may be revoked if the holder refuses to obey an order given by a peace officer at an incident under control by the Police Department or Fire Department, and thereby jeopardizes public safety and order or interferes with an investigation."

16. The letter provides no explanation of a connection between the conduct attributed to me that resulted in the August 24, 2009, warning, jeopardy to public safety caused by me, interference with an investigation, or any indication that the conduct in question occurred at the scene of an investigation.

17. The August 24, 2009, warning letter from the SDPD explicitly states that "possessing a media credential issued by our agency is a privilege and not a right."

18. In October 2009 I recorded sordid activities at a makeshift brothel comprised of individuals illegally or unlawfully in the United States which the SDPD vehemently denied existed in the City's McGonigle Canyon.

19. I posted my recording on the Internet showing evidence of the makeshift brothel in McGonigle Canyon.

20. The proximity in time between the *Baker v. City of San Diego* filing in June 2009, the contact between SDCSD PIO Jan Caldwell and DEPS PIO Gary Hassen, and the City's warning letter to me in August 2009 plausibly implies a

- 4 -

retaliatory animus on the part of the County based upon my exercise of his First Amendment right to record matters of public concern.

22. 21. In 2010 when my media credentials were not renewed, SDCSD PIO disseminated a captioned photograph of me: "Per Jan Caldwell, J.C. Playford is no longer M<u>ed</u>ia." (Ex. 2, *examiner.com* Article)

22. At each one of the arrests on February 10, 2010, March 9, 2010, December 1, 2011, and May 25, 2012, I was told by SDCSD deputies that I was not a member of the media.

23. In 2009-2010 I took a picture of the picture of me in plain view at the Sheriff's Administrative Center with the handwritten note: Per Jan Caldwell, J.C. Playford is no longer M<u>ed</u>ia."

24. I then provided a copy of the picture of the photograph of me that I had taken to the *examiner.com* journalist who wrote the March 30, 2011, article about my trial.

25. At the criminal trial held in September 2013 on my May 25, 2012, arrest, California Highway Patrol Officer Joseph Nielsen ("CHP Officer Nielsen") testified that SDCSD Deputy Allensworth told him prior to any contact that CHP Officer Nielsen had with me that my credentials were not valid and that I was not legitimately part of the media.

26. According to CHP Officer Nielsen, these comments about my media credentials caused CHP Officer Nielsen to believe that my media credentials may not have been correct.

27. As a duly authorized representative of American News, I parked my vehicle on public property approximately seventy-five yards from a public safety response scene in Ramona on February 28, 2010, approached, recorded, and

documented as a newsworthy event the SDCSD response to a dispatch of an assault with a deadly weapon.

28. SDCSD Deputy Jason Ward ("Deputy Ward") knew me as a videographer who responded to law enforcement activities of public interest and reported that he "immediately recognized the subject from prior law enforcement contacts as James Playford." (Ex. 6, Ward Report)

29. As I arrived and while I was recording, Deputy Seiver interviewed Matthew Deskovlck and a witness to the alleged assault, Sean Maginnis, in public on or near a public roadway between the deputies' parked cruisers along the west shoulder of the 200 block of Magnolia Avenue in Ramona.

30. While on public property, I videotaped Deputy Seiver, Deskovlck, and Maginnis from across the street and from the perimeter of the parked cruisers.

31. Deputy Ward observed the nearest I came to Deputy Seiver, Deskovlck, and Maginnis was ten-to-fifteen-feet.

32. The scene was not cordoned by law enforcement and no steps were implemented to prohibit or prevent access by members of the general public or media to the scene.

33. Deputy Seiver did not ask or demand that Deskovlck and Maginnis submit to interviews in a non-public location such as the interior of the cruisers, a police station, private residence, or otherwise and the interviews commenced and proceeded in public.

34. Neither Deputy Ward nor Deputy Seiver arrested me at the scene in Ramona on February 28, 2010, despite the speedy information implicit in their direct observation of the alleged unlawful conduct.

