EXHIBIT 1

EXHIBIT 1

EXHIBIT 1

EXHIBIT 1

EXHIBIT 1

EXHIBIT 1

EXHIBIT 1

EXHIBIT 1

EXHIBIT 1

EXHIBIT 1

EXHIBIT 1

EXHIBIT 1

EXHIBIT 1

EXHIBIT 1

EXHIBIT 1

EXHIBIT 1

EXHIBIT 1

EXHIBIT 1

EXHIBIT 1

EXHIBIT 1

EXHIBIT 1

EXHIBIT 1

EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

AMERICAN NEWS AND INFORMATION
SERVICES, INC., a Connecticut
Corporation; EDWARD A. PERUTA;
and JAMES C. PLAYFORD,
              Plaintiffs,
              vs.                         No. 12-cv-2186-BEN(KSC)
WILLIAM D. GORE, individually and
in his official capacity as
San Diego County Sheriff; JAN
CALDWELL, individually and in her
official capacity as San Diego
County Sheriff's Department
Public Affairs Director; THOMAS
SEIVER, San Diego County
Sheriff's Department Deputy,
individually; BRENDAN COOK,
San Diego County Sheriff's
Department Deputy, individually;
JESSE ALLENSWORTH, San Diego
County Sheriff's Department
Deputy, individually; JAMES
BRENEMAN, San Diego County
Sheriff's Department Deputy,
individually; MICHAEL PROCTOR,
San Diego County Sheriff's
Department Deputy, individually;
JOHN DOE 1-10; San Diego County
Sheriff's Department; WILLIAM
LANSDOWNE, individually and in
his official capacity as
San Diego Police Chief; JOHN DOE
1-10; San Diego Police
Department; and BONNIE DUMANIS,
individually and in her official
capacity as San Diego County
District Attorney; JOHN DOE 1-10;
San Diego County District
Attorney's Office, individually,

              Defendants.
_____/

1

2

3

4                       DEPOSITION OF JAN CALDWELL

5                     Taken at San Diego, California

6                           March 16, 2016

7

8

9    Reported by Patricia M. Beck - CSR

10   Certificate No. 12090

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Jan Caldwell - 3/16/2016**

```
 1                    I N D E X
 2   Deposition of JAN CALDWELL
     March 16, 2016
 3
 4   EXAMINATION                                  PAGE
 5   BY MS. BAIRD                                    5
 6
 7
 8                  INDEX OF EXHIBITS
 9   FOR PLAINTIFFS':                            MARKED
10       Exhibit 1   San Diego County Sheriff's    45
                     Department Media Guide
11
         Exhibit 2   409.5 Authority of Peace       47
12                   Officers, Lifeguard or
                     Marine Safety
13
         Exhibit 3   Defendants Initial Disclosures 92
14                   Pursuant to Federal Rules of
                     Civil Procedure
15
         Exhibit 4   Media Credentials of Ed Baier 105
16
         Exhibit 5   Media Credentials of Ed Baier 107
17
18
19
20
21
22
23
24   Witness signature page                      110
25   Certificate/Stipulation page                111
```

**SHELBURNE SHERR COURT REPORTERS, INC. (619) 234-9100**
**www.sscourtreporters.com**

```
 1              On March 16, 2016, commencing at the hour of
 2    10:20 a.m., at Office of County Counsel, 1600 Pacific
 3    Highway, Room 355, in the City of San Diego, County of
 4    San Diego, State of California, before me, Patricia M.
 5    Beck, Certified Shorthand Reporter, in and for the
 6    State of California, personally appeared:
 7                        JAN CALDWELL,
 8    called as a witness by the Plaintiffs, who, being by
 9    me first duly sworn, was thereupon examined and
10    testified in said cause.
11
12                   A P P E A R A N C E S
13    FOR PLAINTIFFS:
14    RACHEL M. BAIRD & ASSOCIATE
      BY:  RACHEL M. BAIRD, ESQ.
15    15 Burlington Road
      Harwinton, Connecticut 06791
16    (860) 605-9340
17
18    FOR DEFENDANTS:
19    COUNTY OF SAN DIEGO
      OFFICE OF COUNTY COUNSEL
20    BY:  JAMES M. CHAPIN, ESQ.
      1600 Pacific Highway, Room 355
21    San Diego, California 92101
      (619) 531-5244
22
23
24
25
```

Jan Caldwell - 3/16/2016

```
 1        SAN DIEGO, CALIFORNIA; MARCH 16, 2016; 10:20 A.M.,

 2

 3                        JAN CALDWELL,

 4        having been first duly sworn, testified as follows:

 5

 6                        EXAMINATION

 7   BY MS. BAIRD:

 8        Q.   Good morning, Ms. Caldwell.  How are you?

 9        A.   Very well.

10        Q.   I introduced myself when you came to the

11   room.  I'm Rachel Baird, and I represent James C.

12   Playford in this case of American News versus Sheriff

13   Gore.

14        A.   Uh-huh.

15        Q.   Have you been deposed before?

16        A.   I have.

17        Q.   About how many times?

18        A.   Once that I can think of.

19        Q.   So maybe you're not as familiar with the

20   process as I thought.  If you have any questions, if

21   something I ask is not clear, don't hesitate to ask me

22   to clarify and I'll do so.  If you need a break,

23   simply ask.  Your counsel is here.  If you have any

24   questions, he's right there for you, as I assume he's

25   told you already.
```

Jan Caldwell - 3/16/2016

1      A.   Uh-huh.

2      Q.   Any issue that comes up, just bring it up.

3  I'll put it that way.

4      A.   All right.  Thank you.

5      Q.   So your title with the San Diego County

6  Sheriff's Department is public information director?

7      A.   Media relations director.  I'm the public

8  information officer.

9      Q.   Because I've seen it put a couple of

10  different ways.  But the official title is public

11  information officer, slash, media director, or the

12  other way around, perhaps?

13      A.   Either way.

14      Q.   How long have you held that position?

15      A.   A little over nine years.  It will be ten

16  years this October 13th.

17      Q.   Has it always been called the same thing,

18  public information officer, slash, media director?

19      A.   I believe it became media director after I

20  arrived.

21      Q.   Have your duties been primarily the same in

22  the past nearly ten years?

23      A.   They've evolved, in that I have more

24  employees.  We've grown with social media, and we have

25  a video production unit now.

Jan Caldwell - 3/16/2016

1          Q.    So when you came on board, had you been
2    employed previously by the San Diego County Sheriff's
3    Department?
4          A.    No.
5          Q.    So it was somewhat of a hire from outside.
6    You came from another agency or another employment?
7          A.    Correct.
8          Q.    What employment was that?
9          A.    I was a special agent with the Federal
10   Bureau of Investigation.
11         Q.    How long did you do that?
12         A.    I was with the FBI for 32 years.
13         Q.    Is it fair to say you retired from the FBI?
14         A.    It is correct.
15         Q.    Did your job duties with the FBI have to do
16   with media relations or public information?
17         A.    The last 13 years I was with the Bureau were
18   media related.  Before that, I worked other criminal
19   matters.
20         Q.    I forgot to ask you.  Have you ever
21   testified in court?
22         A.    Yes, I have.
23         Q.    How many times have you done that?
24         A.    I don't know if I could give you --
25         Q.    Fair enough.  So, many times you've

Jan Caldwell - 3/16/2016

1  testified in court?

2      A.   I have testified.

3      Q.   What were your job duties then during your

4  last 13 years with the FBI?

5      A.   They call them media representative.  It's

6  basically a public information officer for the

7  division where you're assigned.  I was assigned here

8  in San Diego.

9      Q.   Were you head of that division?

10     A.   No.  I was just the PIO.

11     Q.   So in the media division of the FBI that

12  was located in San Diego, there were a number of

13  employees, it's fair to say?

14     A.   No.

15     Q.   Just you?

16     A.   Yes.

17     Q.   Got it.  How did you go about obtaining

18  employment with the San Diego County Sheriff's

19  Department?  Did you submit an application?

20     A.   No.

21     Q.   Was there an opening?

22     A.   Yes.

23     Q.   Was it a newly created position?

24     A.   No.

25     Q.   Who was sheriff at the time approximately

Jan Caldwell - 3/16/2016

1  ten years ago, a little less than ten years ago when
2  you got the position?
3       A.   Bill Kolender.
4       Q.   Had you known him previously?
5       A.   I had met him.
6       Q.   And how long did you work for -- is it
7  Kalmer, Bill Kalmer?  I'm not sure I heard you say the
8  name right.
9       A.   Kolender.
10      Q.   How long did you work for Sheriff Kolender?
11      A.   He retired I believe in 2009.  Don't hold me
12 to that.  I believe it was 2009.
13      Q.   After he left, is it fair to say that
14 Sheriff William Gore took his place?
15      A.   Yes.
16      Q.   Had you known Sheriff Gore previously?
17      A.   Yes.
18      Q.   How did you know him?
19      A.   I knew him through my employment at the FBI.
20 I knew him personally as I was married to his cousin.
21      Q.   And the employment through the FBI, was that
22 when you were located in San Diego?
23      A.   Primarily.  But I knew Mr. Gore when he was
24 assistant director and a special agent in charge of
25 Honolulu.

Jan Caldwell - 3/16/2016

1       Q.   How long, sitting here today, would you say
2    you've known Sheriff Gore?
3       A.   I believe since around 1976.
4       Q.   It's 2016.  He came on board in 2009.
5    That's seven years.  So you worked for Sheriff
6    Kolender for about three years and then for Sheriff
7    Gore for about almost seven years; is that accurate?
8       A.   That's accurate.  But Sheriff Gore was
9    undersheriff, so I reported to him directly.
10      Q.   Okay.  Fair enough.  Who do you report to
11   directly now?
12      A.   Undersheriff Mark Elvin.
13      Q.   How long have you reported to him?
14      A.   Undersheriff Elvin was assigned there,
15   promoted there last I believe September.
16      Q.   And prior to his promotion, who did you
17   report to?
18      A.   Undersheriff Prendergast.
19      Q.   Prior to Undersheriff Prendergast?
20      A.   Jim Cooke, C-o-o-k-e.
21      Q.   Prior to Undersheriff Cooke?
22      A.   Bill Gore.
23      Q.   Prior to Undersheriff Gore -- when was he
24   undersheriff?
25      A.   I don't know.  That was before my time.

Jan Caldwell - 3/16/2016

1      Q.   So the first person that you reported to

2  when you became the PIO for the San Diego County

3  Sheriff's Department was Undersheriff Gore?

4      A.   That's correct.

5      Q.   At that time, Bill Kolender was the sheriff?

6      A.   That's correct.

7      Q.   Is there a written document describing your

8  job duties?

9      A.   There's my job description, yes.

10      Q.   Has that remained consistent over the past

11  ten years?

12      A.   I believe so, but I don't review it.

13      Q.   How many people do you have working who

14  report to you currently?

15      A.   Six.

16      Q.   Are they all in the Public Information

17  Office?

18      A.   Yes.

19      Q.   What are their job duties?  If you could

20  also attach their name to their job duties.

21      A.   I have an administrative assistant whose

22  name is Cindy Davis.  I have a media specialist by the

23  name of Melissa Acquino, A-c-q-u-i-n-o.  I have a

24  media specialist by the name of Sammy Castanon,

25  C-a-s-t-a-n-o-n.  Video production specialist Mike

1   Kurtz, K-u-r-t-z.  Video production specialist Randy

2   Grimm, G-r-i-m-m.  And I have a Deputy Ariana Ruibe,

3   R-u-i-b-e, who is assigned to Crime Stoppers and

4   physically sits at the San Diego Police Department,

5   but reports to me.

6        Q.   Of those six individuals who report to you,

7   is it fair to say that one of them is a sworn officer?

8        A.   That is correct.  And I'd like to also add,

9   I'm sorry, we have a 960.  This is a deputy who

10   retired as a commander I believe eight years ago.

11   Comes back on a 960 part-time program.  He works in

12   our office one day a week.  His name is Ken Culver,

13   and he does the website.

14        Q.   Mr. Culver is retired from the sheriff's

15   department?

16        A.   That is correct.

17        Q.   So currently he's a civilian?

18        A.   Correct.

19        Q.   When did the -- I'm sorry.  I think I may

20   have missed the name of the person who handles the

21   social media.

22        A.   I have two people, Melissa Acquino and Sammy

23   Castanon.

24        Q.   Were they employed already in the Public

25   Information Office when the office started to focus --

Jan Caldwell - 3/16/2016

1    or originally focused on social media?

2        A.    They were hired and -- Melissa was hired

3    first and charged with beginning our social media.

4        Q.    When was that?

5        A.    I believe it was 2010.

6        Q.    Was a job description created for that

7    position?

8        A.    Yes.

9        Q.    And when was the other person who is tasked

10   with social media hired?  Was that specifically for

11   social media, or did that person's job evolve into

12   that?

13       A.    It was to assist Melissa, social media and

14   proactive stories.  And I believe Sammy was hired in

15   2013, but I don't know if that's the exact year.

16       Q.    And I understand that when you're giving

17   dates, you're sitting there just testifying and you're

18   going by the best of recall.  And certainly if you had

19   to confirm that, you could.

20       A.    Absolutely.

21       Q.    When you reference social media, is Twitter

22   included?

