UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN NEWS AND INFORMATION SERVICES, INC. et al., Plaintiff, v. WILLIAM D. GORE, et al., Defendant. | Case No.: 12CV2186 BEN (KSC) **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** [Docket No. 95] |

Defendants County of San Diego, William D. Gore, and Jan Caldwell, the only remaining defendants in this action, move for summary judgment on the remaining claims for First Amendment retaliation and failure to train. Plaintiff James C. Playford has filed an Opposition addressing the First Amendment retaliation claim and Defendants have filed a Reply. (Docket Nos. 98, 100.) Defendants argue that there is no evidence Gore or Caldwell directed or provided any information that encouraged the arrests of Plaintiff and there is strong evidence of probable cause for each arrest. Defendants additionally argue that the First Amendment retaliation claim is barred by *Heck v. Humphrey*. The Court grants summary judgment to Defendants on both claims.

///

///

# BACKGROUND

Plaintiff alleges that he was arrested numerous times by San Diego County Sheriff's Department (SDCSD) deputies for engaging in First Amendment activities — videotaping matters of public interest.[1] Plaintiff argues that he was targeted for arrest by Sheriff Gore and Sherriff's Department Public Information Officer Caldwell because of these activities, although he either pleaded no contest or was found guilty at trial for all the relevant arrests. Following seven motions to dismiss, three motions to strike, and one motion to amend, two claims remain in this case: (1) First Amendment retaliation against Gore and Caldwell and (2) failure to train against the County and Gore.

Putting aside legal conclusions asserted as facts, the evidence produced by the parties is largely undisputed, at least as to issues that are material.

## I.   Plaintiff's Evidence of Animus

### A.   SDPD Media Credentials

Plaintiff obtained press credentials, issued by the San Diego Police Department ("SDPD"), in 2007. (Decl. of James C. Playford and Edward A. Peruta ("PP Decl.")[2] ¶ 7.) In July 2008, Plaintiff filmed an incident between SDCSD deputies and Allen Baker outside a bar that he posted online. (*Id.* ¶ 9-10.) He also testified as a witness for Baker in Baker's criminal prosecution and in Baker's civil trial against the deputies.[3] Plaintiff says the deputies harassed and intimidated him not to testify, although there is no explanation of when or how. (*Id.* ¶ 11.) The *City* warned Plaintiff in August 2009 by letter that his press credentials were in danger of being revoked because the City had

---

[1] The Court does not consider the May 25, 2012 arrest because the Court found Plaintiff's First Amendment retaliation claim could not proceed on the basis of that arrest, made within a crime scene that Plaintiff alleged he defiantly refused to leave. (*See* September 17, 2014 Order at 8-9.)

[2] The Court notes that the declaration is combined for both Plaintiff and Peruta with specific paragraphs attributed to each and signed by both.

[3] Defendants accurately note that the civil case that Baker, and Plaintiff initially, brought against the deputies resulted in a verdict for the deputies. *Baker v. Cnty. of San Diego*, No. 09CV1194 BEN (WMC), Docket No. 75 (jury verdict in favor of deputies).

received information from SDCSD concerning Plaintiff's questionable recollection of facts in complaints and court actions.[4]  (*Id.* ¶ 13.)  The letter cited a SDPD policy indicating media credentials could be revoked if the holder refused to follow an order from police or fire department personnel that interfered with an investigation.  (*Id.* ¶ 15.)  In October 2009, Plaintiff posted video of what Plaintiff describes as a makeshift brothel in McGonigle Canyon that the SDPD, not the SDCSD, had denied existed.  (*Id.* ¶¶ 119.)  Plaintiff's media credentials were not renewed in January 2010.

**B.     Plaintiff's Photograph**

Caldwell testified that she provided the lobby deputies at the Sheriff's Administrative Center a photograph of Plaintiff out of concern for deputy safety.  (Caldwell Dep. at 66:2-9.)  Caldwell was not directed by her supervisors to provide the photo. (*Id.* 68:21-25; Decl. of Jan Caldwell ¶ 3.)  She indicates it was based on her own and on others' interactions with Plaintiff in which he was aggressive, argumentative, and caustic.  (*Id.* 67:8-68:17.)  With the exception of the funeral noted below, Caldwell indicates she did not disseminate the photograph beyond the lobby deputies and instructed them no further than letting them know the photograph was being provided for deputy safety.  (Caldwell Dep. 71:9-25; 72:22-73:6; Caldwell Decl. ¶ 4; Supplemental Decl. of Jan Caldwell ("Supplemental Caldwell Decl.") ¶ 2.)  That building was of specific concern because Plaintiff came in frequently.  (Caldwell Dep. at 72:1-8.)  A photograph was provided to the Miramar base in 2015 (not to deny access, but just to be aware of who he was) when a funeral for the former Sheriff was being held there.  (*Id.* 74:12-24.)