35. As a duly authorized representative of American News, I positioned myself on property open to the general public, approximately fifty-feet from a public safety response scene in Ramona on March 9, 2010, to record an incident involving a woman Deputy Seiver describes in a report as homicidal and suicidal.

36. Although Deputy Seiver had determined that the woman's homicidal threats and mental condition warranted taking her into custody for immediate hospitalization, Deputy Seiver continued to interview the woman in an Albertson's food store parking lot with members of the general public parking, walking freely, entering and exiting the store with groceries, in and around the immediate area of the woman and Deputy Seiver's interview.

37. Deputy Seiver recorded in his report that "several months ago Playford's media credentials were not renewed by the San Diego police department, that "[o]n several incidents Playford claimed to be a member of the media, but never could produce any credentials," and that Playford, "who is no longer a member of the media, went far beyond reasonable rights of the press or public to film in public.

38. Deputy Seiver stated in his report that Playford is "usually confrontational and argumentative with any deputy who contacts him" but Deputy Seiver failed to add that the nature of the contacts initiated by the deputies was motivated by a retaliatory animus toward Playford and intended to stop Playford from exercising his First Amendment rights to gather information of public interest even though Deputy Seiver and other deputies were aware that Playford was a duly authorized representative of American News who at one-time held SDPD media credentials.

39. I recorded Deputy Seiver and the woman in an area open to the public on public property without interfering in any manner with public safety response activity except to the extent that Deputy Seiver did not want the public incident to be videotaped by me.

40. A consolidated jury trial on two counts of obstructing a police officer arising from the February 28, 2010, and March 9, 2010, arrests resulted in a deadlocked jury on March 29, 2011.

41. The trial judge offered me a plea bargain to disturbing the peace with one-year of probation and warned me that if he were convicted after a retrial he would be sentenced to over two-years in jail.

42. I could not ignore the judge's warning, accepted the plea bargain, and pleaded guilty to disturbing the peace.

43. As a duly authorized representative of American News, I responded as a member of the media to the report of a bomb threat on December 1, 2011, at the offices of United States Congressman Darrell Issa in Vista, California, to record a news event of national interest for distribution by American News to national media outlets.

44. My initial contact with law enforcement occurred at a SDCSD command post north of the congressman's offices on Edna Way, a public road.

45. At the request of public safety personnel, I left the area of the command center and approached the scene from the north on Thibodo Road without progressing beyond the established motor vehicle detour point or yellow police-tape cordoned boundaries.

46. I observed in my vicinity non-public safety civilians freely walking and using their cell phones to make and receive phone calls.

47. While using my cell phone to contact the news desk at San Diego Channel 6 and positioning my camera to record the scene to the south of his location, I was identified, approached, confronted, detained, questioned, and prevented from gathering news by Deputy Brendan Cook.

48. Other individuals walking in the vicinity and individuals in motor vehicles operating eastbound and westbound on State Road 78 in closer proximity to 1800 Thibodo Road were captured by me on videotape using cell phones but those individuals were not ordered to stop using their cell phones or accused of having a bomb detonator disguised as a cell phone. At all times, I remained north of the yellow police-tape cordoned boundaries and north of all public safety vehicles and personnel engaged in traffic control.

49. Deputy Cook contacted American News President Edward A. Peruta on December 1, 2011, at 5:14 pm EST for the stated reason of verifying my media status.

50. Peruta informed Deputy Cook that American News issued me valid media credentials on February 23, 2010, which I validly held.

I declare under penalty of perjury under California law that the foregoing is true and correct.

Executed in Harwinton, Connecticut, April 16, 2016.

    /s/ James C. Playford_____
James C. Playford
As to ¶¶ 1-2, 6-48

    /s/ Edward A. Peruta_____
Edward A. Peruta
As to ¶¶ 3-5, 49-50