23       A.    Yes, it is.

24       Q.    Is Facebook included?

25       A.    Not any longer.

Jan Caldwell - 3/16/2016

1      Q.   For a time it sounds like Facebook was
2  included?
3      A.   That's correct.
4      Q.   Does the San Diego Sheriff's Department have
5  a Facebook presence currently?
6      A.   They do not.
7      Q.   Did they at one time have a Facebook
8  presence?
9      A.   Yes.
10     Q.   During what time period?
11     A.   Again, guessing 2010 until I believe 2013 or
12  '14.
13     Q.   Was there a reason why in about 2014 the
14  Facebook presence for the department ceased?
15     A.   There was a community member posting vulgar
16  verbiage on our page, and we took it down.
17     Q.   Who was that community member?
18     A.   Dimitri, D-i-m-i-t-r-i, Karras, K-a-r-r-a-s.
19     Q.   Was there any record, or do you recall
20  anything being posted on the Facebook page by James C.
21  Playford?
22     A.   I do not.
23     Q.   Let me try to think.  Instagram, is that
24  part of the social media presence for the department?
25     A.   I don't think so, but I'm sorry, I can't

Jan Caldwell - 3/16/2016

1   answer that.
2        Q.   It sounds like there is a separate person
3   who handles the website presence now.  Mr. Culver does
4   that?
5        A.   He does that along with our IT group.
6        Q.   And so do you consider the website presence
7   part of social media or separate?
8        A.   I've never really thought about it.
9        Q.   It's handled separately, it sounds like,
10  though?
11       A.   Yes.
12       Q.   When was the website brought -- made active?
13  I'll put it that way.  When was the website made
14  active?
15       A.   I don't know.  It was before my time.
16       Q.   So it's been that long.  At least ten years?
17       A.   Yes.
18       Q.   Who handled it before Mr. Culver?
19       A.   I would have to suppose our IT department.
20       Q.   And the person in the IT department that
21  helps out Mr. Culver, he doesn't report to you,
22  correct?
23       A.   Correct, he does not.
24       Q.   Is it one person or just the IT department
25  in general that helps Mr. Culver with the website?

Jan Caldwell - 3/16/2016

 1      A.    I believe it's the department in general.
 2      Q.    When you were first hired to be the public
 3  information officer, slash, media director, how many
 4  people reported to you then?
 5      A.    Initially no one.
 6      Q.    One-person department?
 7      A.    No, no.  There was a captain in there
 8  temporarily and administrative assistant.
 9      Q.    Do you know whose place you took?
10      A.    I believe I replaced Chris Saunders,
11  S-a-u-n-d-e-r-s, but it had been a few years since he
12  had worked there.
13      Q.    So there had been somewhat of a gap in
14  filling the position?  It had gone unfilled for a
15  period of time?
16      A.    I believe so.
17      Q.    To the best of your knowledge, did the
18  captain and the administrative assistant fill in while
19  there was a gap in the person who actually had the
20  title PIO?
21      A.    The captain was the POI.
22      Q.    And who was that?
23      A.    Glenn, G-l-e-n-n, Revell, R-e-v-e-l-l, I
24  think.
25      Q.    What became of the captain when you took

Jan Caldwell - 3/16/2016

1  over the job?
2      A.   He stayed there to help train me, and then
3  he was assigned somewhere else.  I don't remember
4  where.  And a lieutenant came in.
5      Q.   So at that time when you became the public
6  information officer, it sounds like there was a
7  captain and an administrative assistant in the office?
8      A.   Correct.
9      Q.   But they didn't report to you?
10     A.   No.
11     Q.   And then the captain trained you and left at
12 some point?
13     A.   Uh-huh.
14     Q.   And a lieutenant came on board?
15     A.   Correct.
16     Q.   Do you recall the name of that lieutenant?
17     A.   His name was Phil Brust, B-r-u-s-t.
18     Q.   And the administrative assistant stayed in
19 the position?
20     A.   Correct.
21     Q.   When did that composition change?
22     A.   We had a temporary light-duty person come in
23 that was assigned to our communications center as a
24 dispatcher.  Came to work for us in a TDY capacity,
25 and that stayed that way for a year, 18 months.  I'm

Jan Caldwell - 3/16/2016

1   not really sure if I can recall the exact time frame.
2         And then Lieutenant Brust was reassigned to
3   the Fallbrook station, and we decided to hire someone
4   to come in and do the proactive stories and social
5   media, and that's when we advertised and we acquired
6   Melissa Acquino.
7       Q.   Was Ms. Acquino the first employee of the
8   Public Information Office that reported to you?
9       A.   No.  While Lieutenant Brust was there, we
10  decided that Adriana Ruibe would report to Phil Brust,
11  and the administrative assistant would report to me.
12      Q.   And after the hire for the social media
13  position, is it fair to say it continued to grow to
14  the point it's at now, where six people report to you?
15      A.   Correct.
16      Q.   In addition to Mr. Culver?
17      A.   Correct.
18      Q.   So it's actually seven?
19      A.   Yes.
20      Q.   As it's grown, have people come and gone, or
21  has it just grown where people have added -- people
22  have come on board and stayed?
23      A.   We had another person come in, a media
24  specialist by the name of Susan Plese, P-l-e-s-e, and
25  she was there for a little while after Lieutenant

Jan Caldwell - 3/16/2016

1    Brust left, and then she resigned.  And then since
2    then we have continued to grow with Melissa and Sammy,
3    et cetera.
4         Q.   What factors have led the department to add
5    the social media component to the Public Information
6    Office?
7         A.   It's a good way to get information to the
8    communities.  The trend is, social media is very
9    popular and just a good way to push out information
10   quickly.
11        Q.   I just want to make sure that I did name all
12   the social media that the information office actively
13   contributes to, and that would be basically Twitter
14   and the web page, if you want to consider that as
15   well.
16        A.   We have our web page.  We have -- for a
17   while we did have Facebook as we discussed.  We do
18   have Twitter.  We use Nixle, N-i-x-l-e.  And we might
19   use Instagram.  I would have to check on that.
20        Q.   Have you had any issues with Twitter or the
21   other social media that you experienced with Facebook
22   that led to the page being shut down?
23        A.   No, we haven't.
24             (Brief recess.)
25   ///

Jan Caldwell - 3/16/2016

```
 1    BY MS. BAIRD:
 2        Q.   The video production, when did that
 3    component of the Public Information Office come into
 4    existence?
 5        A.   Approximately two, three years ago.
 6        Q.   And there are two people involved in that?
 7    A specialist and then the main person, correct?
 8        A.   Well, they're both kind of equal.
 9        Q.   Did they both -- were they both hired about
10    the same time?
11        A.   No.  We had -- one is a volunteer for many,
12    many years before I started.  And then Mr. Kurtz
13    joined us two or three years ago as a volunteer and
14    then applied as we grew this new unit.
15        Q.   And so both of them are paid employees now?
16        A.   Correct.
17        Q.   What does the video production part of the
18    office entail?
19        A.   Well, these two men will do videos at the
20    request of different units.  For instance, they just
21    completed a video on a coffee cart at one of our
22    facilities, one of our detention facilities.  Kind of
23    a culinary arts training program.  So they videotaped
24    that and put it online.  And it was also picked up by
25    the news media.
```

Jan Caldwell - 3/16/2016

1      Q.   What are the various facets of the sheriff's
2  department that the Public Information Office is
3  tasked with distributing information about?  I mean,
4  you just mentioned a corrections facility or a jail
5  facility.  So that would be one component.
6          Would another component be the various
7  stations or substations where sworn officers work out
8  of?
9      A.   Correct.
10     Q.   And what would be some other examples?
11     A.   Court Services Bureau would be another
12  example.  There are a lot of moving parts to the
13  sheriff's department, and we try to put information
14  out about them as requested, or that the public might
15  find interesting.
16     Q.   So it would cover everything involving the
17  sheriff's department then?
18     A.   Correct.
19     Q.   Are the videos that are produced in your
20  unit disseminated through social media?
21     A.   Sometimes.
22     Q.   Including your website sometimes?
23     A.   Sometimes.
24     Q.   And links on Twitter sometimes?
25     A.   I don't know for sure, but I would imagine.

Jan Caldwell - 3/16/2016

1      Q.    Are they used at any functions or forums or
2  places where you give speeches or other members of the
3  department give presentations or speeches?
4      A.    Yes.
5      Q.    Approximately how many videos have been
6  produced, if you know?
7      A.    I couldn't begin to count.
8      Q.    Would there be a list of those videos
9  maintained?
10     A.    There might be.  I would have to research.
11     Q.    Well, the videos would be maintained,
12 correct?
13     A.    Correct.
14     Q.    Do people from the public ever request
15 copies of the videos?
16     A.    No, not that's been my experience.
17     Q.    Do you make training videos for deputies or
18 people that work in the sheriff's department?
19     A.    The two gentlemen in the video production
20 unit do, yes.
21     Q.    Is that a particular task that's assigned to
22 your unit?  In other words, there's not a separate
23 training unit out there that does video; that would be
24 your unit that would do those?
25     A.    There's a separate training unit, but they

Jan Caldwell - 3/16/2016

1     usually rely on Randy or Mike to do the videos.

2          Q.    Okay, okay.  Do you have a formal working

3     relationship with a public information officer

4     employed by the San Diego Police Department?

5          A.    I know the lieutenant, and we converse from

6     time to time on different things.

7          Q.    For example, is there any memorandum of

8     understanding regarding a relationship between you and

9     a PIO from the San Diego Police Department?

10         A.    Not to my knowledge.

11         Q.    Is it fair to say that you rely on the

12    San Diego Police Department for a list of individuals

13    or organizations who have been issued media

14    credentials by the San Diego Police Department?

15         A.    Yes.

16         Q.    And how do you -- if you do, how do you

17    obtain a list or keep current with such a list

18    maintained by the San Diego Police Department?

19         A.    I've never asked for a list.

20         Q.    Do you know if there is a list?

21         A.    I don't know.

22         Q.    Do you have a way of determining if an

23    individual or an organization is on a list, if there

24    is a list, kept by the San Diego Police Department?

25         A.    I'm sorry.  Would you repeat that?

Jan Caldwell - 3/16/2016

1       Q.   Do you have a way of determining if an
2   individual or an organization is on a list, if there
3   is a list, maintained by the San Diego Police
4   Department?
5       A.   Yes.
6       Q.   And how is that?
7       A.   I would pick up the phone and call.
8       Q.   So if you need to determine if an individual
9   or organization has been issued media credentials by
10  the San Diego Police Department, one way you determine
11  that information is by picking up the phone and
12  calling the police department?
13      A.   Correct.
14      Q.   Any particular person that you call at the
15  police department?
16      A.   It would probably be the main PIO.
17      Q.   And who is the current PIO?
18      A.   Lieutenant Scott Wahl, W-a-h-l.
19      Q.   And how many, if you can recall, PIOs have
20  you used in that fashion at the San Diego Police
21  Department?
22      A.   The prior PIO is Detective Gary Hassen,
23  H-a-s-s-e-n, I believe, and I would call him
24  occasionally.  I don't believe I called the prior PIO.
25      Q.   Do you know if deputies employed by the

Jan Caldwell - 3/16/2016

1   San Diego County Sheriff's Department use a similar

2   means of determining if an individual or an agency has

3   media credential issued by the San Diego Police

4   Department?

5       A.   I don't know.

6       Q.   Do you know if there is a procedure or

7   policy in place for deputies with the County to

8   determine if an individual or agency has media

9   credentials issued by the San Diego Police Department?

10      A.   I'm sorry.  Would you repeat the question?

11      Q.   Do you know if there's a procedure or policy

12  for deputies to determine if an individual or

13  organization has media credentials issued by the

14  San Diego Police Department?

15      A.   Not to my knowledge.

16      Q.   Do you know if it's part of a deputy's job

17  to make a determination if an individual or agency at

18  a scene has been issued media credentials by the

19  San Diego Police Department?

20      A.   I've never been a deputy.  I wouldn't be

21  able to answer that.

22      Q.   Do deputies ever ask you, in your position

23  as a public information officer, slash, media

24  director, whether a certain individual or agencies

25  they've come in contact with has media credentials

Jan Caldwell - 3/16/2016

1   issued by the San Diego Police Department?

2       A.   I believe they've asked that, I believe.

3       Q.   There's no policy or procedure, that you

4   know of, that informs deputies of how to make a

5   determination of whether an individual or agency has

6   media credentials issued by the San Diego Police

7   Department?

8       A.   To my knowledge, no.

9       Q.   Have you ever been contacted by a deputy

10  employed by the County and asked if James C. Playford

11  has media credentials issued by the San Diego Police

12  Department?

13      A.   I can't think of a specific deputy.  I can't

14  recall one.

15      Q.   I guess I should ask, just as a foundation,

16  whether you know who James C. Playford is.

17      A.   Yes, I do.

18      Q.   Have you ever met him in person?

19      A.   Yes, I have.

20      Q.   So you'd recognize him if you saw him?

21      A.   Yes, I would.

22      Q.   Has anybody, a civilian employee of the

23  County, contacted you to ask you if Mr. Playford has

24  media credentials issued by the San Diego Police

25  Department?

Jan Caldwell - 3/16/2016

1       A.    A civilian employee of the County?

2       Q.    Yes.  Well, the sheriff's department, I

3   mean.  I'll say the whole thing.  San Diego County

4   Sheriff's Department, a civilian employee.

5       A.    I don't recall.

6       Q.    Have you been contacted, that you recall,

7   by either a sworn officer, a deputy, or a civilian

8   employee of the San Diego County Sheriff's Department,

9   and asked if American News and Information Services

10  has been issued media credentials by the San Diego

11  Police Department?

12      A.    I don't recall.

13      Q.    When I mention American News and Information

14  Services, does that mean anything to you?

15      A.    It is I believe the agency that has used or

16  hired J.C. Playford.

17      Q.    Have you ever had contact with an individual

18  named Edward Peruta?

19      A.    I don't believe directly.

20      Q.    Do you know if he has any association with

21  American News and Information Services or James C.

22  Playford?

23      A.    My understanding is he's the owner of

24  American News and Information Services which employs

25  Mr. Playford.

Jan Caldwell - 3/16/2016

1       Q.   Do you know if Mr. Playford currently has
2  media credentials issued by the San Diego Police
3  Department?
4       A.   My latest understanding, and it's been a few
5  months, is that he does not.
6       Q.   And do you know if Mr. Peruta has media
7  credentials issued by the San Diego Police Department?
8       A.   I do not know.
9       Q.   When you say it's your understanding from
10  the past couple of months that Mr. Playford does not
11  have such media credentials, did you have some
12  occasion in the past couple of months to check, or did
13  somebody volunteer information to you that gives you
14  that understanding?
15       A.   I don't recall a specific incident.  The
16  last one would have been I believe last June when we
17  had a news conference in the building, and we were
18  trying to ascertain if Mr. Playford had media -- valid
19  media credentials issued by the San Diego Police
20  Department.
21       Q.   And the press conference you're referring to
22  and in the building -- what building was that press
23  conference back in June of 2015?
24       A.   Our sheriff's administrative headquarters on
25  Ridgehaven Court.