The parties dispute when Caldwell provided a photograph of Plaintiff to the lobby deputies.  In her deposition, taken in March 2016 Caldwell initially indicates that she

---

[4] At some point in time, Caldwell contacted the SDPD public information officer about Plaintiff and his behavior, (Dep. of Jan Caldwell ("Caldwell Dep.") 40:9-41:3), however, it is unclear if this was the same contact referenced in the August 2009 letter.

3

provided a photograph "a few years ago." (*Id.* 65:9-12.) When asked for a more specific time, she indicates she does not remember. (*Id.* 65:21-66:1.) In her Declaration in support of Defendants' Motion, she indicates she provided the photograph to the front desk out of security concerns on May 31, 2012, shortly after Plaintiff's arrest in a multiple-fatality accident scene on May 25, 2012 and his increasingly aggressive behavior. (Caldwell Decl. ¶ 4.) In Opposition, Plaintiff relies on his Declaration that he took a picture of a photograph of him at the Sheriff's Administrative Center in 2009-2010 with a handwritten note stating "Per Jan Caldwell, J.C. Playford is no longer 'Media.'" (PP Decl. ¶ 23.) He also indicates in a different paragraph of his Declaration that the photograph was provided in 2010 when his media credentials were not renewed. (*Id.* ¶ 21.) The picture he took was included in a March 30, 2011 *examiner.com* article. (*Id.* ¶ 24.) However, after reviewing that photograph, submitted in opposition to the Motion, Caldwell indicates that it is not the photograph she provided, she does not recognize that photograph, and she does not know who provided it. (Supplemental Caldwell Decl. ¶ 1.) Caldwell attached a copy of the email she sent with Plaintiff's photograph on May 31, 2012 to her Supplemental Declaration.

## II.   Arrests

### A.   February 28, 2010

The following summary of events on February 28, 2010 is based primarily on the Declaration of Deputy Thomas Seiver. (Decl. of Thomas Seiver ("Seiver Decl.").) Any variations or particular points raised by Plaintiff are included; however, the facts of the February 28, 2010 encounter are largely undisputed. Seiver was standing on the shoulder of a road between two patrol cars with Deputy Jason Ward and was attempting to interview an individual who had been brandishing a handgun at a residence in Ramona. (Seiver Decl. ¶¶ 2-3). As the interview began, Plaintiff began yelling from across the street while holding a video camera. (*Id.* ¶ 3.) The deputies tried to ignore him, but the individual being interviewed became nervous, began focusing on Plaintiff, and stopped

responding to Seiver's questions. (*Id.*) Plaintiff then crossed the street and approached one of the patrol cars. (*Id.*) Seiver asked him to move away several times. (*Id.*) Plaintiff initially moved away a little, however, he returned to the same spot within a couple of minutes. (*Id.*) At this point, Seiver had to stop the interview because the individual was so upset that Plaintiff was there. (*Id.* ¶¶ 3-4.) Plaintiff was hostile and acting irrational. (*Id.* ¶ 4.) Seiver again asked him to move back so he could complete the interview. (*Id.*) After arguing with Seiver for several minutes, Plaintiff refused to move. (*Id.*) Seiver moved toward Plaintiff and directed him to move back. (*Id.*) Plaintiff eventually did, but continued yelling at the deputies and the individual as they attempted to complete the interview. (*Id.*) Seiver did not stop Plaintiff from filming. (*Id.* ¶ 5.)

Plaintiff largely does not dispute these facts. He adds that the deputies did not demand that the individual being interviewed be interviewed in a non-public area and that the area was not cordoned by law enforcement. (PP Decl. ¶ 32.) Plaintiff additionally declares that Ward observed that the nearest Plaintiff came to Seiver was 10-15 feet.[5] (PP Decl. ¶ 31.) He also emphasizes, consistent with Seiver's declaration, that he was not arrested at the scene. (PP Decl. ¶ 34; Seiver Decl. ¶ 6.)