Jan Caldwell - 3/16/2016

```
 1        Q.   And other than this June of 2015 occasion
 2   that you recall involving Mr. Playford and the issue
 3   of press credentials, do you recall any other press
 4   conferences where Mr. Playford has been present, and
 5   it was determined that he didn't have the necessary or
 6   valid media credentials to attend the press
 7   conference?
 8        A.   Press conference, no.
 9        Q.   So tell me what you remember about this
10   June 2015 press conference involving J.C. Playford
11   that would have caused you to be informed of or check
12   into whether he had valid media credentials.
13        A.   Could you be more specific?
14        Q.   Sure.  Were you present at the news
15   conference?
16        A.   Yes.
17        Q.   Is it a news conference or press conference?
18        A.   I believe it's called media conference.
19        Q.   So you were present at the media conference
20   back in June 2015?
21        A.   Correct.
22        Q.   Were you the one giving the presentation at
23   the media conference?
24        A.   No.
25        Q.   Who was?
```

1      A.    Sheriff Gore.

2      Q.    Do you know what the media conference

3  pertained to?

4      A.    It was about a deputy who had tazed a

5  teenager in Fallbrook.

6      Q.    When you have a media conference such as the

7  one we're talking about back in June 2015, is there

8  any policy or procedure about notice going out that

9  there's going to be such a conference?

10     A.    No.

11     Q.    Fair to say some are more hastily put

12  together than others depending on the issue?

13     A.    Correct.

14     Q.    So at this June 2015 conference, were there

15  members of the media there with valid media

16  credentials?

17     A.    Yes.

18     Q.    And did they gain entry by showing those

19  media credentials?

20     A.    Yes.  That was part of their entrance.

21  They have to go through -- everyone goes through a

22  magnetometer and shows identification to gain entry

23  into our building.

24     Q.    And there's somebody that is stationed at

25  the magnetometer?

Jan Caldwell - 3/16/2016

1       A.    Correct.

2       Q.    They will be the ones that look to see if

3  any alarm goes off?

4       A.    Correct.

5       Q.    And then they ask each person for their

6  valid media credentials?

7       A.    If they are a member of the media, yes.

8       Q.    So how would that person that's stationed

9  there know to ask someone for their valid media

10 credentials?

11      A.    If they have camera equipment with them

12 would be one way.  They might have their credentials

13 around their neck displayed and would ask to see them

14 if they were current.

15      Q.    Is the general public allowed?  Let's stick

16 to the June 2015 conference just to make it more

17 specific.  Was the general public allowed into that

18 media conference?

19      A.    Generally they don't come so we don't have

20 to make a decision if they are allowed or not.

21      Q.    Is there a policy or procedure about whether

22 the general public is allowed into a media conference?

23      A.    What was policy is that a person with the

24 news, with the media, has a valid San Diego Department

25 issued credential.  They are allowed into our building

Jan Caldwell - 3/16/2016

1    to videotape or conduct interviews.  They don't need a
2    credential if we have the media conference outside.
3    And then the general public may attend as well.
4         Q.   Do you mean outside the building?
5         A.   Correct.
6         Q.   But inside the building, then an individual
7    needs that media credential from the San Diego Police
8    Department?
9         A.   That is correct.
10        Q.   What other kind of persons or classes or
11   categories of people can attend an inside media
12   conference, other than individuals with valid media
13   credentials?
14        A.   Employees.
15        Q.   So any other categories?
16        A.   Other departments.  Employees that might be
17   associated with an investigation.  Another law
18   enforcement agency or another stakeholder.
19        Q.   And could a stakeholder be an individual not
20   employed by the government, or would it always be
21   another department or agency?
22        A.   Each situation would be different.
23        Q.   I'm just trying to think of what a
24   stakeholder would be.  Perhaps a victim, would they be
25   a stakeholder?

Jan Caldwell - 3/16/2016

1       A.   That could be.

2       Q.   A witness, could that person be a

3    stakeholder?

4       A.   That could be.

5       Q.   So when you say "stakeholder," you mean

6    somebody directly involved with the facts of the case?

7       A.   Usually, but each situation is different.

8    It stands on its own.

9       Q.   What do you recall, if anything, about

10   Mr. Playford and the June 2015 media conference?

11      A.   Can you be more specific?

12      Q.   Was he present?

13      A.   Yes.

14      Q.   Did he go through the -- I forget --

15   magnetometer?

16      A.   Magnetometer.

17      Q.   Did he go through the magnetometer?

18      A.   I wasn't there, but I'm sure he did.

19      Q.   How do you know he was there?

20      A.   I saw him.

21      Q.   Where did you see him?

22      A.   In the training room where we held the media

23   conference.

24      Q.   So he made it into the training room?

25      A.   He did.

Jan Caldwell - 3/16/2016

1    Q.   And did he stay for the whole media

2    conference?

3    A.   Yes, he did.

4    Q.   Did he ask any questions?

5    A.   I believe he did.

6    Q.   Is that the incident that caused you to

7    check to see if he had valid media credentials?

8    A.   I did not.

9    Q.   Did you direct somebody to do that?

10   A.   They always check.

11   Q.   The person stationed at the machine?

12   A.   Correct.

13   Q.   And do you know if the person stationed at

14   the machine in June 2015 checked?

15   A.   I know that they asked him for them.

16   Q.   Do you have reason to believe that Mr.

17   Playford gained entry in June 2015 to the media

18   conference when he did not have media credentials

19   issued by the San Diego Police Department?

20   A.   He did.

21   Q.   Was there any follow-up investigation done

22   to determine how he accomplished that?

23   A.   No, there was no investigation.

24   Q.   Was there any action taken against the

25   person stationed at the machine that allowed

Jan Caldwell - 3/16/2016

1    Mr. Playford entry?

2         A.   No.

3         Q.   Was it error to allow Mr. Playford entry

4    into that media conference?

5         A.   Yes.

6         Q.   Was it error because he didn't have media

7    credentials issued by the San Diego Police Department?

8         A.   Correct.

9         Q.   And do you know if that error has been made

10   at any other time of allowing Mr. Playford into a

11   media conference when he didn't have press media

12   credentials issued by the San Diego Police Department?

13        A.   I'm not sure if I can answer that.

14        Q.   Has any action been taken by your office to

15   ensure that this error of allowing Mr. Playford into a

16   media conference inside without media credentials

17   doesn't occur again?

18        A.   Nothing has changed in our office.

19        Q.   So there hasn't been any memo or notice

20   issued to individuals that are stationed at these

21   entry machines telling them, be sure and check if

22   people have media credentials issued by the San Diego

23   Police Department before you let them in the media

24   conferences?

25        A.   I don't know if there was something before

1  that time or after that time.  My colleague Melissa
2  prepared something that gave an example of what a
3  San Diego media credential looked like, and to make
4  sure that people with the media had them.  But in
5  honesty, I don't know if it was before or after.
6       Q.   And what was Melissa's last name?
7       A.   Acquino.
8       Q.   Did this, if you know, did the notice have a
9  written description of the media credential or just a
10  picture of it?
11       A.   I believe it was just a picture.
12       Q.   Did you see anyone at the June 2015 press
13  conference confront Mr. Playford about his presence at
14  the media conference?
15       A.   Not that I saw.
16       Q.   Other than media conferences, are there
17  other informational events that are open to -- well,
18  what I should say, that are limited to members of the
19  media who have media credentials issued by the
20  San Diego Police Department?
21       A.   I'm sorry.  One more time.
22       Q.   Sure.  Other than the media conferences,
23  are there other informational events, presentations
24  given by either Sheriff Gore or other members of the
25  sheriff's department, that are only open to media if

Jan Caldwell - 3/16/2016

1  they have credentials issued by the San Diego Police

2  Department?

3       A.   Yes.

4       Q.   What are those events?

5       A.   They might be placing either the sheriff or

6  a captain, another individual, a media availability to

7  answer questions on a specific event or situation.

8  That would be one example.

9       Q.   Can you think of any others?

10       A.   Not off the top of my head.  But as we go

11  along, I might remember something.

12       Q.   Is there any provision for reciprocity of

13  recognition of media credentials?  For example, if an

14  individual had a media credential issued by the

15  Sacramento Police Department, would that be -- is

16  there any provision or list of recognizing media

17  credentials issued by other government agencies?

18       A.   Yes.

19       Q.   What is that provision?

20       A.   Well, there's no policy.  If another media

21  individual has valid current credentials, they've been

22  authorized by an outside law enforcement agency, we

23  would recognize those.

24       Q.   Other than recognizing credentials issued by

25  law enforcement agencies, is there any provision for

Jan Caldwell - 3/16/2016

1   recognizing credentials issued by non law enforcement
2   organizations?
3        A.    Those aren't recognized as being valid.
4        Q.    So a media credential to be recognized by
5   the San Diego County Sheriff's Department has to be
6   issued by government agency?
7        A.    Yes.
8        Q.    Would you call that a policy?
9        A.    I don't know honestly if it's in our policy
10  manual, but it is the protocol we follow.
11       Q.    Was that the protocol that was followed when
12  you came on board as the public information officer,
13  slash, media director for the County?
14       A.    Since I've been there.  I can't speak
15  beforehand.
16       Q.    Has it remained the same, to your knowledge,
17  during the nearly ten years you've been with the
18  County?
19       A.    To the best of my knowledge, yes.
20       Q.    Now, are you aware that Mr. Playford has
21  credentials issued by American News and Information
22  Services?
23       A.    No, I didn't know that.
24       Q.    Are you aware that Mr. Playford has claimed
25  to have credentials issued by a non law enforcement

Jan Caldwell - 3/16/2016

 1    organization?

 2        A.    I don't have firsthand knowledge of that,

 3    no.

 4        Q.    So you sitting here today, either firsthand

 5    or understanding from information that's been given to

 6    you, you have no knowledge that Mr. Playford has or

 7    does not have credentials issued by a non government

 8    organization?

 9        A.    No, I don't.  I don't know.

10        Q.    Is that because it's irrelevant to you

11    whether or not he has credentials issued by a non

12    government organization, because they wouldn't be

13    valid under your protocol?

14        A.    We look to see if they have a San Diego

15    Police Department issued credentials.

16        Q.    Or other law enforcement, correct?

17        A.    Correct.

18        Q.    So if it's not San Diego Police Department

19    or other law enforcement that issued the credentials,

20    then the credentials under the protocol of your

21    department aren't valid?

22        A.    Correct.

23        Q.    Have you ever contacted the San Diego Police

24    Department to indicate that an individual who has

25    San Diego Police Department media credentials has done

Jan Caldwell - 3/16/2016

1    something that should be looked into by the San Diego
2    Police Department, something inappropriate where
3    perhaps their media credential should be looked into?
4         A.   Yes.
5         Q.   How many times have you done that?
6         A.   I don't know how many times.
7         Q.   What is the time or occasions that you were
8    thinking of when you answered yes to my question?
9         A.   I don't remember specific years, but I do
10   remember contacting Detective Hassen about Mr.
11   Playford and his behavior.
12        Q.   So obviously that would have been while
13   Detective Hassen was the PIO at the San Diego Police
14   Department, right?
15        A.   Correct.
16        Q.   So that puts it into a time frame somewhat?
17        A.   Yes.
18        Q.   And was there another occasion when you
19   contacted Detective Hassen or any other PIO over at
20   the San Diego Police Department about Mr. Playford?
21        A.   I believe so, but I don't remember specific
22   dates or times.  Another PIO over there I just
23   remember was Andra, A-n-d-r-a, Brown, B-r-o-w-n.  And
24   she was also a co-PIO with Detective Hassen.
25        Q.   So you remember at least one time contacting

Jan Caldwell - 3/16/2016

1   Detective Hassen about Mr. Playford and his media
2   credentials?
3        A.    Correct.
4        Q.    At that time, did you have cause to believe
5   that Mr. Playford had San Diego Police Department
6   media credentials?
7        A.    Yes, he did, I believe.
8        Q.    Do you know if your phone call to the
9   San Diego Police Department about Mr. Playford and his
10  conduct led to any action by the San Diego Police
11  Department?
12       A.    I don't know.
13       Q.    Did the San Diego -- Detective Hassen ask
14  you for additional information?
15       A.    I don't recall that.
16       Q.    Other than your phone call to him, do you
17  recall following up on the matter, taking any other
18  action?
19       A.    No.
20       Q.    Are you aware of the circumstances that led
21  to Mr. Playford having media credentials issued by the
22  San Diego Police Department at one time, but not
23  having them now?
24       A.    I understand that he had credentials, and
25  then they were not renewed by the San Diego Police

Jan Caldwell - 3/16/2016

1    Department.  They would have to answer that.  This is
2    strictly from my memory.  And then he was issued
3    credentials again, and my understanding is that he has
4    let them lapse.
5        Q.   Other than Mr. Playford, have you had
6    occasion -- or have you contacted the San Diego Police
7    Department about an individual who has media
8    credentials issued by the police department and
9    engaged in conduct that you believed impacted, one,
10   whether they should have credentials or not?
11       A.   I'm sorry.  Would you repeat?
12       Q.   Sure.  Other than Mr. Playford, have you
13   contacted the police department, the San Diego Police
14   Department, about any other individual where you've
15   had concerns about their conduct as related to them
16   having media credentials issued by the San Diego
17   Police Department?
18       A.   No.
19       Q.   Do you know an individual -- not know.  Are
20   you familiar with the name Ed Baier, B-a-i-e-r?
21       A.   I've heard the name.
22       Q.   Any contacts made by you to the San Diego
23   Police Department about Ed Baier?
24       A.   No, not to my recollection, no.
25       Q.   What information do you recall having

Jan Caldwell - 3/16/2016

1    received that causes you to remember the name

2    Ed Baier?

3         A.   Mr. Baier will occasionally send e-mails.  I

4    don't remember specifically what they concern, but

5    they're ranting in nature.  He will call the office

6    sometimes leaving messages, or he will be upset about

7    something.  Again, I don't recall the subject matter,

8    but those are infrequent.