After reviewing his audio recording of the event, Seiver requested a warrant for violation of Penal Code § 148 — delaying or obstructing an officer. (Seiver Decl. ¶ 6.) Seiver specifically indicates in his Declaration that he requested the warrant because he believed Plaintiff had obstructed and delayed his investigation and the arrest was not in retaliation for anything.[6] (*Id.* ¶¶ 6, 10.) He also indicates that he was not directed by

---

[5] This is not entirely accurate. Deputy Ward's report of his observations was that Plaintiff was approximately ten feet from him. (PP Decl., Ex. 6.) The witness statements in the report indicate those witnesses observed Plaintiff within 10-15 feet from the deputies and 15 feet from the witness. (*Id.*) As Plaintiff is the non-moving party, the Court will assume that Plaintiff came within 10-15 feet of the deputies.

[6] Plaintiff's Third Amended Complaint ("TAC") alleges that Seiver arrested him, in part, because Plaintiff filed an Internal Affairs complaint against Seiver over this interaction. However, in moving for summary judgment Defendants produced evidence that no Internal Affairs complaint was ever filed by

5

anyone to make the arrest. (*Id.* ¶ 10.) Caldwell similarly indicates that she never gave any direction to deputies regarding Plaintiff's arrests nor did Gore give her any direction regarding Plaintiff. (Caldwell Decl. ¶ 3; Supplemental Caldwell Decl. ¶ 3.)

In a trial consolidated with another § 148 charge for the March 9, 2010 arrest, discussed below, the jury deadlocked. (Def.'s Notice of Lodgment, Ex. D, [ECF No. 95-7 at 74].) Plaintiff then pleaded no contest to disturbing the peace, California Penal Code § 415(2). (Ex. D [ECF No. 95-7 at 81].)

### B.     March 9, 2010

On March 9, 2010, Seiver was speaking to a woman in an Albertson's parking lot in Ramona who was suicidal and threatening to kill others. (*Id.* ¶ 7.) She was mentally disturbed and Seiver was trying to determine if she needed to be taken into custody pursuant to Welfare and Institutions Code § 5150. (*Id.*) Seiver was trying to get her into the patrol car voluntarily to avoid the use of force. (*Id.*) She had agreed to go to the patrol car, but as they walked that way, she commented that she did not want her picture taken. (*Id.*) Plaintiff was filming them and asking her questions. (*Id.*) As they got closer, Seiver told Plaintiff to stay back. (*Id.*) The woman was getting angry and said she was going to grab the camera. (*Id.*) Plaintiff refused to move out of the way, started arguing with Seiver, and advanced toward them. (*Id.*) Seiver told him to get back several times, but when he was about 10 feet away, the woman screamed and charged at Plaintiff. (*Id.*) Seiver put himself between them and another deputy had to get control of the woman. (*Id.*) After the deputies calmed down the woman and had placed her in the patrol car, Plaintiff was arrested for violating Penal Code § 148. (*Id.* ¶ 9.) As with the prior arrest, Seiver indicates that he did not prevent Plaintiff from filming, he arrested him based on his conduct at the scene, the arrest was not in retaliation for anything, and

---

Plaintiff against Seiver. (Declaration of Jeff Duckworth ¶¶ 2, 6.) Plaintiff does not dispute this in his Opposition.

he was not directed by anyone to make the arrest. (*Id.* ¶¶ 9-10.) Again, Plaintiff does not dispute these facts in any way. He says he did not interfere, but does not dispute Seiver's version of the interaction. (PP Decl. ¶ 39.) Additionally, Plaintiff notes, as with the prior incident, the interview was taking place in a public area. (*Id.* ¶ 36.)

As noted above, this charge was consolidated with the charge for the February 28, 2010 incident. After the jury deadlocked, Plaintiff pleaded no contest to disturbing the peace.