9         Q.   And the e-mails, are they sent to you?

10        A.   They are.

11        Q.   And the voice mails, they're left at your

12   number?

13        A.   They are not.

14        Q.   At the information -- at the Public

15   Information Department's number?

16        A.   Yes, my administrative assistant's number.

17        Q.   Do you know if Mr. Baier has media

18   credentials issued by the San Diego Police Department?

19        A.   My understanding, he does not.

20        Q.   And where would that understanding come

21   from?

22        A.   I believe from Detective Hassen.  I

23   understand that Mr. Baier was convicted of a felony

24   and cannot have press credentials.

25        Q.   What would have caused you to engage in a

1  conversation with Detective Hassen about that?

2      A.   I don't recall.  I believe it would be in

3  the same conversation as Mr. Playford.  I believe

4  they're friends.

5      Q.   And that conversation would have occurred

6  back around the June 2015 media conference event?

7      A.   No.

8      Q.   Before or after?

9      A.   Before.

10      Q.   Are you familiar with the name Jerry Nance,

11  N-a-n-c-e?

12      A.   Yes, I am.

13      Q.   And do you know if Mr. Nance has media

14  credentials issued by the San Diego Police Department?

15      A.   I understand he does not.

16      Q.   Where does that understanding come from?

17      A.   That comes from a question that I asked

18  yesterday at the San Diego Police Department because

19  he's going through a trial now for 148.

20      Q.   What was your -- I'm not quite sure I

21  connected it.  I need you to explain.  What was the

22  reason why you contacted Detective Hassen to check on

23  Mr. Nance's media credentials?

24      A.   Detective Hassen retired a few years ago.

25  I contacted Detective Mark Herring, H-e-r-r-i-n-g.

1    And because the assistant district attorney contacted
2    me as a witness to discuss our policy and procedure,
3    I did some research to see if Mr. Nance had a valid
4    media credential on the date in question.
5        Q.   Were you able to provide any policies and
6    procedures?
7        A.   Provide any policies and procedures to?
8        Q.   I think you said that -- I'm not sure if it
9    was the DA or the investigation agency involved with
10   Mr. Nance's trial had called you --
11       A.   Correct.
12       Q.   -- to ask -- we'll go by memory now.  I
13   think you said they called you to ask if you had any
14   policies or procedures?
15       A.   I provided them our media guide, as well as
16   our 7.3.
17            (Exhibit 1 was marked for identification by
18            the court reporter.)
19   BY MS. BAIRD:
20       Q.   If I could have this marked as Plaintiff's
21   Exhibit 1.  Is that the way we do it in California?
22   We've had marked a nine-page document entitled "San
23   Diego County Sheriff's Department Media Guide."  And
24   I'll just ask you to look at that to, first, determine
25   if you recognize it, and then if you do, to determine

Jan Caldwell - 3/16/2016

 1   if it's current.

 2        A.   Yes, this is current.

 3        Q.   Is there a way you could tell that so fast?

 4        A.   I brought the copy with me.

 5        Q.   Okay.  And this media guide, Exhibit 1, is

 6   posted at the web page for the San Diego County

 7   Sheriff's Department, correct?

 8        A.   That is correct.

 9        Q.   And it looks like from what you brought

10   there's also a pamphlet in color version.

11        A.   Correct.

12        Q.   What is available for those who come in and

13   request a copy?

14        A.   That is correct.

15        Q.   And this media guide, which is Exhibit 1,

16   is the media guide you would have provided responsive

17   to the request for policies and procedures?

18        A.   That is correct.

19        Q.   And 7.3, what are you referring to when you

20   reference 7.3?

21        A.   That is also online.  That is part of our

22   P&P, and it relates to media relations.

23        Q.   So the P&P, policies and procedures for the

24   Public Information Office media would be either found

25   in Exhibit 1 or Section 7.3, which is also found on

Jan Caldwell - 3/16/2016

1    the website?
2           A.    Correct.
3           Q.    Any other information that would be included
4    as policies and procedures, other than those two
5    resources we just named?
6           A.    7.3 is the official document.
7           Q.    7.3 is the official document?
8           A.    Correct.
9           Q.    And then the media guide, which is
10   Exhibit 1, is sort of a user-friendly website summary
11   of 7.3.  Is that fair?
12          A.    That is fair.
13                (Exhibit 2 was marked for identification by
14                the court reporter.)
15   BY MS. BAIRD:
16          Q.    If I could have this marked as Exhibit 2.
17   And you're going to have to give me a second now
18   because I've got two other copies hidden somewhere in
19   my staples in my documents here.
20   Ms. Caldwell, if I could just take that from you for a
21   minute.
22          A.    Yes.
23          Q.    There's one particular place I want to -- I
24   think I can do it without relying on -- we just
25   referred to Section D of Exhibit 2.  First of all,

Jan Caldwell - 3/16/2016

1   are you familiar in your capacity as the public

2   information officer with 409.5?

3        A.   Yes.

4        Q.   Section 409.5?

5        A.   Yes.

6        Q.   And directing your attention to Subsection D

7   of 409.5 where it references members of the news

8   media.  Do you see that?

9        A.   Section D?

10       Q.   Yes.

11       A.   Yes.

12       Q.   Is the protocol -- let me ask it this way.

13  Is it the protocol of the San Diego County Sheriff's

14  Department that the media referenced in Subsection D

15  of 409.5 includes only those individuals or

16  organizations who have been credentialed by law

17  enforcement agencies?

18       A.   Or those who purport to be media.

19       Q.   Does the San Diego County Sheriff's

20  Department recognize those who purport to be media as

21  the media if they don't have credentials issued by law

22  enforcement agency?

23            MR. CHAPIN:  Object as vague.

24  BY MS. BAIRD:

25       Q.   Okay.  I got to figure out what you meant by

1    "purport to be media."  From my perspective, the word

2    "purport" means somebody claims something but it's not

3    really true.  I don't know if that's what you meant or

4    not.  I'm going to try to ask you questions to try to

5    figure that out.

6    Exhibit 2, Subsection D of 409.5 references news media.

7    Do you see that?

8         A.   It says:  "Nothing in this section shall

9    prevent a duly authorized representative of any news

10   service, newspaper, or radio or television station or

11   network from entering the areas closed pursuant to

12   this section."

13        Q.   And those categories that you just read from

14   Subsection D of 409.5, my question is:  Is it the

15   protocol of the San Diego County Sheriff's Department

16   to only recognize those referenced in Subsection D if

17   they have media credentials issued by law enforcement

18   agency?

19        A.   I think I understand what you mean, but I'm

20   not sure if I'm clear still.

21        Q.   We need to have another copy of that.  I

22   have to either find mine or get another copy.

23             MR. CHAPIN:  You want to take a ten-minute

24   break?

25             MS. BAIRD:  Yeah.

Jan Caldwell - 3/16/2016

```
 1            (Recess taken.)
 2    BY MS. BAIRD:
 3        Q.   Ms. Caldwell, I think you have Exhibit 1 and
 4    Exhibit 2 in front of you.
 5        A.   Correct.
 6        Q.   And if I could direct your attention to
 7    page 8 of Exhibit 1.
 8        A.   Correct.
 9        Q.   To the last sentence on page 8 where it
10    states:  "Absent official government media
11    credentials, access pursuant to 409.5 penal code will
12    be granted on a case-by-case basis upon presentation
13    of information complying with 409.5 penal code."
14            Okay.  So does the San Diego County
15    Sheriff's Department have a policy or procedure for
16    determining, on a case-by-case basis, if access will
17    be granted pursuant to 409.5?
18        A.   I would have to look at the policy and see
19    it, but it would require the current valid San Diego
20    Police Department issued media credential.
21        Q.   Now, do you agree that the sentence I just
22    read on page 8 of Exhibit 1 that begins with:  "Absent
23    official government media credentials"?
24        A.   What was your question with that?  I'm
25    sorry.
```

Jan Caldwell - 3/16/2016

1      Q.   Do you agree with the first part of the last
2  sentence on page 8 of Exhibit 1 that begins with:
3  "Absent official government media credentials"?
4      A.   Yes, I would agree with this sentence.
5      Q.   And do you agree that would mean someone
6  would not have the valid San Diego Police Department
7  issued media credentials?
8      A.   Your question again is?
9      Q.   Do you agree that if someone is absent
10  official government media credentials, then they would
11  not have the valid San Diego Police Department issued
12  media credentials?
13      A.   Correct.
14      Q.   That last sentence on page 8 of Exhibit 1
15  is referring to a person who is absent official
16  government media credentials.  And my question is to
17  you:  What policies or procedures determine, on a
18  case-by-case basis, when someone who doesn't have the
19  San Diego Police Department issued media credentials
20  can be granted access under 409.5?
21      A.   These determinations we're talking about,
22  media access at disaster scenes.  So these
23  determinations are made by the front-line deputies at
24  the scene.
25      Q.   So the front-line deputies have the

1   discretion to grant, on a case-by-case basis, access

2   to disaster scenes, even though an individual does not

3   have the San Diego Police Department issued media

4   credentials?

5       A.   As it's written, "on a case-by-case basis,

6   upon presentation of information complying with

7   409.5P.C."

8       Q.   And what information would comply with

9   409.5P.C. to allow access to someone who didn't have

10  media credentials issued by the San Diego Police

11  Department?

12      A.   Again, that's not made by me.  I'm not at

13  the scene generally.  I'm not at the scene of a

14  disaster.  I'm somewhere else.  So these are deputies

15  making that decision.  But I can opine for you that

16  would be someone, say, from the Los Angeles area that

17  has NBC or major network credentials.  And they might

18  make that determination on a case-by-case basis where

19  they would be granted access.

20      Q.   Even though this NBC or major network

21  individual or agency didn't have a valid San Diego

22  Police Department issued media credential, or any

23  government credential, on a case-by-case basis they

24  may be allowed into, I think you said it, a disaster

25  scene?

Jan Caldwell - 3/16/2016

1      A.    That might be the case.

2      Q.    Now, do you agree that 409.5 doesn't just

3   deal with disasters?

4      A.    Correct.

5      Q.    It also deals with accidents?

6           MR. CHAPIN:  Objection.  Question is calling

7   for a legal opinion and conclusion.

8   BY MS. BAIRD:

9      Q.    Okay.  Fair enough.  For the officers out

10  actually at the scenes, what training do they receive,

11  if you know, regarding media access to accident scenes

12  or disaster areas?

13     A.    The media training done in the academy is

14  conducted by the San Diego Police Department.

15     Q.    Okay.  So the deputies with the San Diego

16  County Sheriff's Department attend the San Diego

17  Police Department academy?

18     A.    It's not the police department academy.

19  It's the Regional Law Enforcement Academy at Miramar

20  College.  And the specific training regarding media is

21  conducted by the PIO for the San Diego Police

22  Department.  I don't conduct that training, so I don't

23  know what is given.

24     Q.    So the public information officer for the

25  San Diego Police Department is the one tasked with

Jan Caldwell - 3/16/2016

1    training the officers at the regional academy?

2         A.   On the block of media, correct.

3         Q.   On the block of media.  And do you have any

4    idea what that training entails?

5         A.   I do not.

6         Q.   Have you ever seen a training manual?

7         A.   I have not.

8         Q.   Have you ever discussed with any PIO at the

9    San Diego Police Department about what training they

10   give at the regional academy?

11        A.   I have not.

12        Q.   Have you ever gone and sat in on any of the

13   training yourself that's given at the regional

14   academy?

15        A.   I have not.

16        Q.   Sitting here today, you have no idea how

17   deputies with the San Diego County Sheriff's

18   Department are trained with regard to media?

19        A.   I do not sit in on the training, so I do not

20   know.

21        Q.   Do any deputies with the San Diego -- when I

22   say deputies, I don't want to get the language

23   incorrect.  I'm referring to sworn officers.

24        A.   Deputies, yes.

25        Q.   Have any deputies with the San Diego County

 1    Sheriff's Department come to you with questions about
 2    handling the media out in the field or at scenes?
 3         A.   Yes.
 4         Q.   Are you able to recall exactly how many
 5    times?
 6         A.   Many times.  I couldn't tell you exactly how
 7    many.
 8         Q.   So it's happened on a number of occasions,
 9    so many that you can't sit there and recall how many?
10         A.   Frequently, yes.
11         Q.   Do you have a protocol for responding to
12    their questions?
13         A.   Depends on the question they ask, but I do
14    the best to answer to the best of my ability.
15         Q.   Do you ever refer them to the public
16    information officer at the San Diego Police Department
17    to ask questions?
18         A.   No.
19         Q.   Do they ever say to you -- or has there ever
20    been an instance where any of these individuals have
21    said to you, well, that's not how we were trained at
22    the regional academy by the public information officer
23    at the San Diego Police Department?
24         A.   No.
25         Q.   So do you have any idea if what you're

Jan Caldwell - 3/16/2016

1    responding to the deputy's questions with is
2    consistent with how deputies are being trained at the
3    regional academy?
4         A.    I'm sorry.  One more time.
5         Q.    Is it fair to say that in some of the
6    instances where the deputies have asked you questions
7    about handling the media in the field, you've
8    responded to them?
9         A.    Yes.
10        Q.    You've attempted to answer their questions?
11        A.    Yes.
12        Q.    When you've done that, do you have any idea
13   if what you're telling them is consistent with how
14   they were trained at the regional academy by the PIO
15   for the San Diego Police Department?
16        A.    It's pretty straight forward.  I believe
17   it's in line.
18        Q.    And what gives you that belief?
19        A.    Because we operate at scenes in the same
20   way.
21        Q.    The San Diego County Sheriff's Department
22   and the San Diego Police Department operates the same
23   way?
24        A.    That's been my observation.
25        Q.    Have you ever engaged in any presentations

Jan Caldwell - 3/16/2016

1  or training of deputies with the San Diego County
2  Sheriff's Department regarding handling the media out
3  in the field?
4      A.   Yes, I have.
5      Q.   Do those trainings occur on a scheduled
6  basis?
7      A.   I believe so.
8      Q.   Are they scheduled in terms of deputies
9  receive the training at various mileposts in their
10  career, or do you schedule the training once a year?
11  What's the frequency of the training?
12      A.   I don't schedule the training.  The training
13  unit does that.  And they call me and ask if I would
14  speak.
15      Q.   How often has that occurred in the past ten
16  years?
17      A.   I don't have a list, but it happens, I would
18  estimate, two to three times.
19           Let me back up.  Maybe one to two -- once or
20  twice a year.  And the first time I found that I did
21  training was in 2008.
22      Q.   So it sounds like maybe 15 or 16 times
23  you've done the training?
24      A.   Yes.
25      Q.   And has the training been the same from 2008

Jan Caldwell - 3/16/2016

1   to now, or have you been asked to address different

2   things?