### C. December 1, 2011

On December 1, 2011, Deputy Brendan Cook encountered Plaintiff at the site of a bomb threat at the Vista office of a Congressman, where Cook was helping evacuate people and maintain a safe perimeter. (Def.'s Request for Judicial Notice, Ex. A, 1-53, 1-56-57.) One of the people Cook was evacuating pointed out Plaintiff and said that he had been with protesters earlier (there had been a protest earlier in the day) and that Plaintiff was in the building right before the bomb threat. (*Id.* 1-58.) Cook observed Plaintiff walking at a hurried pace towards the perimeter wearing jeans covered with grease and oil. (*Id.* 1-59.) This concerned Cook because, according to Cook, building bombs could involve getting dirty. (*Id.*) At the time Cook encountered him, Plaintiff had walked within the perimeter past at least one patrol car. (*Id.*) He was filming with a hand-held camera intermittently. (*Id.* 1-60-61.) Cook told Plaintiff he needed to stop and back out of the perimeter. (*Id.* at 1-60) Plaintiff began arguing with Cook, but did back out. (*Id.*)[7] Cook then tried to talk to him, but Plaintiff refused to give his name after being asked numerous times. (*Id.* 1-61.)

---

[7] Cook indicated that Plaintiff had progressed passed at least one patrol car that was serving as a perimeter and may have passed a second. Plaintiff declares that he did not "progress[] beyond the established motor vehicle detour point or yellow police-tape cordoned boundaries." (PP Decl. ¶ 45.) These versions are not necessarily in conflict and even if they are, the dispute is not material because Plaintiff did back out of the perimeter and the encounter with Cook proceeded outside the perimeter. (Ex. A at 1-60.)

1    Plaintiff was not detained or arrested at this point.  However, Cook became
2 concerned that Plaintiff might be trying to detonate a bomb because he was holding up
3 his cell phone and the camera and aiming both at the doors where the bomb was
4 suspected to be located.  (*Id.* 1-63-64.)  Plaintiff does not dispute this is what he did, but
5 emphasizes that there were other individuals in the vicinity that were using cell phones.
6 (PP Decl. ¶¶ 46, 48.)  Cook told Plaintiff to "hang up" the phone four or five times and he
7 did not.  (*Id.* 1-65.)  Cook then took Plaintiff's phone and closed it, took his camera and
8 put it down, detained Plaintiff, and asked Plaintiff to sit on the ground.  (*Id.* 1-65-66)
9 Plaintiff refused to answer whether he was carrying any weapons and was yelling and
10 screaming at Cook.  (*Id.*)  Eventually, after Plaintiff refused numerous requests to sit
11 down, Cook physically sat him down and put him in handcuffs.  (*Id.* 1-66, 1-68.)
12 Plaintiff continued to refuse to provide answers such as his name, his reason for being
13 there, whether he was carrying weapons, and whether he was going to detonate a bomb.
14 (*Id.* 1-68.)  When Cook explained that he took Plaintiff's cell phone because he was
15 worried Plaintiff was detonating a bomb, Plaintiff began screaming and yelling that Cook
16 was crazy, but still did not indicate who he was or why he was there.  (*Id.* 1-69.)

17    At some point Plaintiff said he was a reporter with a news station and asked people
18 in the crowd to call the news station.  (*Id.* 1-69-70.)  When Cook asked if he was a
19 reporter, Plaintiff refused to answer.  (*Id.* 1-71.)  Cook had no idea who Plaintiff was
20 before this encounter and had not been briefed about him.  (*Id.* 1-77.)  According to
21 Edward Peruta, President of American News, Cook contacted him to verify Plaintiff's
22 media status and Peruta verified Plaintiff was issued media credentials by American
23 News.  (PP Decl. ¶¶ 49-50.)

24    Cook had to call in other units from evacuation and perimeter responsibilities to
25 assist Cook with Plaintiff.  (*Id.* at 1-74.)  Cook was the only law enforcement personnel
26 on the west perimeter at that time.  (*Id.* 1-66, 1-71.)
27 ///

1  At trial, Plaintiff argued a First Amendment defense — that he did not do anything
2  wrong because everything he did was protected by the First Amendment and Cook was
3  not lawfully performing his duties when he detained and arrested Plaintiff.  (*Id.* 2-82-89.)
4  Plaintiff was found guilty of violating § 148(a)(1) by a jury.  (Def.'s Ex. B, ECF 95-7 at
5  3.)  Plaintiff raised his First Amendment rights on appeal as well.  (Def.'s Ex. C,
6  Appellant's Brief.)  His conviction was unanimously affirmed.  (*Id.* 051.)

## DISCUSSION

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . .  The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).  However, the inferences that may be drawn are not limitless.  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 632 (9th Cir. 1987).  Inferences must be based on specific facts and only "'rational' and 'reasonable'" inferences may be drawn.  *Id.*; *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989).