3       A.   They're new situations that come up, new

4   dynamics that arise locally and nationally, so I adapt

5   the training to that.  I also adapt the training to

6   the audience.

7       Q.   Is the audience comprised of deputies?

8       A.   Not always.

9       Q.   And who else may attend?

10      A.   I have conducted training at the academy for

11  new detentions deputies.  I have conducted training at

12  Ridgehaven, our administrative headquarters, for both

13  sworn and professional staff, new supervisors.  I've

14  provided training for new sergeants.  And I have been

15  asked to provide training on media to the regional

16  training center here in San Diego which trains new

17  lieutenants from throughout the state.

18      Q.   The regional training center that trains new

19  lieutenants throughout the state, is that different

20  from the regional academy that we talked about that

21  trains new officers?

22      A.   Yes.

23      Q.   Going back to Exhibit 1 on page 8, the media

24  guide, has any of the training that you've provided

25  address the discretion that on-scene officers have to

Jan Caldwell - 3/16/2016

1  grant, on a case-by-case basis, access to scenes, even
2  though they don't have official government media
3  credentials?
4       A.   Not specifically, to my knowledge.
5       Q.   Has it addressed it peripherally?
6       A.   Maybe peripherally.
7       Q.   Sitting here today, what do you recall about
8  even peripheral references you've made to that
9  discretion?
10      A.   Based on the fact that we've had two very
11  large wildfires here, 2003, 2007, we train for that.
12  And we are familiar with these disaster scenes, and
13  the deputies and officers around the county are.  And
14  so we discuss granting access to the media versus
15  civilians.
16      Q.   When you say the media, again, are you
17  referring to only those who have San Diego Police
18  Department issued media credentials or other law
19  enforcement credentials?
20      A.   Well, again, I'm not on the front scenes of
21  a disaster.  And the deputies, depending on where they
22  are, would probably allow people through that don't
23  always have the government-issued or the largely
24  recognized credential.
25      Q.   Have you provided any training with regard

Jan Caldwell - 3/16/2016

1   to a standard for who you allow in to instances like

2   the wildfires in 2003 and 2007 who didn't have the

3   San Diego Police Department issued media credentials?

4       A.   I don't recall that specifically, no.

5       Q.   Well, sitting here today, do you have in

6   your mind a standard of who would be let into, for

7   example, incidents such as the 2003 and 2007

8   wildfires, even though they didn't have the San Diego

9   Police Department issued media credentials?

10      A.   Well, again, it says it's granted on a

11   case-by-case basis, absent the official government

12   media credentials.  And that would be a call that the

13   deputy or the officer would have to make on scene.

14      Q.   But somebody trains them to make those

15   calls, correct?

16      A.   This is addressed in the training academy

17   that they initially attend, and they probably have

18   some discussion.  But as far as a specific block of

19   training, I don't teach that, and I can't say that the

20   San Diego Police Department does in the regional

21   academy.

22      Q.   And the 15 to 16 times you've conducted

23   training and then the other training you provided that

24   you've testified about already, giving them guidance

25   on exercising the discretion of the field was not part

Jan Caldwell - 3/16/2016

1   of that training either?

2       A.   No, I have not done that.

3       Q.   I mean, you had mentioned I think previously

4   that it was your understanding that -- I think you

5   mentioned it was your understanding that Ed Baier has

6   a felony and so does not have -- or is not eligible or

7   not qualified, or is disqualified from having a

8   San Diego Police Department media credential, right?

9       A.   That is my understanding.

10      Q.   No, I understand that's your understanding.

11          Do you know if the deputies in the field

12  have complete discretion, even to let people who have

13  felonies into scenes?  I mean, is there any standard

14  given to the deputies out in the field, that you know

15  of, who would be allowed in on a case-by-case basis

16  absent media credentials issued by the government?

17      A.   At a disaster scene, media personnel are

18  allowed inside, civilians are not.

19      Q.   But again, going back to Exhibit 1 on

20  page 8, it says:  "Absent official government media

21  credentials, access pursuant to 409 penal code will be

22  granted on a case-by-case basis upon presentation of

23  information complying with 409.5 P.C."

24          409.5 C references disasters, correct, among

25  a lot of other things?

Jan Caldwell - 3/16/2016

```
 1          A.   You're referring to C, Subsection C?
 2          Q.   Well, A references disaster.  I'm not sure I
 3     see it in C.  I'm looking.  I just see it in A.
 4               MR. CHAPIN:  I'm not sure why were going
 5     down this path.  This case doesn't involve menace to
 6     public health in any way.
 7               MS. BAIRD:  Right.  All I'm trying to figure
 8     out is if Ms. Caldwell has any knowledge whether the
 9     deputies out in the field are trained with regard to
10     this discretion they have to grant, on a case-by-case
11     basis --
12               MR. CHAPIN:  I understand.
13               MS. BAIRD:  -- access pursuant to 409.5.
14               THE WITNESS:  I believe I've answered that.
15     BY MS. BAIRD:
16          Q.   And the answer -- I'm not sure what the
17     answer was.  Was the answer no?
18          A.   I'm not sure what your question is.  One
19     more time, please.
20          Q.   I've heard you say a couple of things.
21     You're not there.  They're there.  They're trained at
22     the regional academy.  So I just want to get it
23     straight.
24               On Exhibit 1, page 8 where it says:  "Absent
25     official government media credentials, access pursuant
```

1    to 409.5 penal code will be granted on a case-by-case

2    basis," I'm just trying to figure out if you know of

3    any training given to the deputies, with regard to how

4    they exercise that discretion, to give access pursuant

5    to 409.5 on a case-by-case basis when individuals

6    don't have the government media credentials.

7         A.   Well, and the rest of that is upon

8    presentation of information complying with 409.5 penal

9    code.

10        Q.   Yes, it is.

11        A.   So it is up to the deputy on scene.  As far

12   as the training that goes to that, I do not

13   specifically conduct training.  With that, that would

14   be probably better asked of those who train at the

15   Regional Law Enforcement Academy.

16        Q.   Thank you.  Right now I'm asking you if you

17   have any knowledge about any training given to

18   deputies out in the field to exercise that discretion.

19        A.   Not to my knowledge.

20        Q.   Okay.  Are they told what kind of

21   information is supposed to be presented?

22        A.   I do not train in that area, no.

23             MS. BAIRD:  If we could have this marked as

24   Exhibit 3.

25             MR. CHAPIN:  Do you really need to have that

1    attached as an exhibit?

2             MS. BAIRD:  Well, I'm going to go through

3    and just ask about specific paragraphs.

4             MR. CHAPIN:  It's up to you.  That will make

5    it a longer transcript.

6             MS. BAIRD:  I mean, if you want to stipulate

7    that -- we could do that.

8             MR. CHAPIN:  We're referring to the amended

9    complaint.

10            MS. BAIRD:  So unmark that?

11            MR. CHAPIN:  So you don't have to have

12   that -- if that's okay with you.

13            MS. BAIRD:  That's fine.

14            So we'll stipulate that this is the third

15   amended complaint that I'm referring to when I

16   reference --

17            MR. CHAPIN:  Just identify the paragraphs.

18            MS. BAIRD:  Yes, exactly.

19   BY MS. BAIRD:

20       Q.   Ms. Caldwell, do you know of any photograph

21   of Mr. Playford in possession of the San Diego County

22   Sheriff's Department?

23       A.   Can you be more specific?

24       Q.   Because it's not clear enough to you what

25   I'm asking?

1              MR. CHAPIN:  Well, we have booking photos.
2      Probably things like that.
3              MS. BAIRD:  Well, that's my question.
4              MR. CHAPIN:  She may not know.
5              Go ahead and answer.
6              THE WITNESS:  I don't know of any booking
7      photos.  I know of one photograph.
8      BY MS. BAIRD:
9          Q.   Okay.  And what is the one photograph you
10     know of?
11         A.   Photograph that we gave to the lobby
12     deputies a few years ago of Mr. Playford.
13         Q.   Do you know where the picture that was
14     portrayed on that document was obtained?
15         A.   I believe from the San Diego Police
16     Department.
17         Q.   You were the public information officer at
18     the time, correct?
19         A.   I have for the last past nine-and-a-half
20     years.
21         Q.   And are you able to narrow when this
22     photograph of Mr. Playford was provided to the -- did
23     you say it was the lobby deputy?
24         A.   Correct.
25         Q.   The lobby deputy?

Jan Caldwell - 3/16/2016

```
 1          A.    I honestly don't remember.
 2          Q.    Do you know who provided it to the lobby
 3   deputy?
 4          A.    I did.
 5          Q.    Were you instructed to do that by someone
 6   else?
 7          A.    No.
 8          Q.    What was your reason for doing it?
 9          A.    Deputy safety.
10          Q.    Was it a one-page document with a photograph
11   on it?
12          A.    I believe so.
13          Q.    What was the means of putting it together?
14          A.    I'm not sure I understand.
15          Q.    For example, there was a photograph in the
16   document, correct?
17          A.    Correct.
18          Q.    Was the photograph originally in digital
19   form on a computer?
20          A.    It might have been.
21          Q.    Do you know if it was e-mailed from the
22   San Diego Police Department?
23          A.    I believe it was.
24          Q.    And who was the PIO at the time at the
25   San Diego Police Department?
```

Jan Caldwell - 3/16/2016

```
 1        A.   Detective Hassen.
 2        Q.   And did you request that he send you the
 3   photograph?
 4        A.   I may have.
 5        Q.   Well, may he have just sent it to you on his
 6   own?
 7        A.   I probably requested it.
 8        Q.   And what was the reason for the request?
 9        A.   Deputy safety.
10        Q.   What was the information that you had that
11   providing this picture to the lobby deputy would
12   address deputy safety?
13        A.   Mr. Playford's behavior and conduct
14   recently.
15        Q.   What was the behavior and conduct?
16        A.   He was rather aggressive, argumentative,
17   caustic.
18        Q.   Towards you?
19        A.   Toward me and others, other deputies, other
20   personnel.
21        Q.   When he acted in this manner toward you,
22   was he in your presence?
23        A.   Yes.
24        Q.   Was that conduct displayed in any other
25   manner?  For example, you had said you had gotten some
```

Jan Caldwell - 3/16/2016

1    voice mails and e-mails from another individuals.  So
2    I'm asking you:  Other than this conduct being
3    displayed in your presence, were there any other kinds
4    of communications where he displayed this conduct
5    towards you?
6         A.   At that time, I don't believe so.  I think
7    it was just in person.
8         Q.   At any other time, has the conduct been
9    displayed towards you in other manner?
10        A.   He's left some voice mails in my office, as
11   well as the office of the sheriff that have been
12   antagonistic.
13        Q.   Have those voice mails been continuous, or
14   did they occur during certain periods of time?
15        A.   Sporadic.
16        Q.   When was the last one that you recall?
17        A.   I'm guessing last year.
18        Q.   Now, who was the lobby deputy that you
19   provided the photograph to?
20        A.   I don't remember.
21        Q.   Did you discuss with your direct supervisor,
22   the undersheriff at that time, that you were going to
23   do this?
24        A.   I don't believe so.  I may have, but I don't
25   believe so.

Jan Caldwell - 3/16/2016

1    Q.   Do you know if Sheriff Gore was the sheriff
2   at the time when you passed this photograph on to the
3   lobby deputy?
4    A.   It may have been beforehand.
5    Q.   So if it was beforehand, then it would been
6   Sheriff Kolender, correct?
7    A.   Correct.
8    Q.   And Sheriff Gore would have been your direct
9   supervisor as the undersheriff?
10    A.   Correct.
11    Q.   Did you use a computer to print out the
12   document that you gave to the lobby deputy?
13    A.   I would have.
14    Q.   And was there anything written on the
15   document -- well, I should say typed in on the
16   computer on -- that was on the same document as the
17   photograph?
18    A.   Probably his name.
19    Q.   Do you know if his date of birth was on the
20   document?
21    A.   It may have been.  I don't remember for
22   certain.
23    Q.   Do you know if there was any other
24   information on the document other than a name?
25    A.   Not to my recollection, but there could have

Jan Caldwell - 3/16/2016

1    been.

2        Q.   You mentioned that other than you, there had

3    been conduct displayed by Mr. Playford towards others

4    that led to a concern for deputy safety.  Could you

5    identify the others that had encountered

6    Mr. Plaford's conduct that led you to believe there

7    may be concerns for deputy safety.

8        A.   The lieutenant at the time in Fallbrook was

9    Duncan Frasier, F-r-a-s-i-e-r.  And deputies, other

10   deputies, I don't know their names.  Sheriff Gore,

11   myself.  Other deputies, I don't remember their names.