A moving party bears the initial burden of showing there are no genuine issues of material fact.  *Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007) (citing *T.W. Elec. Serv., Inc.*, 809 F.2d at 630).  The moving party can do so by negating an essential element of the non-moving party's case, or by showing that the non-moving party failed to make a showing sufficient to establish an element essential to that party's case, and on which the party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986).  The burden then shifts to the non-moving party to show that there is a genuine issue for trial.  *Horphag Research Ltd.*, 475 F.3d at 1035.

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. As a general rule, the "mere existence of a scintilla of evidence" will be insufficient to raise a genuine issue of material fact; there must be evidence on which the jury could reasonably find for the non-moving party. *Id.* at 252. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.*, 477 U.S. 327 (quoting Fed. R. Civ. P. 1).

## I. First Amendment Retaliation

Plaintiff's First Amendment retaliation claim is premised on the idea that he was arrested at these scenes because he showed up at crime scenes and filmed deputies. But, the undisputed evidence establishes that he was not arrested in retaliation for filming these events or because the SDCSD, or Gore, or Caldwell was retaliating against him for other times he was filming. He was arrested for interfering with these deputies' ability to investigate and respond to dangerous situations and crimes, not for filming.[8]

"In order to establish a claim for retaliation in violation of the First Amendment, [a plaintiff's] evidence must demonstrate that the [defendants]' conduct would chill a

---

[8] The Court notes that Penal Code § 148, the statute Plaintiff was charged with violating, was recently amended to add a subsection (g). It provides:
> The fact that a person takes a photograph or makes an audio or video recording of a public officer or peace officer, while the officer is in a public place or the person taking the photograph or making the recording is in a place he or she has the right to be, does not constitute, *in and of itself*, a violation of subdivision (a), nor does it constitute reasonable suspicion to detain the person or probable cause to arrest the person

Cal. Penal Code § 148(g) (emphasis added). Based on the undisputed evidence of the events leading to Plaintiff's arrests, he was not arrested for filming "in and of itself." *Id.* He was arrested for defying deputies' directions to back away and get out of the way because his conduct was preventing them from doing their jobs — interviewing an individual about a crime, securing a potentially mentally ill individual without the use of force, and securing a bomb threat location.

person of ordinary firmness from future First Amendment activity." *Ford v. City of Yakima*, 706 F.3d 1188, 1193 (9th Cir. 2013) (citing *Skoog v. Cnty. of Clackamas*, 469 F.3d 1221, 1231-32 (9th Cir. 2006)). "In addition, the evidence must enable [a plaintiff] ultimately to prove that the [defendant's] desire to chill his speech was a but-for cause of their allegedly unlawful conduct." *Id.* (citing *Lacey v. Maricopa Cnty.*, 639 F.3d 896, 916-17 (9th Cir. 2012)).

### A. Causation

The absence of causation as to Gore and Caldwell is dispositive. It is a narrow issue because this Motion only concerns Gore and Caldwell. The Court must determine whether Plaintiff has put forth evidence that Gore or Caldwell retaliated against him for engaging in First Amendment activities. There is no evidence that Gore or Caldwell directed, encouraged, or otherwise had anything to do with any of Plaintiff's arrests.

The only evidence of Caldwell's involvement is that she provided a photograph of Plaintiff to the lobby deputies at the Sheriff's Administrative Center. This is insufficient in numerous respects. First, the evidence reflects that Caldwell did not provide a photograph of Plaintiff until 2012, after all of his arrests. Caldwell had never seen the photograph Plaintiff saw at the desk in 2010 and did not provide it. A photograph provided after Plaintiff's arrests cannot show retaliatory animus for his arrests. Second, even if the Court assumes Caldwell did deliver the photograph in 2010, it only indicates Plaintiff was no longer considered "media," consistent with his media credentials not being renewed. This single photograph, observed only at this location, is not sufficient to infer that Caldwell directed or encouraged Plaintiff's arrests in retaliation for videotaping deputies. This is particularly the case when the arresting deputies indicate they arrested him only for interfering with their duties and not in retaliation for anything. Nor is it consistent with the deputies' responses to his videotaping at the first two arrests — he was never asked to stop filming. He was only asked to move further away as to the first and out of the way of a mentally ill individual being escorted to a patrol car as to the

second. There is no evidence as to Gore's involvement in any of Plaintiff's arrests or that he otherwise had any involvement in any matters related to Plaintiff.