12   There were several instances.  And other members of

13   the media, as well as some of our professional staff.

14   And that's just in our department.

15       Q.   Have you in your nearly ten years ever

16   provided a photograph to a lobby deputy based on

17   concerns for deputy safety other than the one of

18   J.C. Playford?

19       A.   I don't think I provided Ed Baier.  I may

20   have, but those would be the only two to my knowledge,

21   to my recollection.

22       Q.   Now, was it you who provided the photograph

23   of Mr. Playford and perhaps Mr. Baier because they

24   identified themselves as media and you were the PIO?

25   In other words, why was the PIO involved in this?

Jan Caldwell - 3/16/2016

1    A.   Because of them alleging to be media and
2  because of my position and because of behaviors that I
3  had witnessed firsthand.
4    Q.   Did you refer it to -- with regard to the
5  behavior you witnessed firsthand, did you refer it to
6  any deputy for investigation of a possible or
7  potential criminal violation?
8    A.   No.
9    Q.   Did you provide instructions to the lobby
10 deputy what to do with the photograph when you
11 provided it?
12   A.   I believe I said, "This is a photograph of
13 J.C. Playford.  He is a person known to me that is
14 antagonistic and aggressive, and I'm giving this
15 photograph to you for deputy safety reasons."  I would
16 have said something along those lines.
17   Q.   Is there any manner of inputting information
18 like that into a computer system to make everyone
19 aware of it if there was a concern for deputy safety?
20   A.   Yes.  There would be an e-mail that could go
21 to everyone in the department.
22   Q.   Do you know if that happened?
23   A.   No, it did not.
24   Q.   With regard to Mr. Playford?
25   A.   It did not.

Jan Caldwell - 3/16/2016

 1     Q.   So there was a concern about Mr. Playford
 2   gaining access then to that one particular building
 3   where the lobby deputy served?
 4     A.   Yes, because he came there frequently.
 5     Q.   So was there a particular place in the lobby
 6   where the picture was kept of Mr. Playford?
 7     A.   I gave the picture for their information.  I
 8   did not instruct them further.
 9     Q.   And are all the lobby deputies sworn
10   officers?
11     A.   Yes.
12     Q.   Did you ever see the poster -- the document
13   with Mr. Playford's picture on it after the day when
14   you handed it to the lobby deputy?
15     A.   I don't go down there often.  I may have,
16   but not specifically.
17     Q.   Do you know if it was posted in a prominent,
18   visible area?
19     A.   I don't know.
20     Q.   Do you have any idea what happened to it?
21     A.   I don't.
22     Q.   Did you, after you prepared the document on
23   the computer with the photograph, e-mail it to anyone?
24     A.   Not to my recollection.
25     Q.   Do you know if any law enforcement agencies,

1    other than the San Diego County Sheriff's Department,
2    obtained that document with Mr. Playford's photo?
3         A.   Not to my knowledge.
4         Q.   Did you provide Detective Hassen with a copy
5    of the document?
6         A.   Not to my recollection.
7         Q.   Do you have any knowledge of how that
8    document with Mr. Playford's photo would have ended up
9    at -- or with security at Miramar?
10        A.   I have no idea.
11        Q.   Where is the regional academy that's run by
12   the San Diego Police Department located?
13        A.   Miramar College.
14        Q.   That's different than Miramar, right?
15        A.   Well, there's Miramar base.  There's Miramar
16   College.  They're different entities.
17        Q.   They're not located together?
18        A.   They are not co-located, no.
19        Q.   So just to clarify my question, then, do you
20   have any knowledge of how that picture of Mr. Playford
21   that you provided to the lobby deputy would have ended
22   up at Miramar base?
23        A.   I have no knowledge of that.  I have no
24   idea.
25        Q.   When was Detective Hassen the PIO?

Jan Caldwell - 3/16/2016

1       A.    To the best of my recollection, he started
2  before I retired from the FBI.  Maybe in 2004, '5.
3  You'd have to check with the PD on this.  And he
4  retired maybe three years ago, but I don't know for
5  sure.
6       Q.    Just as a reference, if it's helpful to you,
7  I'm going to be referring to paragraph 16 on page 6 of
8  the third amended complaint, and that's what my next
9  question will be based on.
10      A.    Ms. Baird, I'd like to back up --
11      Q.    Yes.
12      A.    -- and pause here.  You indicated that
13 Mr. Playford's photograph was at Miramar base.  I
14 think we did provide his photograph before Sheriff
15 Kolender's funeral in case he were to show up.  Not to
16 deny access, but just to make aware who J.C. Playford
17 was, and that he was an aggressive individual.
18      Q.    Sheriff Kolender, obviously he passed away,
19 correct?
20      A.    Yes, he did.
21      Q.    When did he pass away?
22      A.    His services were last October.
23      Q.    October of 2015?
24      A.    Correct.
25      Q.    Was he former military?  Was he --

Jan Caldwell - 3/16/2016

```
1        A.    No.
2        Q.    Were the services at the base?
3        A.    His memorial was at the base.  It was a
4   large venue.
5        Q.    Okay.  I understand.  Thank you.
6              In paragraph 16 of the third amended
7   complaint, it makes reference to a representation at
8   the website for sdsheriff.net with regard to a
9   protocol where the "public affairs media relations
10  office grants credentialed media superior access to
11  the most up-to-date and reliable information."
12             Do you recognize the language?
13       A.    "Superior access," no, I don't know where
14  that comes from.
15       Q.    Well, do you recognize -- if you could just
16  look at the quoted material:  "grants credentialed
17  media the most up-to-date and reliable information."
18             Do you recognize that?
19       A.    Let me read this and see if I may.
20             I don't really recognize it, but I don't
21  think I would take issue, I don't believe.
22       Q.    Well, the real question is:  The reference
23  to "credentialed media," is that media credentialed by
24  the San Diego Police Department?
25       A.    Correct.
```

Jan Caldwell - 3/16/2016

1      Q.   Or other law enforcement agencies?

2      A.   Correct.

3      Q.   And is it the policy of the public affairs

4   media relations office to provide information to

5   individuals or agencies that are credentialed by the

6   San Diego Police Department, that would not be

7   provided to those who are not credentialed by the

8   San Diego Police Department?

9      A.   We would provide information after hours

10  through our communications center or through media

11  access to me through e-mail after hours and provide

12  information.

13     Q.   And would you limit that provision of

14  information to those who are credentialed by law

15  enforcement agencies?

16     A.   Generally those that reach out to me after

17  hours, I recognize that have my e-mail address and I

18  answer their questions.  When someone calls the media

19  line in the communications center, I do not believe

20  the watch commander asks them if they have valid

21  San Diego Police/Fire credentials.  They answer the

22  questions to the best of their ability because it's

23  public source information, and they would answer it to

24  anyone who called.

25     Q.   Okay.  I'll be referring to paragraph 19 in

Jan Caldwell - 3/16/2016

1   the third amended complaint.

2        A.    190?

3        Q.    Yes.  It's on page 34.  Thank you.

4             Did you make a statement to a North County

5   Times reporter named Brandon Laury as quoted in

6   paragraph 190?

7        A.    Are you asking me if I said this?

8        Q.    Yes.

9        A.    Yes.

10       Q.    And is that an accurate representation of

11  your observations and opinion?

12       A.    It is as of 2012.  Since then, I've done an

13  interview with him where he was talking about CCWs,

14  and I went downstairs and talked with him at length

15  about it and it went fine.  He was at the funeral of

16  an Escondido Police Department officer, Laura Perez,

17  and he was well mannered.  And he was at the swearing

18  in of Sheriff Gore the last time, and he was also well

19  mannered.

20       Q.    Did that swearing in take place inside or

21  outside?

22       A.    Inside.

23       Q.    And was that an event that required media

24  credentials issued by San Diego?

25       A.    It was held here, so we had no say.

Jan Caldwell - 3/16/2016

1      Q.   Referencing paragraph 191, and I'll just go
2  through the sections I've listed there, A through F in
3  the third amended complaint.  Do you recall attending
4  a February 19th, 2013, meeting of the San Diego
5  Society of Professional Journalists?
6      A.   Yes, I do.
7      Q.   And were you invited to go to that event?
8      A.   Yes, I was.
9      Q.   Have you been to any other San Diego Society
10  of Professional Journalists events?
11      A.   No, I have not.
12      Q.   My next question is:  In paragraph 191,
13  Subsection A, is that statement in quotes an accurate
14  statement of something you said at that February 19th,
15  2013, meeting?
16      A.   Yes, I believe that's accurate.
17      Q.   Is Subsection B an accurate statement of
18  a statement you made at that February 19th, 2013,
19  meeting?
20      A.   I believe.
21      Q.   Is there anything in Subsection B that you
22  would not agree with as your observation or opinion as
23  you sit here today?
24      A.   Well, I don't know if I would say that's my
25  soap box on that, but I may have.

Jan Caldwell - 3/16/2016

1      Q.   Paragraph 191, Subsection C, is that a
2  statement that you made at the February 19th, 2013,
3  meeting?
4      A.   Yes, I believe that's accurate.
5      Q.   When you became the public information
6  officer almost ten years ago, was it an issue that you
7  knew of that had been raised about whether those with
8  media credentials issued by a law enforcement agency
9  should be treated differently than media credentials
10  issued by a non law enforcement agency?
11      A.   The media has changed a great deal since
12  that time, since I began doing this in 1993.  The
13  advent of social media, a lot has changed, so it was a
14  different environment then.
15      Q.   Have you had discussions with your
16  supervisor, the undersheriff, or even the sheriff,
17  regarding any changes in the protocol that currently
18  just recognizes media as those issued credentials by
19  law enforcement agency?
20      A.   Sorry.  Can you boil that down a little bit?
21      Q.   Yeah.  Given the changes that you've
22  mentioned in social media since you came on board
23  nearly ten years ago, have you had any discussions
24  with the supervisor, the undersheriff, or even the
25  sheriff or anyone else, about changing the protocol

1    that's been in effect since you came on board that

2    just recognizes the media as those holding credentials

3    issued by a law enforcement agency?

4        A.    No.

5        Q.    Do you know if the San Diego County

6    Sheriff's Department has any discretion with regard to

7    who or whom it recognizes as the media?

8            MR. CHAPIN:  Objection.  That's vague as to

9    time, location issue.

10            MS. BAIRD:  Okay.  Fair enough.

11   BY MS. BAIRD:

12       Q.    Does the San Diego County Sheriff's

13   Department have to, under some policy, procedure,

14   law, regulation, memorandum of understanding,

15   recognize as the media only those issued media

16   credentials by the San Diego Police Department?

17            MR. CHAPIN:  Same objection.  I'm not sure

18   the question is clear.

19            THE WITNESS:  I'm sorry.  I don't

20   understand.

21   BY MS. BAIRD:

22       Q.    Why is it that the San Diego County

23   Sheriff's Department delegates its authority as to who

24   is the media or is not the media to the San Diego

25   Police Department?

Jan Caldwell - 3/16/2016

1      A.   That was a decision I understand that was

2  made many, many years ago in a division of labor, that

3  the San Diego Sheriff's Department would issue

4  concealed carry weapons permits, and the San Diego

5  Police Department would issue media credentials.

6      Q.   And other than that division of labor, is

7  there any other reason that you know of or have been

8  told of?

9      A.   No.

10     Q.   Going to paragraph 191D, Subsection D of the

11 third amended complaint, is that a statement in quotes

12 that you made on February 19th, 2013, at the meeting

13 of the Society of Professional Journalists?

14     A.   I believe it is.

15     Q.   And is that an opinion or observation that

16 you hold today?

17         MR. CHAPIN:  I'm not sure that's an opinion.

18 That's a statement.

19         Can you answer that?

20 BY MS. BAIRD:

21     Q.   Did you answer?

22     A.   No.

23         MR. CHAPIN:  That's sort of a preface to E.

24 I'm not sure there's any opinion.  Your question is

25 whether that's an opinion.

Jan Caldwell - 3/16/2016

1         MS. BAIRD:  Well, are you saying that it's a
2    fact?  I don't know if that's a fact or not.
3         MR. CHAPIN:  It's like an incomplete
4    sentence, so I'm not sure it has a verb.
5         THE WITNESS:  It is difficult to discern who
6    is media today.  This hyperbole is given to indicate
7    that it is very difficult for PIOs to ascertain who is
8    legitimate media; that is, someone who you can give
9    information to the smallest number of people, to get
10   information to the largest number of people.  Because
11   PIOs are small in number, but when we have something
12   to share, we need to make sure we get it out to people
13   that would share it with the most people.
14   BY MS. BAIRD:
15       Q.   That pertains to when the PIO is
16   disseminating information, correct?
17       A.   Disseminating information, answering
18   questions, any number of things.
19        MR. CHAPIN:  Can we go off the record.
20        (Recess taken.)
21   BY MS. BAIRD:
22       Q.   Going back to -- I wanted to follow up on
23   something you had said about -- when we broke, about
24   wanting to distribute information to a media
25   organization that can get the word out to the most

Jan Caldwell - 3/16/2016

1    people, and that being an important consideration.
2            Did I summarize that right?
3        A.    I believe so.
4        Q.    What is the consideration in instances where
5    individuals such as Mr. Playford responds to a single
6    car accident where you don't have the large mainstream
7    credentialed media responding?  What are the
8    considerations there that require the San Diego County
9    Sheriff's Department to identify who is credentialed
10   by law enforcement agency and who isn't?
11           MR. CHAPIN:  I'm going to object as vague.
12   It's sort of an incomplete hypothetical question.
13   BY MS. BAIRD:
14       Q.    Can you answer it?
15       A.    I'm not sure I understand.
16       Q.    Going back to paragraph 191.  D and E, if
17   you want to read them together.  And then I guess I
18   could ask the question more clearly then, if you
19   currently hold the position expressed in paragraph
20   191, Subsections D and E together of the third amended
21   complaint.
22       A.    Well, I believe I answered that, but I'm
23   happy to try to do it again.  That this hyperbole was
24   given in this panel form to express consternation that
25   it's hard to identify journalists today.