No reasonable juror could find from the undisputed facts that Caldwell or Gore was the but-for cause of Plaintiff's arrests.

### B. Probable Cause and Retaliatory Motive

When there is "very strong evidence of probable cause and very weak evidence of retaliatory motive," a First Amendment retaliation claim cannot survive summary judgment. *Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 901 (9th Cir. 2008) (distinguishing *Skoog*, 469 F.3d at 1231 (finding a First Amendment retaliation claim could proceed despite probable cause for arrest when evidence of probable cause was weak and evidence of retaliatory motive was strong)). As the Ninth Circuit has explained, if such claims could survive summary judgment, "nearly every retaliatory First Amendment claim would survive summary judgment [because] there is almost always a weak inference of retaliation whenever a plaintiff and a defendant have had previous negative interactions." *Id.*

Plaintiff's evidence of retaliatory motive is weak because it the inference is based on nothing more than previous negative interactions, most of which have no connection to Gore or Caldwell. Plaintiff's media credentials were not renewed by SDPD. Neither Gore nor Caldwell issued or revoked Plaintiff's SDPD media credentials. Plaintiff himself points to his reporting of a brothel SDPD had claimed did not exist as a motive for retaliation, but there is no evidence connecting that to Gore or Caldwell. Similarly, there is no evidence connecting Caldwell or Gore to SDPD's reference to SDCSD in its August 2009 letter. Caldwell contacted SDPD at some point about Plaintiff's credentials, but there is no evidence connecting that contact to SDPD's warning letter. As to the lobby photograph of Plaintiff, as explained above, even if the Court assumes Caldwell did provide a photograph of Plaintiff to the lobby deputies in 2010, there is no evidence it was disseminated any further by Caldwell or Gore, or anyone else, and particularly not to

the arresting deputies. Additionally, assuming there was some connection between Gore or Caldwell and Plaintiff's arrests, the evidence of retaliatory motive is weakened further by the fact that Plaintiff was never stopped from filming during the February 28 and March 9 incidents and was only stopped at the third incident because the deputy thought he might be trying to detonate a bomb.

There is strong evidence of probable cause for each arrest. As to the first arrest, Plaintiff interfered with Seiver's efforts to interview an individual about a crime. His conduct was distracting the individual being interviewed to the point that the individual stopped responding to Seiver's questions. Seiver had to stop the interview numerous times to direct Plaintiff away. Plaintiff defied Seiver's directions to move further away, returning within a couple minutes to the same spot. Plaintiff seems to claim that his interference was the deputies' fault because they failed to demand that the interview be completed in a non-public place. Although Plaintiff's obstruction and delay of the deputies might be even clearer if he had been in a cordoned-off or non-public area, his interference, as it was, provided probable cause for his arrest.

As to the second arrest, Plaintiff clearly ignored Seiver's directive to get out of the way as the deputy tried to move a suicidal individual threatening to kill others into a patrol car without using force. Instead, Plaintiff advanced as Seiver directed him back. Plaintiff's advance aggravated the unstable individual. Again, Seiver did not attempt to stop Plaintiff from filming. Plaintiff had advanced within ten feet when the suicidal individual charged Plaintiff, requiring the physical altercation Seiver was attempting to avoid. Again, Plaintiff notes it was a public parking lot, but in this instance, Seiver was trying to persuade the suicidal individual into a patrol car, the sort of non-public space Plaintiff suggests is a prerequisite for his conduct to have actually delayed or obstructed an officer performing his duties.

///

///

As to the third arrest, Plaintiff was convicted of the crime for which he was arrested. In California, a conviction is conclusive evidence of probable cause.[9] *Plumley v. Mockett*, 164 Cal. App. 4th 1031, 1052 (2d Dist. 2008). The facts of the arrest only strengthen the evidence of probable cause. The Court will not repeat the facts laid out above, but Plaintiff defied the directions of a deputy evacuating people and attempting to secure a perimeter for a bomb threat. The deputy was concerned Plaintiff might be attempting to detonate a bomb. Plaintiff's only basis to dispute probable cause for this arrest is that other people were using cell phones too. However, other people had not been pointed out as being of concern by an evacuating individual and other people were not aiming their cell phone and camera directly at the location where the bomb was suspected to be.