Jan Caldwell - 3/16/2016

 1      Q.   So you have no knowledge that the San Diego
 2   Police Department, in issuing media credentials,
 3   considers somebody's weight?
 4      A.   No.
 5      Q.   That was a hyperbole?
 6      A.   That's hyperbole.
 7      Q.   And you don't have any knowledge that the
 8   San Diego Police Department considers whether somebody
 9   is disabled, whether they're credentialed or not?
10      A.   Absolutely not.  This was a panel setting.
11   And in this one dimension, it's hard to see how that
12   was, but it was hyperbole given just to illustrate the
13   point.  It's hard to see who's real media today and
14   who pretends to be media.
15      Q.   Do you know if the San Diego Police
16   Department issues media credentials to felons?
17      A.   My understanding is they do not, but that
18   would have to be directed to them.
19      Q.   Would you have any concerns if they did?
20      A.   Yes, I would.
21      Q.   Have you been concerned enough to check to
22   see if they do?
23      A.   No, I have not.
24      Q.   Are you familiar with the National Press
25   Photographers Association?

Jan Caldwell - 3/16/2016

1        A.   I believe I've heard of it.  I'm not sure.
2        Q.   It doesn't sound like you recall having any
3   communications or direct contact with anyone
4   associated with NPPA?
5        A.   I might have, but I don't recall.  If I had
6   a name, maybe I would remember.  But not off the top
7   of my head.
8        Q.   Have you ever -- let me put it this way.
9   Do you recognize the name Mickey Ostereicher?
10        A.   Yes, I've been contacted by him.
11        Q.   In particular any issues you've been
12   contacted by him for?
13        A.   To the best of my recollection, I believe he
14   wanted me to attend a training he was putting on here
15   in San Diego within the last couple of years -- I
16   don't remember exactly when -- about the right of
17   access.
18        Q.   Did you attend the training?
19        A.   I did not.
20        Q.   It's my understanding -- and tell me if I'm
21   wrong -- from your testimony that the San Diego County
22   Sheriff's Department is not considering any changes to
23   its position that the valid media is media issued
24   credentials by law enforcement agencies, correct?
25             MR. CHAPIN:  Objection.  That's vague.  Sort

Jan Caldwell - 3/16/2016

1    of compound.

2    BY MS. BAIRD:

3        Q.   Well, is the San Diego County Sheriff's

4    Department considering currently any changes to its

5    protocol, that only individuals or agencies issued

6    media credentials by law enforcement are valid media?

7            MR. CHAPIN:  Same objection.  And the

8    context is too broad, sounds like to me, talking about

9    having access to the sheriff's department

10   headquarters.  You're talking about having access to a

11   press conference on the courthouse steps.  If you

12   could narrow it down.

13   BY MS. BAIRD:

14       Q.   I guess what I need to do then is, I need to

15   define the different categories of media events that

16   the San Diego County Sheriff's Department encounters.

17   I think we've already talked about media conferences,

18   correct?

19       A.   Correct.

20       Q.   And then there's instances out in the field

21   where the front-line deputies come in contact with

22   individuals who have valid press credentials or

23   represent themselves as the media, correct?

24       A.   Correct.

25       Q.   Are we able to define categories for other

Jan Caldwell - 3/16/2016

1    events?

2         A.   We would conduct interviews.  The sheriff,

3    any member of the department could be a participant in

4    a media interview.  E-mail contact, telephonic

5    contact.  Sometimes things even come up with a fax

6    machine.  Lot of different ways the media can contact

7    the sheriff's department with a lot of different

8    people.

9         Q.   Is there a difference in whom the sheriff's

10   department considers media based on what the event is?

11        A.   I'm sorry.  Can you restate that?

12        Q.   Is there a different standard that's applied

13   to determining if somebody is media -- if a member of

14   the media -- if the media event is different?

15        A.   No.  We attempt to answer the questions by

16   the media or the general public to the best of our

17   ability.

18        Q.   Even if it's an after-hours contact by

19   e-mail, such as we referenced in the media guide

20   that -- the questions are answered the same from the

21   media as the general public?

22        A.   Yes, generally.

23        Q.   Do you know why -- do you know why on the

24   three different occasions -- and we can go into the

25   complaint if you need more background of the dates and

Jan Caldwell - 3/16/2016

1  times.  But do you know why on the three different
2  occasions that are referenced in the complaint in this
3  case, why Mr. Playford wasn't allowed access to
4  accident scenes?
5      A.   I have no idea.  That's up to the deputy or
6  the incident commander at each scene, and I was not
7  there.
8      Q.   Do you know if it had anything to do with
9  him not having media credentials issued by the
10  San Diego Police Department?
11      A.   I couldn't answer that question since I
12  wasn't there.
13      Q.   Do you agree that the officers at those
14  scenes, the deputies at those scenes had the
15  discretion on a case-by-case basis to allow
16  Mr. Playford into the accident scene, even though he
17  didn't have media credentials issued by the San Diego
18  Police Department?
19          MR. CHAPIN:  Objection.  That's vague.
20  Assumes facts not in evidence.  It misstates the
21  statute -- misstates the evidence that in these events
22  there was no menace to public health.
23          Are you able to answer the question?
24          THE WITNESS:  We would not allow anyone into
25  an accident crime or incident scene until the scene

Jan Caldwell - 3/16/2016

1    was finished, to preserve evidence and for public
2    safety and to conclude the investigation.
3    BY MS. BAIRD:
4        Q.    Okay.  So even if a person -- are you
5    familiar with Karen Braner?
6        A.    No, I'm not.
7        Q.    Even if a person who had media credentials
8    issued by the San Diego Police Department, even if a
9    person had those credentials, they would not be
10   allowed into an accident scene until the investigation
11   was closed?
12       A.    They would not be allowed past the tape or
13   where the deputy told them not to cross.
14            MR. CHAPIN:  Objection.  Vague again as to
15   "accident scene."  If it is a crime scene, I think
16   that is what the witness is referring to.
17            MS. BAIRD:  Well, I'm referring to accident.
18            MR. CHAPIN:  Then you're vague again.
19   Because accident, in your view, falls within 409.5,
20   which is not the court's view or the statement of law.
21   If you're asking for a legal conclusion in the
22   context of the question --
23            MS. BAIRD:  What did you say?  Accident
24   doesn't fall into 409.5?
25            MR. CHAPIN:  Accident does not fall into

```
 1   409.5 in any event, in this case, and only involves an
 2   incident which is a menace to public safety in
 3   Subsection A.
 4           MS. BAIRD:  But accident is right there.  Do
 5   you see the word?
 6           MR. CHAPIN:  That's what Mr. Playford says
 7   too.  The judge has already ruled on that.  It's not
 8   an issue in this case.  It's an accident involving a
 9   menace to public safety.  My objection is just that
10   you're asking --
11           MS. BAIRD:  This is a deposition.
12           MR. CHAPIN:  I know.  I'm objecting for the
13   record.
14           MS. BAIRD:  Those other plaintiffs could
15   very well come back at another time.
16           MR. CHAPIN:  I'm objecting to the form of
17   the question simply because it's calling for a legal
18   opinion and conclusion.  You're misstating the statute
19   and you're asking the witness to assume something
20   that's not accurate.  She can answer the question if
21   it's possible.  I'm objecting to the form of the
22   question.
23   BY MS. BAIRD:
24       Q.  You don't remember the question anymore, do
25   you?
```

Jan Caldwell - 3/16/2016

 1      A.   You would have to restate it.
 2           MS. BAIRD:  We have to go back to the
 3      record.
 4           (Record read.)
 5           MS. BAIRD:  I don't think I misstated
 6      anything in the complaint.  I wasn't even asking about
 7      the complaint.
 8           MR. CHAPIN:  I just want to make sure the
 9      objection is to the form of the question, which
10      assumes that any accident scene falls within Section
11      409.5.  That's not the case.  That's not the law.
12      BY MS. BAIRD:
13      Q.   Again, what your counsel is saying about the
14      law and accidents and all that, you don't train
15      anybody in that?
16      A.   I do not.
17      Q.   You do not.  That would happen at the
18      regional academy, if it happens?
19      A.   It would happen there.
20      Q.   And you don't have any idea what they tell
21      them there?
22      A.   I have not attended a class, no.
23      Q.   That's a different question.  You could have
24      an idea other ways.
25      A.   No, I don't know.  I'm not a sworn deputy.

Jan Caldwell - 3/16/2016

 1              MS. BAIRD:  Okay.  If we can have this

 2     marked as the next exhibit, Exhibit 3.

 3              (Exhibit 3 was marked for identification by

 4              the court reporter.)

 5     BY MS. BAIRD:

 6         Q.   This may be quick.  I just want to go

 7     through some of the names with you.  If you could turn

 8     to page 2 of Exhibit 3.

 9         A.   Okay.

10         Q.   Have you discussed Mr. Playford's conduct

11     with Sheriff Gore?

12         A.   In general?

13         Q.   Ever.

14         A.   Yes.

15         Q.   When was the last time?

16         A.   I don't recall.  It's been recently.

17         Q.   Do you recall what prompted that discussion

18     with Sheriff Gore?

19         A.   Probably this lawsuit.

20         Q.   Was it prompted by any conduct of

21     Mr. Playford?

22         A.   Not recently.

23         Q.   Are you able to recall any other

24     discussions, other than this most recent one about

25     the -- that may have been about the lawsuit?

Jan Caldwell - 3/16/2016

1        A.    Over the years there have been several,

2   many.  But as to specific times, I don't remember

3   exactly.

4        Q.    And what particular issues have you

5   discussed with Sheriff Gore about Mr. Playford?

6        A.    His aggressiveness.  We believe him to be

7   unstable.  His violation of body space with his

8   cameras.  Primarily those issues.

9        Q.    Does Sheriff Gore -- to your knowledge, is

10  Sheriff Gore aware of the document with Mr. Playford's

11  picture on it that was given to the lobby deputy?

12       A.    I believe he's aware of it because of the

13  lawsuit.

14       Q.    Do you know if Sheriff Gore is aware of the

15  distribution of the document with Mr. Playford's

16  picture to Miramar base?

17       A.    I don't know.

18       Q.    Addressing page 2 again of Exhibit 3,

19  No. 3, do you have any knowledge of Deputy Thomas

20  Seiver's involvement at any time with Mr. Playford?

21       A.    I don't.

22       Q.    Do you know who Deputy Thomas Seiver is?

23       A.    I've heard his name.

24       Q.    Same question.  Deputy Brendan Cook, do you

25  know who he is?

Jan Caldwell - 3/16/2016

1      A.   I've heard his name.

2      Q.   And do you know of any association between

3  Deputy Brendan Cook and Mr. Playford?

4      A.   I do not.

5      Q.   Deputy Jesse Allensworth, do you know his

6  name?

7      A.   I may.

8      Q.   Is it fair to say that you haven't discussed

9  this case with Deputy Thomas Seiver?

10     A.   No.

11     Q.   Or Deputy Brendan Cook?

12     A.   No.

13     Q.   Deputy Jesse Allensworth?

14     A.   No.

15     Q.   And none of them have ever -- I'll ask it

16  singly.  Deputy Thomas Seiver ever come to you to ask

17  you about handling media out in the field?

18     A.   I don't recall that.

19     Q.   Deputy Brendan Cook, has he ever come to you

20  to ask you about handling media out in the field?

21     A.   I don't recall.

22     Q.   Deputy Jesse Allensworth, has he ever

23  contacted you to ask about handling media out in the

24  field?

25     A.   I don't recall.

Jan Caldwell - 3/16/2016

1      Q.   Deputy James Brennan, do you recognize that
2  name?
3      A.   Not really.
4      Q.   It sounds like he's never contacted you to
5  discuss some handling media in the field?
6      A.   Not that I recall.
7      Q.   Deputy Michael Proctor, do you know him or
8  recognize his name?
9      A.   I recognize the name.
10     Q.   And has he ever come to you to discuss
11 handling media out in the field?
12     A.   Not that I remember.
13     Q.   Deputy Jason Ward, do you recognize his
14 name?
15     A.   No.
16     Q.   And do you recall him ever coming to you to
17 discuss handling media out in the field?
18     A.   Not that I recall.
19     Q.   Deputy James Stemper, do you recognize his
20 name?
21     A.   I don't think so.
22     Q.   Do you recall him ever contacting you to --
23 with regard to recognizing or handling media out in
24 the field?
25     A.   Not that I recall.

Jan Caldwell - 3/16/2016

```
 1        Q.   California Highway Patrol Officer Joseph
 2   Nielsen, do you know him?
 3        A.   I do not.
 4        Q.   And I believe we've discussed San Diego
 5   Police officer Gary Hassen?
 6        A.   Correct.
 7        Q.   Am I correct that he's the -- or he was the
 8   public information officer for the San Diego Police
 9   Department?
10        A.   Yes.
11        Q.   Do you know Steve Fiorina?
12        A.   I do.
13        Q.   Have you had contact with him in his
14   capacity as the media?
15        A.   Yes.
16        Q.   A reporter?
17        A.   Yes.
18        Q.   And how long have you known him?
19        A.   Maybe since I began doing this in 1993.
20        Q.   Have you ever discussed Mr. Playford with
21   Mr. Fiorina?
22        A.   Not that I recall.
23        Q.   Have you discussed Mr. Playford with any
24   member of the valid media, the media that has the
25   credentials issued by law enforcement?
```

Jan Caldwell - 3/16/2016

1     A.    Yes.

2     Q.    And who have you had those discussions with?

3     A.    I can't remember his name.  He is a reporter

4  with Channel 7.  Several years ago, when Mr. Playford

5  was at Ridgehaven, made a comment that Mr. Playford

6  was a joke.  More recently, this past January, at a

7  Code 11 in Imperial Beach, a cameraman for KUSI

8  commented that J.C. Playford was a problem.