The Court does not discount that Plaintiff has had negative interactions with SDCSD. However, as described above, there is strong evidence of probable cause and weak evidence of retaliatory motive by Gore or Caldwell. "[H]olding that this case survives summary judgment would provide almost no 'protection for government officials from the disruption caused by unfounded claims.'" *Dietrich*, 548 F.3d at 901 (citing *Skoog*, 469 F.3d at 1232).

Additionally, Plaintiff's claim is barred as to the third arrest by *Heck v. Humphrey*, 512 U.S. 477 (1994). Under *Heck,* a plaintiff cannot "recover damages for [an] allegedly

---

[9] The Court does not address the implications of Plaintiff's no contest plea for evaluating probable cause because Defendants failed to address it. In Opposition, Plaintiff emphasized he did not plead guilty as represented by Defendants, but rather, pleaded no contest as to the first two arrests and argued California Penal Code § 1016 prohibits the use of a nolo contendere plea for a non-felony in civil suits. Defendants did not address this issue. However, the Court notes that Plaintiff's indignation at the suggestion he pleaded guilty is misplaced. While the Court agrees he pleaded no contest based on the undisputed record, the confusion is of Plaintiff's own making. The Amended Complaint, Second Amended Complaint, and TAC all allege he "*pleaded guilty* to disturbing the peace." (AC ¶ 99; SAC ¶ 103; TAC ¶ 98 (emphasis added).) And more significantly, Plaintiff's Declaration filed in support of his Opposition to this Motion states, "I . . . accepted the plea bargain, and *pleaded guilty* to disturbing the peace." (PP Decl. ¶ 42 (emphasis added).)

unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid" unless the conviction has been reversed, expunged, or declared invalid. 512 U.S. at 486-87. In short, the Court "must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction." *Hooper v. Cnty. of San Diego*, 629 F.3d 1127, 1130 (quoting *Heck*, 512 U.S. at 487). "If the answer is yes, the suit is barred." *Id.* Here, a judgment in favor of Plaintiff based on the third arrest would necessarily imply the invalidity of his conviction because the facts asserted at his trial, including that other people were using cell phones is the same. Plaintiff raised a First Amendment defense at trial and the First Amendment was the basis for his unsuccessful appeal of his conviction. If the Court were to find that Plaintiff's arrest was in retaliation for his First Amendment activities rather than for his violation of the law, it "would necessarily imply the invalidity of his conviction." *Id.*

The Court grants summary judgment to Caldwell and Gore on Plaintiff's claim for First Amendment retaliation.

## II.     Failure to Train

The failure to train claim is asserted against Gore and the County. Plaintiff's Opposition does not address the failure to train claim, however, the Court may not grant summary judgment by default. *Heinemann v. Satterberg*, 731 F.3d 914, 917 (9th Cir. 2013). "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizen's rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."). The "failure to train . . . must amount to 'deliberate indifference to the rights of persons with whom the untrained employees come into contact.'" *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Under this standard, a municipal actor would have to be on notice of "an

omission in their training program that causes . . . employees to violate citizens' constitutional rights." *Id.* Generally, a pattern of similar violations is necessary because the conduct does not rise to the level of deliberate indifference unless the decisionmakers have notice of the deficiency and elect not to do anything. *Id.* at 62.

Here, there is no evidence of any constitutional violation, certainly not a pattern of constitutional violations, that would provide notice of a deficiency in training. Plaintiff's pleas and convictions for each of his arrests would also suggest that there are no constitutional violations taking place, *i.e.* to the extent Plaintiff's arrests could provide notice of a deficiency, it is dispelled by his pleas and convictions on those arrests. Additionally, the only evidence in the record as to training does not reflect a deficiency. Seiver indicated in his declaration that he knows *based on his training* that law enforcement activities in public are subject to being filmed and he has never prevented anyone from filming him in the performance of his duties. (Seiver Decl. ¶ 11.) Cook indicated anyone can film as long as they are outside the perimeter. (Ex. A at 1-63.) The only evidence in the record on training does not suggest any deficiency.

The Court grants summary judgment to Gore and the County on Plaintiff's claim for failure to train.

## CONCLUSION

The Motion is **GRANTED**. The Court grants summary judgment to Defendants Gore, Caldwell, and the County on Plaintiff's remaining claims for First Amendment retaliation and failure to train.

**IT IS SO ORDERED.**

Dated: April 28, 2016

Hon. Roger T. Benitez
United States District Judge