9     Q.    When was that time frame on the Code 11?

10    A.    January.

11    Q.    Of 2016?

12    A.    Correct.

13    Q.    Did you convey that information in either

14  one of those two instances to any deputy to

15  investigate or anyone to investigate?

16    A.    No.

17    Q.    You have to tell me, Imperial Beach, is that

18  in the City of San Diego, or is that in the County?

19    A.    It's in the County.

20    Q.    And Ridgehaven, is that in the City or

21  County?

22    A.    That is in the City.  That's our

23  headquarters.

24    Q.    Do you know if either one of these

25  reporters -- well, the cameraman and the individual

1  from Channel 7, were they making a criminal complaint?

2       A.   No.

3       Q.   Did they contact you?  In other words, how

4  did the discussion -- we'll start with the Channel 7

5  discussion.  How did that arise?

6       A.   I believe Mr. Playford was at Ridgehaven,

7  and this reporter expressed his opinion about

8  Mr. Playford in general.

9       Q.   Were you there?

10      A.   Yes, I was.

11      Q.   And was this reporter in your office and

12  expressed the opinion?

13      A.   No.  We were outside in front of the

14  building.

15      Q.   Was this some sort of media conference

16  outside the building?

17      A.   I don't remember if it's a conference or

18  just interviews being conducted.

19      Q.   And then the Code 11 in Imperial Beach, how

20  did that discussion arise?

21      A.   I was just standing there just talking with

22  the media, not official statements, waiting before --

23  in between my statements, and this cameraman

24  approached me to give his opinion about Mr. Playford.

25      Q.   So this was during the daytime?

Jan Caldwell - 3/16/2016

1      A.   It was late afternoon, early evening.

2      Q.   And about how many people were present?

3      A.   I think it was just the two of us.  There

4  were other people present.  There were probably 15 to

5  20 other people in the area, but did not hear our

6  conversation.

7      Q.   What's a Code 11?

8      A.   That's when our Swat Team is called out to

9  usually a barricade situation, a subject barricade or

10  hostage situation.

11     Q.   And that's part of your job duty to respond

12  to events like that?

13     A.   Correct.

14     Q.   And you have some sort of an area set aside

15  where you disseminate information to the media?

16     A.   We have a media section set up, yes.

17     Q.   And is that what happened?

18     A.   Correct.

19     Q.   And were you the primary individual giving

20  out information at that media site that was set up?

21     A.   Yes.

22     Q.   There were about 20 members of the media or

23  the general public in that area?

24     A.   Approximately.

25     Q.   It didn't really matter which was which at

Jan Caldwell - 3/16/2016

1  that point.  You were just giving out information.

2  It wasn't information just for credentialed media, or

3  was it?

4      A.   It was outside in a public area, so it was

5  for the general public as well as the media.

6      Q.   And Mr. Playford was present?

7      A.   He was not.

8      Q.   He was not present?

9      A.   No.

10     Q.   And an individual from KUSI cameraman

11  approached you to discuss Mr. Playford?

12     A.   Correct.

13     Q.   What did he tell you about Mr. Playford?

14     A.   That he was a problem at scenes.  That he

15  had an issue recently.  He was basically expressing

16  his consternation about Mr. Playford.

17     Q.   What did you see as your job responsibility

18  to do with that information?

19     A.   It was his opinion.  There was nothing to do

20  with it.

21     Q.   I'm back at Exhibit 3 on page 2.  Jefferson

22  Baker, he's listed as No. 13.  Do you know who that

23  person is?

24     A.   I do not.

25     Q.   Do you know who Deanna Baker is?

Jan Caldwell - 3/16/2016

1    A.   I do not.

2    Q.   Debra Sue Bonomo, do you know who that is?

3    A.   I do not.

4    Q.   Do you recall an incident involving an

5    individual by the name of Alan Baker that Mr. Playford

6    videotaped?

7    A.   Not with just that information, I don't

8    recognize it.

9    Q.   Minnie or Miney Boettcher, No. 17?

10    A.   I do not know that person.

11    Q.   Donald Eppich?

12    A.   I do not know that person.

13    Q.   Ryan Peters?

14    A.   I do not know that person.

15    Q.   Deputy Robert Williamson, do you recognize

16    that name?

17    A.   No.

18    Q.   No. 21 is listed on page 3 of Exhibit 3,

19    Jennifer Messervy.

20    A.   I don't know that person.

21    Q.   No. 22, Robert Isaacson, do you know that

22    person?

23    A.   I do not.

24    Q.   Do you recognize the name Matthew William

25    Deskovick, or do you know him?

Jan Caldwell - 3/16/2016

1       A.   I do not.

2       Q.   Sean Maginnis, do you recognize that name,

3   or do you know him?

4       A.   I do not.

5       Q.   Thomas Valente, do you recognize that name

6   or do you know him?

7       A.   I do not.

8       Q.   Sergeant George Calderon, do you recognize

9   that name or know him?

10      A.   I do recognize the name, and I know Sergeant

11  Calderon.

12      Q.   Is he employed by the San Diego County

13  Sheriff's Department?

14      A.   Yes, he is.

15      Q.   Have you ever discussed Mr. Playford with

16  Sergeant Calderon?

17      A.   Not that I recall.

18      Q.   Do you know of any context that Sergeant

19  Calderon has had with Mr. Playford?

20      A.   I do not.

21      Q.   Lieutenant Duncan Fraser?

22      A.   I know Duncan Fraser.  He has retired from

23  the department.

24      Q.   You mentioned him at the beginning of our

25  deposition.  I recall that, but if you don't mind

Jan Caldwell - 3/16/2016

1    repeating for me, how do you know Mr. Frasier?

2         A.   He was a lieutenant in Ramona, Ramona

3    substation when I first met him or got to know him.

4    And he was promoted to captain.  And I worked with him

5    a little bit when he was captain over the Central

6    Investigations Division.

7         Q.   Do you know of any association or

8    involvement he had professionally with Mr. Playford?

9         A.   I know that Mr. Playford did speak to then

10   Lieutenant Frasier when he was in Ramona, but I really

11   don't recall what the interactions were.

12        Q.   Kay Lynn Cheatwood, do you recognize that

13   name or know that person?

14        A.   I do not.

15        Q.   Detective McNeil, do you recognize that name

16   or know that person?

17        A.   No.

18        Q.   Deputy Benjamin Brown, do you recognize that

19   name or know that person?

20        A.   I believe I recognize the name, but I don't

21   think I know that person.

22        Q.   Do you have any recognition of the name

23   that's associated with Mr. Playford?

24        A.   I'm sorry?

25        Q.   Do you have any recognition of that name

Jan Caldwell - 3/16/2016

1  because of any understanding that he had an
2  association with Mr. Playford?
3       A.   No.
4       Q.   Deputy Fred Magana, do you know that person
5  or recognize that name?
6       A.   I think I recognize the name, but I don't
7  think I know him.
8       Q.   Oceanside Police Detective Josh Ferry?
9       A.   I do not know him.
10      Q.   Oceanside Police Officer Todd Ringrose?
11      A.   I do not know that person.
12      Q.   It looks like California Highway Patrol
13 Officer Brian Pennings.  Do you recognize that name?
14      A.   I recognize and I know Officer Pennings.
15      Q.   How do you know him?
16      A.   Just through shared PIO job functions.
17      Q.   So is it your understanding that at one time
18 or currently he was a PIO for the California Highway
19 Patrol?
20      A.   Correct.
21      Q.   Do you know if he is right now?
22      A.   I do not know.
23      Q.   Do you know where he worked out of when you
24 last had contact with him or knew him?
25      A.   I do not.

Jan Caldwell - 3/16/2016

1    Q.   A. Macias, do you know that person or

2  recognize his or her name?

3    A.   Without a first name, no, it's not familiar

4  to me.

5    Q.   California Fire Battalion Chief R. Scales,

6  do you recognize that name or know that person?

7    A.   I do not.

8         MS. BAIRD:   If I could have that marked as

9  Exhibit 4.

10        (Exhibit 4 was marked for identification by

11        the court reporter.)

12  BY MS. BAIRD:

13    Q.   Ms. Caldwell, do you recognize any of those

14  four squares that appear to be identification cards on

15  Exhibit 4 as media credentials issued by the San Diego

16  Police Department?

17    A.   They are not.

18    Q.   In the upper left-hand corner of Exhibit 4

19  where it has Ed Baier's name at the top of it, have

20  you seen that media credential or one similar to it

21  previously?

22    A.   Not that I recall, no.

23    Q.   Does your protocol at the San Diego County

24  Sheriff's Department consider any of those media

25  credentials on Exhibit 4 as valid media credentials?

Jan Caldwell - 3/16/2016

1      A.   They are not issued by the San Diego Police
2  Department, no.
3      Q.   Do you know if they're issued by other law
4  enforcement agencies?
5      A.   It's hard to tell through this, this copy.
6  I can't tell through this copy.
7      Q.   If none of those four cards portrayed on
8  Exhibit 4 are issued by law enforcement agencies, is
9  it the San Diego County's protocol to consider them
10  not valid credentials?
11      A.   They would not be allowed into our building,
12  in all likelihood, with just that for a media event.
13      Q.   Again, you can't respond or comment on how
14  those credentials would be treated in the field
15  because that would be up to the deputies out in the
16  field?
17      A.   That's up to the deputies in the field at
18  any particular scene.
19      Q.   Do you know or are you familiar with the
20  name Matthew Glazer as an individual who worked at
21  KFMB TV in San Diego?
22      A.   No.
23           MS. BAIRD:   I think I'm done.  Can you just
24  give me five minutes, ten minutes, and I think we'll
25  be done.

1          MR. CHAPIN:  This would be fine.

2          (Exhibit 5 was marked for identification by

3          the court reporter.)

4  BY MS. BAIRD:

5      Q.   Do you recognize any of the cards or IDs in

6  Exhibit 5 that's issued by the San Diego Police

7  Department?

8      A.   I recognize the last one.

9      Q.   Okay.  Is that a media credential or ID

10  card, or is that --

11     A.   That looks to be a parking placard.

12     Q.   And have you seen one of those?

13     A.   Yes.

14     Q.   And again, you don't know the policies or

15  procedures for the San Diego Police Department for

16  issuing parking placards, correct?

17     A.   No.  You would have to contact us as far as

18  that goes.

19     Q.   Does the PIO at the San Diego Police

20  Department -- has a PIO at the San Diego Police

21  Department ever contacted you in the past to discuss

22  whether an individual or entity should be issued a

23  media credential by the PD?

24     A.   Not to my recollection, no.

25     Q.   Has a PIO at the San Diego Police Department

1    contacted you in the past about whether someone --
2    someone who has been issued a media credential by the
3    PD, whether that credential should be revoked?
4          A.   No, not to my knowledge.
5          Q.   And I think the third scenario:  Has a PIO
6    at the San Diego Police Department contacted you in
7    the past about whether an individual's media
8    credential issued by the PD should be renewed?
9          A.   Not to my knowledge.  They generally make
10   those decisions on their own.
11         Q.   When they make the decisions, is there any
12   means of communicating the decision to you?  Because
13   there's no list, right?
14         A.   They have a list, but it's not published to
15   us.  What is your question again?
16         Q.   Oh, for example, if they decide -- if the
17   San Diego Police Department decided to revoke an
18   individual's media credential, would they communicate
19   that to you?
20         A.   No.
21              MS. BAIRD:  Okay.  I think I'm done.
22   Thanks.  Well, I am done.  I don't "think."  I'm done.
23              MR. CHAPIN:  In San Diego we do a
24   pre-stipulation that covers some of the reporter's
25   responsibilities, if you want to hear me out.

Jan Caldwell - 3/16/2016

1  Normally I would relieve the court reporter of some of
2  her duties by having the original transcript go to my
3  office to be provided to the witness to sign under
4  penalty of perjury.
5       MS. BAIRD:  Yes.
6       MR. CHAPIN:  That I will notify you of any
7  changes within two weeks, or a reasonable time
8  thereafter, of receipt of it from the court reporter.
9  And if the original is lost, misplaced for any reason,
10 a certified copy can be used for any reason.
11      MS. BAIRD:  Yes.  Perfect.
12      (The deposition of JAN CALDWELL concluded at
13       1:40 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

Jan Caldwell - 3/16/2016

```
 1   STATE OF CALIFORNIA    )
                            ) ss.
 2   COUNTY OF SAN DIEGO    )

 3

 4   I, the undersigned, hereby declare that I am the

 5   witness in the within matter, that I have read the

 6   foregoing deposition and know the contents thereof,

 7   and I declare that the same is true of my own

 8   knowledge except as to those matters, I believe them

 9   to be true.

10           I declare under penalty of perjury that the

11   foregoing is true and correct.

12   Executed on this _____day of _____, 2016,

13   at _____, California.

14

15

16                    _____

17                              JAN CALDWELL

18

19

20

21

22

23

24

25
```

Jan Caldwell - 3/16/2016

```
 1   STATE OF CALIFORNIA    )
                            ) ss.
 2   COUNTY OF SAN DIEGO    )

 3

 4           I, PATRICIA M. BECK, Certified Shorthand

 5   Reporter for the State of California, do hereby

 6   certify:

 7           That prior to being examined, the witness

 8   named in the foregoing deposition was by me duly sworn

 9   to testify to the truth, the whole truth and nothing

10   but the truth.

11           That said deposition was taken before me at

12   the time and place therein set forth and was taken

13   down by me in machine shorthand and thereafter was

14   transcribed into typewriting under my direction and

15   supervision, and I hereby certify the foregoing

16   transcript is a full, true and correct transcript of

17   my shorthand notes so taken.

18           I further certify that I am neither counsel

19   for nor related to any party to said action nor in any

20   way interested in the outcome thereof.

21           IN WITNESS WHEREOF, I have hereunto

22   subscribed my name this March 29, 2016, at San Diego,

23   California.

24                         _____

                          PATRICIA M. BECK
25                        CSR NO. 12090
```